# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| VIRGINA HUDDLESTON & DARRYL WILSON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CASE NO: 1:26-CV-00212-WS-M |
| PAUL BURCH, et. al. | ) ) | |
| Defendants. | ) ) ) ) ) ) | |

## DEFENDANTS BAYOU LA BATRE HOUSING AUTHORITY, AND PAUL BURCH, JOHN WAYNE HATCHER, MICHAEL BURDINE, DEBRA JONES, STEPHANIE GODSEY, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES AS BOARD MEMBERS OF THE BAYOU LA BATRE HOUSING AUTHORITY'S MOTION TO DISMISS

COME NOW, Defendants, Bayou La Batre Housing Authority and Paul Burch, John Wayne Hatcher, Michael Burdine, Debra Jones, Stephanie Godsey in their individual and official capacities as board members of the Bayou La Batre Housing Authority (collectively "Moving Defendants"), and respectfully file this Motion to Dismiss for failure to state a claim upon which relief can be granted. In support thereof, Defendants state as follows:

## INTRODUCTION

Plaintiffs' lawsuit concerns alleged issues with the search of the home of Plaintiffs Darryl Wilson and Virginia Huddleston, a grand jury's indictment of Plaintiff Huddleston,

1

3661769.1

the warrant issued for her arrest, her arrest, and her prosecution. (Doc. 1, Ex. A). Plaintiffs bring ten counts: False arrest, False imprisonment, Malicious Prosecution, Violation of Civil Rights, Violation of Civil Rights – False Arrest, Violation of Civil Rights – False Imprisonment, Violation of Civil Rights, Deprivation of Property, Violation of Civil Rights – Equal Protection, Violation of Civil Rights – Conspiracy to Interfere with Civil Rights, and Conversion. *Id.* Additionally, Plaintiffs bring an additional count against fictitious parties. *Id.*

The Moving Defendants who bring this Motion are the Bayou La Batre Housing Authority and Paul Burch, John Wayne Hatcher, Michael Burdine, Debra Jones, and Stephanie Godsey in their individual and official capacities as board members of the Bayou La Batre Housing Authority. Defendant Paul Burch is a part of this Motion solely as it relates to his role individually and as a member of the Bayou La Batre Housing Authority. He is not a part of this Motion as it relates to his role as Sheriff of Mobile County. Moving Defendants John Wayne Hatcher and the Bayou La Batre Housing Authority have not been served. Undersigned counsel are appearing specially on their behalf and reserve all defenses with regard to service of process as set forth in *Federal Rules of Civil Procedure* 4, 5, & 12.

As explained below, all claims Plaintiffs bring against these Defendants fail as a matter of law and are barred by the doctrines of *res judicata* and laches. As such, they should be dismissed pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure.*

2

3661769.1

## LEGAL STANDARD

A motion to dismiss a complaint pursuant to *Federal Rule of Civil Procedure* 12(b)(6) is proper if the plaintiff has failed to state a claim upon which relief may be granted. "To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347-48 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Stated another way, the factual allegations in the complaint must be sufficient to 'raise a right to relief above the speculative level.'" *Jones v. City of Birmingham*, No. 2:25-cv-995-EGL, 2026 U.S. Dist. LEXIS 31681, at *3 (N.D. Ala. Feb. 17, 2026) (quoting *Twombly*, 550 U.S. at 555).  This requirement mandates "more than an unadorned, the-defendant unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## BACKGROUND

In 2007, the City of Bayou La Batre received approximately $15.7 million in federal grant funds to purchase affordable housing for those displaced by Hurricanes Katrina and Ria. (Doc. 1, Ex, A, ¶ 15). The following year, the BLBHA was founded pursuant to ALA. CODE § 24-1-20 as a public housing authority to oversee and manage the affordable housing complex.

3

3661769.1

Pursuant to the BLBHA's Articles of Incorporation, the BLBHA's objectives were to address the housing needs of the City of Bayou La Batre, Alabama, and to organize, own, manage, or otherwise provide for housing and housing projects for the citizens of the City of Bayou La Batre.

As an incorporated Housing Authority under ALA. CODE § 24-1-20, the BLBHA is managed by five commissioners appointed by the Mayor of Bayou La Batre. ALA. CODE § 24-1-24. Paul Burch, Johnny Hatcher, Michael Burdine, Debra Jones, and Stephanie Godsey were legally appointed and served as Board Members of the BLBHA.

The BLBHA, via its Board, owns, operates, and manages a residential housing complex called "Safe Harbor." Safe Harbor provides housing assistance to low and moderate-income families.

In May of 2013, Plaintiff Huddleston was hired to serve as the Executive Director of the BLBHA. (Doc. 1, Ex. A, ¶ 16). Plaintiff Wilson was hired to serve as the facilities manager later that same year.

Over the course of Plaintiffs' employment by the BLBHA, they were allegedly provided numerous lucrative contracts and contract addenda. (Doc. 1, Ex. A, ¶ 17-18). In addition to their lucrative salaries and job benefits, the Plaintiffs were each provided with $50,000 in retirement pay, despite not being retired, and $25,641 each to pay their personal income taxes. (Doc. 1, Ex. A, ¶ 18).

Ultimately, Plaintiff Huddleston allegedly was provided a contract and addenda that provided retirement pay of $100,000 per year, with an annual 2% costs of living increase for the remainder of her life (which would be $100,000 for 2020, $102,000 for 2021,

4

3661769.1

$104,040 for 2022, $106,120.80 for 2023, $108,243.22 in 2024, $110,408.08 in 2025, $112,616.24 in 2026, etc.) and a lump sum payment of $2,521,359.00. Plaintiff Wilson allegedly was provided a contract and addenda that provided retirement pay of $70,000 per year, with an annual 2% costs of living increase for the remainder of his life (which would be $70,000 in 2020, $71,400 in 2021, $72,828 in 2022, $74,284.56 in 2023, $75,770.25 in 2024, $77,285.66 in 2025, $78,831.37 in 2026, etc.) along with a lump sum payment of $1,661,412.00. In total, Plaintiffs Huddleston and Wilson alleged contracts and addenda provide them with a current amount of $5,446,599.18.[1]

When the astronomical financial terms Plaintiffs' contracts and addenda allegedly provided were discovered, litigation ensued. The BLBHA filed suit on December 14, 2020. *Bayou La Batre Housing Authority v. Virginia Huddleston, Darryl Wilson, et. al*, 02-cv-2020-902475 Circuit Court of Mobile County, Alabama ("First Suit")[2]. The BLBHA argued, among other claims, that Huddleston and Wilson's contracts and addenda were unconscionable and unenforceable. Huddleston and Wilson filed an answer and a counterclaim asserting a breach of contract claim against the BLBHA. (Ex. A).

In 2022, Plaintiff Huddleston was indicted by 14 grand jurors in Mobile County, Alabama, on the charge of theft. (*See* Ex. B, Grand Jury Indictment[3] and Doc. 1, Ex. A, ¶

---

[1] This is alleged in the Counterclaim Huddleston and Wilson filed in the first suit that is attached as Exhibit A to this Motion.

[2] This Court may take judicial notice pursuant to FED. R. EVID. 201(b) of this prior lawsuit. *See also Kerruish v. Essex Holdings, Inc.*, 777 Fed. Appx. 285, 293 (11th Cir. 2019)(holding a court can take judicial notice of federal and state court records).

[3] This Court may take judicial notice pursuant to FED. R. EVID. 201(b) of the grand jury indictment and corresponding warrant for the purpose of recognizing the judicial action taken. *Olmstead v. Humana, Inc.*, 154 Fed. Appx. 800, 803 n. 3 (11th Cir. 2005)

3661769.1

22). Pursuant to the grand jury's indictment, a warrant was issued for her arrest. (Ex. C, Warrant). She was arrested on May 27, 2022.

Following her arrest, on September 29, 2022, Huddleston and Wilson filed an answer, an amended counterclaim, and a third-party complaint against the BLBHA, Stephanie Godsey, Debra Jones, Paul Burch, Michael Brudine, and John Hatcher, among others, in the First Suit. (Ex. D, Second Counterclaim) On November 10, 2022, Huddleston and Wilson filed a third counterclaim and third-party complaint. (Ex. E, Third Counterclaim). A fourth counterclaim and third-party complaint was filed on December 7, 2022. (Ex. F, Fourth Counterclaim). The claims asserted in the counterclaims and third-party complaint are substantially similar to the ones Plaintiffs Huddleston and Wilson now assert in this matter. Additionally, the issues and parties involved in this prior suit are identical to the ones Plaintiffs Huddleston and Wilson now assert.

In response to the multiple counterclaims and third-party complaints, the BLBHA and the Board Members filed Motions to Dismiss. The various counterclaims and third-party complaints were dismissed on February 14, 2023. All claims now asserted against the present Defendants were dismissed in the First Suit.

Now, nearly four years after Plaintiff Huddleston's arrest and after having already brought the instant claims in state court, Plaintiffs have filed this suit. Simply put, Plaintiffs have re-alleged substantially the same claims against the same Defendants, just four years later.

In the First Suit, discovery has closed, and Motions for Summary Judgment have been filed. Oral argument was held on June 22, 2026. The BLBHA is hopeful that an Order

6

3661769.1

will be entered resolving the First Suit prior to the Fourth of July. It has been nearly six years since the First Suit was filed.

## LEGAL ARGUMENT

Plaintiffs' claims are due to be dismissed for two reasons. First, all claims alleged against Moving Defendants fail as a matter of law.  Second, all claims brought against the Moving Defendants are or will be barred by the doctrine of *res judicata* and laches and therefore fail to state a claim upon which relief can be granted. As detailed below, Moving Defendants respectfully request this Court dismiss *all* of Plaintiffs' claims pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure.*

### A. Plaintiffs' False Imprisonment and False Arrest Claims, Counts I & II, Fail as a Matter of Law.

Plaintiffs' False Imprisonment (Count I) and False Arrest (Count II) Claims are properly analyzed together because they are subject to the same analysis. The Alabama Supreme Court has been clear that a claim for false arrest or imprisonment cannot be maintained when the individual is arrested pursuant to a warrant. *Ennis v. Beason*, 537 So. 2d 17, 19 (Ala. 1988)(holding: "The law in Alabama is clear that a plaintiff is not entitled to recover for false arrest or imprisonment where he or she is arrested pursuant to a valid warrant issued by a lawfully authorized person. *Blake v. Barton Williams, Inc.*, 361 So. 2d 376 (Ala. Civ. App. 1978)"). Under such circumstances, "neither the arrest nor the subsequent imprisonment is 'false,' and, as a consequence, the complaining party's action must be one for malicious prosecution." *Blake,* 361 So. 2d at 378. If an individual is arrested and jailed under a warrant properly issued by a magistrate, a claim for false arrest

or imprisonment cannot be made. *Goodwin v. Barry Miller Chevrolet, Inc.*, 543 So. 2d 1171, 1176 (Ala. 1989).

Here, Plaintiff Huddleston was arrested pursuant to a grand jury indictment. (Ex. B & C). Plaintiffs admit this fact in Para. 22 of their Complaint. This indictment resulted in a warrant being issued for Plaintiff Huddleston's arrest. Plaintiff Huddleston was arrested pursuant to the warrant issued by a magistrate.

Because Plaintiff Huddleston was indicted and arrested pursuant to a magistrate's warrant, her claims for false imprisonment and arrest fail as a matter of law. Therefore, this Court should grant a dismissal of Count I & II for a failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure.*

**B.  Plaintiffs' Malicious Prosecution Claim, Count III, Fails as a Matter of Law.**

Malicious prosecution actions are not favored at law. *Alabama Power Co. v. Neighbors*, 402 So. 2d 958, 962 (Ala. 1981). In order for a plaintiff to prevail on a malicious prosecution claim, they must prove (1) a judicial proceeding was instigated by the defendants (2) without probable cause and with malice, and (3) the proceeding ended in the plaintiff's favor and (4) the plaintiff was damaged thereby. *Fina Oil & Chem. Co. v. Hood*, 621 So. 2d 253, 256 (Ala. 1993), *citing Lumpkin v. Cofield*, 536 So. 2d 62 (Ala. 1988).

In order for a plaintiff to establish the judicial proceeding was instigated without probable cause, a plaintiff has the "strict burden of proving a negative – i.e., the complete absence of a scintilla of probable cause..." *Eidson v. Olin Corp.*, 527 So. 2d 1283, 1285 (Ala. 1988). Further, "'[i]n malicious prosecution the general rule is that *the finding of an*

8

3661769.1

*indictment* by a grand jury against one charged with crime *is prima facie evidence of the existence of probable cause*, and that the acquittal of a defendant upon the trial does not tend to show a want of probable cause for believing him guilty of the offense charged when the arrest [was] made or prosecution initiated. . . .'" *Smith v. Wendy's of South, Inc.*, 503 So. 2d 843, 844 (Ala. 1987) *quoting Alabama Power Co. v. Neighbors*, 402 So. 2d 958, 967 (Ala. 1981)(italics in original). Additionally, neither an acquittal nor a decision to *nol pros* a case creates an inference that probable cause was lacking. *Alabama Power Co.,* 402 So. 2d at 967 (Ala. 1981).

First, Moving Defendants did not instigate the judicial proceeding against Plaintiffs. Plaintiffs allege, "[d]efendants did initiate a judicial proceeding against Plaintiff to wit: by charging her with 3rd degree felony theft." (Doc. 1, Ex. A, ¶ 41). Further, Plaintiffs allege, "[a]t all times, Defendants were acting under color of law, exercising authority given to them by the Mobile County Sheriff's Office." (Dox. 1, Ex. A, ¶ 44). Moving Defendants are a public housing authority and its Board Members. None of the Moving Defendants work for the Mobile County Sheriff's Office, let alone have the authority or ability to charge Plaintiffs with a felony.

Additionally, in a matter similar to the present one, *King v. Second National Bank & Trust Co. of Saginaw, Michigan*, a Plaintiff brought suit for malicious prosecution. 173 So. 498 (Ala. 1937). He had been charged with willfully and knowingly and without permission entering upon land, cutting down timber, and carrying the timber away. *Id.* at 499. An employee of the landowner reported the matter to the solicitor and to a grand jury.

9

3661769.1

*Id.* Thereafter, the Plaintiff was indicted and arrested, but ultimately acquitted. *Id.* Plaintiff then filed the malicious prosecution suit. *Id.*

The Court held that the law favors the prosecution of crimes such as larceny and that public policy demands a citizen may freely bring before a grand jury the fact that a crime has been committed, request an investigation, and furnish such information as he has in aid of the investigation. *Id.* In such a case, the citizen is not the prosecutor, but is simply aiding the tribunal in determining whether there is probable cause to believe a crime has been committed and the malicious prosecution claim fails. *Id.*

Here, the only Moving Defendant involved in the criminal proceeding of Plaintiff Huddleston was Johnny Hatcher. However, all Defendant Hatcher did was report a crime had been committed, request an investigation, and furnish such information that he possessed. As such, Defendant Hatcher cannot be the one deemed to have instigated the criminal proceedings against Plaintiff Huddleston. Under Alabama law, Plaintiffs' Complaint fails to allege sufficient facts that could meet the first element for malicious prosecution against Moving Defendants.

Additionally, Plaintiffs' Complaint fails to allege sufficient facts that show Moving Defendants lacked probable cause. As discussed, a grand jury indicted Plaintiff Huddleston, and a warrant was subsequently issued. This is prima facie evidence of probable cause, and the fact that the charges were *nol pros* on the day of trial has no bearing. *Smith v. Wendy's of South, Inc.*, 503 So. 2d 843, 844 (Ala. 1987). Plaintiffs have failed to allege any facts which would overcome this presumption.

10

3661769.1

Plaintiffs' claim for malicious prosecution fails as a matter of law. Even accepting Plaintiffs' allegations as true, Plaintiff cannot establish that Moving Defendants instigated the judicial proceedings against her. Further, Plaintiff Huddleston was arrested pursuant to a grand jury indictment, which establishes prima facie evidence of probable cause. As a result, Plaintiffs cannot also meet the third element. Therefore, this Court should grant a dismissal of Count III for a failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure.*

### C. Plaintiffs' Violation of Civil Rights Claims, Counts IV-IX, Fail as a Matter of Law.

First, it is unclear if these claims are even alleged against Moving Defendants. Plaintiffs allege throughout these counts that Defendants were acting "in their capacity as law enforcement with Mobile County Sheriff's Office" and that Defendants "were acting under the color of law" (Doc. 1, Ex. A, ¶ 50, 52, 61, 70, 80, 92, 100). As discussed, none of Moving Defendants are employed by the Mobile County Sheriff's Office. Further, none of Moving Defendants can act "under the color of law" as none have governmental authority.

It is well established that a claim under 42 U.S.C. § 1983 must involve state action to be valid. Specifically, "Section 1983 provides a remedy for persons alleging deprivations of their constitutional rights by government officials through action taken 'under color of state law.'" *Point Properties, Inc. v. Anderson*, 584 So. 2d 1332, 1336 (Ala. 1991). Further, there is no "'close nexus between the State and the challenged action' that seemingly

11

private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

Moving Defendants did not engage in "state action" to allow a claim under § 1983 to proceed against them. Additionally, there is no close nexus between the state and Moving Defendants such that Moving Defendants could be treated as the State. As there is no state action on the part of Moving Defendants, all of Plaintiffs' § 1983 claims against them fail as a matter of law. Therefore, this Court should grant a dismissal of Count IV-IX for a failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure.*

Additionally, all of Plaintiffs' § 1983 claims are barred by the applicable statute of limitations. "All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought." *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008). Here, Alabama imposes a two-year statute of limitations. *Lufkin v. McCallum*, 956 F.2d 1104, 1106 (11th Cir. 1992); see also Ala. Code Ann. § 6-2-38. Plaintiffs allege that the unlawful search, seizure, indictment, and arrest occurred between October 5, 2020 and May 27, 2022. (Doc. 1, Ex. A, ¶¶ 21-22). Plaintiffs did not file this action until 2026. Therefore, all of Plaintiffs' claims under § 1983 are barred by the applicable statute of limitations.

### D. Plaintiffs' Conversion Claim, Count X, Fail as a Matter of Law.

Plaintiffs base their claim for conversion on the facts that they owned "a cable battery charger, personal checkbooks, financial documents, a Bosch hammer drill, a Keurig coffee maker and a 35 mm Minolta camera, computer equipment, personal checkbooks,

12

3661769.1

fan and power tools, as well as other personal items that were seized during the search of their home on October 5, 2020" and that these items were not returned to them. (Doc. 28, ¶ 107 & 111). Specifically, Plaintiffs allege that following the charges being "Nolle Prossed," the items seized from their property were not returned to them. (Doc. 110, ¶ 110-111).

In order for a Plaintiff to prevail on a claim for conversion, the "plaintiff must establish that the defendant converted specific personal property to his own use and beneficial enjoyment or that the defendant destroyed or exercised dominion over property to which, at the time of the conversion, the plaintiff had a general or specific title and of which the plaintiff was in actual possession or to which he was entitled to immediate possession. *Schaeffer v.* Poellnitz, 154 So. 3d 979, 988 (Ala. 2014), *citing Rice v. Birmingham Coal & Coke Co.*, 608 So. 2d 713, 714 (Ala. 1992). Further, "the gist of the action is the <u>wrongful</u> exercise of dominion over property in exclusion or defiance of plaintiff's rights, where said plaintiff has general or special title to the property or the immediate right to possession." *Id. quoting Horne v. TGM Assocs., L.P.*, 56 So. 3d 615, 628 (Ala. 2010) (underline in original).

Here, Plaintiffs' claims against Moving Defendants fail as a matter of law as none of Moving Defendants converted Plaintiffs' property to their own use, destroyed Plaintiffs' property, or exercised dominion over Plaintiffs' property. As Plaintiffs' Complaint makes clear, their property was taken when the Mobile County Sheriff's Department conducted a search of their premises. As a result of this search, several items were taken. The Mobile County Sheriff's Department then retained those items while the criminal charges against

13

3661769.1

Plaintiff Huddleston proceeded. Following the decision to *nol pros* the charges, Plaintiffs complain the items were not returned to them.

None of the Moving Defendants can be found liable for conversion, as they were not the individuals or entities who took possession of Plaintiffs' property and failed to return it to them. As discussed, Moving Defendants are a public housing authority and said Housing Authority's Board Members. None of Moving Defendants obtained possession, kept, stored, or allegedly lost Plaintiffs' property. As such, Plaintiffs' claims for conversion fail as a matter of law and are due to be dismissed against Moving Defendants.

### E. All of Plaintiffs' Claims are Barred by *Res Judicata.*

Under Alabama law, *res judicata* bars the relitigation of all claims and matters that were or could have been litigated in a previous lawsuit. *Century 21 v. Alabama Real Estate Comm'n*, 401 So. 2d 764, 768 (Ala. 1981). The underlying rationale for this rule is that "[a] party . . . is not at liberty to split up his demand and prosecute it by piecemeal, or present only a portion of the grounds upon which special relief is sought, and leave the rest to be presented in a second suit, if the first fails. There would be no end to litigation if such a practice were permissible." *Id*. at 768, *citing Baltimore Steamship Co. v. Vernon Phillips,* 274 U.S. 316 (1927). Under *res judicata*, "a prior judgment bars later actions on all questions falling within the scope of the original action, including those which could have been litigated by exercising due diligence. *Sullivan v. Walther Builders, Inc.*, 495 So. 2d 655, 656-657 (Ala. 1986). If a court determines the claims made in a present litigation "were, or could have been, raised in the prior litigation between the same parties," dismissal is proper. *Id.*

14

3661769.1

Here, Plaintiffs attempt to relitigate claims *they actually made* against the same Defendants *four years ago*. On September 29, 2022, Plaintiffs filed an answer, an amended counterclaim, and a third-party complaint against the BLBHA, Stephanie Godsey, Debra Jones, Paul Burch, Michael Brudine, and John Hatcher, among others, in the First Suit. (Ex. D). On November 10, 2022, Plaintiffs filed a third amended counterclaim and third-party complaint. (Ex. E). A fourth amended counterclaim and third-party complaint was filed on December 7, 2022. (Ex. F). The claims asserted in the counterclaims and third-party complaint are substantially similar to the ones Plaintiffs now assert in this matter. Additionally, the issues and parties involved in this prior suit are identical to the ones Plaintiffs bring. (Ex. G).

In response to the multiple counterclaims and third-party complaints, the BLBHA and the Board Members filed Motions to Dismiss. The BLBHA and its Board Members had to hire counsel to defend them, discuss the facts with their counsel, incur legal expenses, and file Motions to Dismiss addressing the same allegations they now face. The various counterclaims and third-party complaints were dismissed on February 14, 2023.

By the time Plaintiffs filed the present suit, the First Suit had been going on for nearly six years (and is still currently pending). Written discovery was exchanged, depositions were taken, discovery had closed, and briefing on Motions for Summary Judgment had begun. It is fair to state the First Suit was nearly resolved when Plaintiffs decided to file the present suit, rehashing the same allegations they first made four years ago.

3661769.1

Additionally, part of Plaintiffs' support for their current claims is "the lawsuit filed by the Housing Authority" and was done so "with malice to deny the Plaintiffs her/his retirement package(s) due pursuant to their employment contract(s)." (Doc. 1, Ex. A, ¶ 24). Whether Plaintiffs are entitled to their retirement packages is precisely what was already litigated in the First Suit. This is exactly the scenario in which *res judicata* bars an action. Plaintiffs are not entitled to continue with litigation against Moving Defendants indefinitely. Indeed, all of Plaintiffs' claims are barred by the doctrine of *res judicata*. Therefore, this Court should dismiss all of Plaintiffs' claims pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure*.

## F. Plaintiffs' Claims are Barred by the Doctrine of Laches.

Laches is negligence by a plaintiff in asserting a right or claim that, when taken together with a lapse of time and other factors, causes disadvantage or prejudice to the adverse party such that the suit should be barred. *Elliott v. Navistar, Inc.*, 65 So. 3d 379, 386 (Ala. 2010). "It is an equitable doctrine applied by the courts to prevent a party that has delayed asserting a claim to assert that claim after some change in conditions has occurred that would make belated enforcement of the claim unjust." *Id., citing Ex parte Grubbs*, 542 So. 2d 927, 929 (Ala. 1989). "A party asserting laches as a defense is generally required to show that the plaintiff has delayed in asserting a claim, that that delay is inexcusable, and that the delay has caused the party asserting the defense undue prejudice." *Id.*

The affirmative defense of laches can be raised in a 12(b)(6) motion "'where the face of the complaint shows that the claim is barred by the statute of limitations, and/or

16

3661769.1

laches, [5 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 1277 (1969)]; see

*McGruder v. B. & L. Construction Company, Inc.*, 293 Ala. 354, 303 So. 2d 103 (1974)."

*Sims v. Lewis*, 374 So. 2d 298, 302 (Ala. 1979). If on the face of the complaint the claim is

barred by the doctrine of laches, the court should dismiss this matter pursuant to Rule

12(b)(6). *Id.*

Here, Plaintiffs make clear the raid on their house occurred on October 5, 2020,

nearly six years ago. (Doc. 1, Ex A, ¶ 21). Further, Plaintiff Huddleston was indicted by a

grand jury and arrested on May 27, 2022, over four years ago. (Doc. 1, Ex. A, ¶ 22). Lastly,

the charges against Plaintiff Huddleston were dropped in 2024. (Doc. 1, Ex. A, ¶ 23).

As previously discussed, Plaintiffs made the exact same allegations in 2022, nearly

four years ago. The same parties and nearly the same claims were made arising out of the

same transaction and the same occurrence of events. Moving Defendants expended

substantial time, effort, and resources in defending that action. Those claims were

dismissed from the First Suit on February 14, 2023. Now, over three years later, and with

the First Suit almost resolved, Plaintiffs are attempting to revive their allegations in a new

suit.

The delay of over three years in Plaintiffs asserting these claims, if they are even

allowed to do so, is inexcusable. Moving Defendants are prejudiced by this delay as they

now have to litigate actions and conduct which began in 2020, six years ago. Additionally,

they are prejudiced as they have to litigate and defend against claims they have already

litigated for approximately six years. Plaintiffs' claims are barred by the doctrine of laches

17

and this Court should dismiss them pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure.*

## CONCLUSION

All of Plaintiffs' claims against Moving Defendants fail as a matter of law. Even if Plaintiffs were able to prove all their allegations contained within their Complaint, they would not be entitled to relief against Moving Defendants. Additionally, all claims brought against the Moving Defendants are or will be barred by the doctrine of *res judicata* and laches. Because the claims fail as a matter of law and are barred by the doctrine of *res judicata* and laches, Plaintiffs have failed to state a claim upon which relief can be granted. Moving Defendants respectfully request this Court dismiss *all* of Plaintiff's claims pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure.*

## COUNTERCLAIM

COME NOW, the Defendant/Counterclaim Plaintiff Defendants, Bayou La Batre Housing Authority and Paul Burch, John Wayne Hatcher, Michael Burdine, Debra Jones, Stephanie Godsey in their individual and official capacities as board members of the Bayou La Batre Housing Authority (collectively "Counterclaim Plaintiffs"), and in accordance with Rule 13 of the *Federal Rules of Civil Procedure* and the Alabama Litigation Accountability Act (ALA. CODE § 12-19-270 et seq.) files the following Counterclaim against Plaintiffs/Counterclaim Defendants Virginia Huddleston and Darryl Wilson ("Counterclaim Defendants") as follows:

3661769.1

## PARTIES

1.      Counterclaim Plaintiff the Bayou La Batre Housing Authority ("BLBHA") is an Alabama non-profit corporation.  The BLBHA is a public housing authority in Bayou La Batre, Alabama that provides affordable housing to low and moderate-income families.

2.      Counterclaim Plaintiff Paul Burch is over the age of nineteen and is a citizen of Alabama. Counterclaim Plaintiff Paul Burch brings this counterclaim in his official capacity as a member of the BLBHA Board. Counterclaim Plaintiff Paul Burch does not bring this counterclaim in his capacity as a law enforcement officer for the Mobile County Sheriff's Office.

3.      Counterclaim Plaintiff John Wayne Hatcher is over the age of nineteen and is a citizen of Alabama. Counterclaim Plaintiff John Wayne Hatcher brings this counterclaim in his official capacity as a member of the BLBHA Board.

4.      Counterclaim Plaintiff Michael Burdine is over the age of nineteen and is a citizen of Alabama. Counterclaim Plaintiff Michael Burdine brings this counterclaim in his official capacity as a member of the BLBHA Board.

5.      Counterclaim Plaintiff Debra Jones is over the age of nineteen and is a citizen of Alabama. Counterclaim Plaintiff Debra Jones brings this counterclaim in his official capacity as a member of the BLBHA Board.

6.      Counterclaim Plaintiff Stephanie Godsey is over the age of nineteen and is a citizen of Alabama. Counterclaim Plaintiff Stephanie Godsey brings this counterclaim in his official capacity as a member of the BLBHA Board.

19

3661769.1

7. Counterclaim Defendant Virginia Huddleston is over the age of nineteen and is a citizen of the state of Alabama.

8. Counterclaim Defendant Darryl Wilson is over the age of nineteen and is a citizen of the state of Alabama.

## JURISDICTION

9. This Court has supplemental jurisdiction over this matter as the counterclaim arises from the same case or controversy as Plaintiff's claims which are properly before this Court.

10. Venue is proper in this Court as this counterclaim arises from the same transaction or occurrence that is the subject matter of Counterclaim Defendants' claim against Counterclaim Plaintiffs, which is currently pending before this Court.

## FACTS

11. Counterclaim Defendants filed suit on May 12, 2026, asserting claims for False Arrest, False Imprisonment, Malicious Prosecution, Violation of Civil Rights, Violation of Civil Rights – False Arrest, Violation of Civil Rights – False Imprisonment, Violation of Civil Rights, Deprivation of Property, Violation of Civil Rights – Equal Protection, Violation of Civil Rights – Conspiracy to Interfere with Civil Rights, and Conversion. (Doc. 1, Ex. A)

12. In the Complaint, Counterclaim Defendants alleged that Counterclaim Plaintiffs falsely arrested and imprisoned her, maliciously prosecuted her, and violated her civil rights. *Id.*

20

3661769.1

13.     Counterclaim Plaintiffs retained undersigned counsel to represent them in this dispute.

14.     On June 8, 2026, Counterclaim Plaintiffs informed Counterclaim Defendants that their newly filed Complaint was groundless in law and interposed for an improper and vexatious purpose. Counterclaim Plaintiffs respectfully requested the claims be dismissed, or Counterclaim Plaintiffs would be forced to file a Counterclaim pursuant to the Alabama Litigation Accountability Act. ("ALAA").

15.     No response was received from Counterclaim Defendants.

## RELEVANT BACKGROUND

16.     Prior to this suit being filed, the BLBHA initiated a suit against Huddleston and Wilson regarding acts and omissions that occurred during and after their employment. *Bayou La Batre Housing Authority v. Virginia Huddleston, Darryl Wilson, et. al*, 02-cv-2020-902475 Circuit Court of Mobile County, Alabama.[4]

17.     This suit was filed nearly six years ago, in 2020.

18.     On September 29, 2022, Huddleston and Wilson filed an answer, an amended counterclaim, and a third-party complaint against the BLBHA, Stephanie Godsey, Debra Jones, Paul Burch, Michael Brudine, and John Hatcher, among others. (Ex. D).

19.     On November 10, 2022, Huddleston and Wilson filed a third amended counterclaim and third-party complaint. (Ex. E).

---

[4] Counterclaim Defendants are represented by the same counsel they are presently represented by in this matter.

20.    A fourth amended counterclaim and third-party complaint was filed on December 7, 2022. (Ex. F). The claims asserted in the counterclaim and third-party complaint are substantially similar to the ones Huddleston and Wilson now assert in this matter. Additionally, the issues and parties involved in this prior suit are identical to the ones Huddleston and Wilson now assert. (Ex. G).

21.    In response to the multiple counterclaims and third-party complaints, the BLBHA and the Board Members filed Motions to Dismiss.

22.    The various counterclaims and third-party complaints were dismissed on February 14, 2023.

### COUNT I – VIOLATION OF THE ALABAMA LITIGATION ACCOUNTABILITY ACT

23.    Counterclaim Defendants incorporate by reference as if fully set forth herein the preceding paragraphs.

24.    Counterclaim Defendants brought a civil action against Counterclaim Plaintiffs.

25.    Counterclaim Defendants' claims are without substantial justification as defined by the ALAA. (ALA. CODE § 12-19-270).

26.    Under the ALAA, "without substantial justification" means that the claim is "frivolous, groundless in fact or law," or interposed for an improper or vexatious purpose. ALA. CODE § 12-19-271(1).

3661769.1

**I. All of the claims Counterclaim Defendants bring are groundless in law as they clearly fail as a matter of law.**

    **a.**      **False Arrest and Imprisonment**

27.    Counterclaim Defendant Virginia Huddleston was arrested pursuant to a grand jury indictment. (Ex. B).

28.    The grand jury indictment resulted in a valid warrant issued by the Circuit Court of Mobile County, Alabama. (Ex C).

29.    The Alabama Supreme Court has been clear that a claim for false arrest or imprisonment cannot be maintained when the individual is arrested pursuant to a warrant. *Ennis v. Beason*, 537 So. 2d 17, 19 (Ala. 1988)(holding: "The law in Alabama is clear that a plaintiff is not entitled to recover for false arrest or imprisonment where he or she is arrested pursuant to a valid warrant issued by a lawfully authorized person. *Blake v. Barton Williams, Inc.*, 361 So.2d 376 (Ala. Civ. App. 1978). Under such circumstances, "neither the arrest nor the subsequent imprisonment is 'false,' and, as a consequence, the complaining party's action must be one for malicious prosecution." *Id.* at 378.

30.    Because Counterclaim Defendant Virginia Huddleston was arrested pursuant to the grand jury indictment which resulted in a warrant, her claims of false arrest and imprisonment fail as a matter of law and are therefore groundless under the law.

    **b.**      **Malicious Prosecution**

31.    Actions for malicious prosecution are not favored at law. *Alabama Power Co. v. Neighbors*, 402 So. 2d 958, 962 (Ala. 1981).

32.     In order to succeed on a malicious prosecution claim, a plaintiff has the burden of providing that a defendant instigated a judicial proceeding without probable cause with malice, and the proceeding ended in the plaintiff's favor. *Id.*

33.     Neither an acquittal nor a decision to *nol pros* a case creates an inference that probable cause was lacking. *Alabama Power Co. v. Neighbors*, 402 So. 2d 958, 967 (Ala. 1981).

34.     Additionally, "'[i]n malicious prosecution the general rule is that *the finding of an indictment* by a grand jury against one charged with crime *is prima facie evidence of the existence of probable cause*, and that the acquittal of a defendant upon the trial does not tend to show a want of probable cause for believing him guilty of the offense charged when the arrest [was] made or prosecution initiated. . . .'" *Smith v. Wendy's of South, Inc.*, 503 So. 2d 843, 844 (Ala. 1987) *quoting Id.*

35.     As discussed, Counterclaim Defendant Huddleston was arrested via the findings of an indictment by a grand jury. Therefore, there is prima facie evidence of probable cause. The fact that the charges against her were ultimately *nol pros* has no relevancy.

36.     Therefore, this claim is also groundless under the law as it relates to Moving Defendants.

c.      **Violation of Civil Rights**

37.     First, it is unclear whether Counterclaim Defendants assert this cause of action against Counterclaim Plaintiffs.

24

3661769.1

38.    The Complaint alleges "Defendants acting in their capacity as law enforcement with the Mobile County Sheriff's Office, unlawfully deprived Plaintiff of her legal and civil rights as guaranteed to her by the Constitution and Laws of the United States and of the State of Alabama." (Doc. 1, Ex. A, ¶ 50).

39.    Counterclaim Plaintiffs are the BLBHA and the Board members in their capacity as BLBHA Board Members. None of Counterclaim Plaintiffs acted "in their capacity as law enforcement with the Mobile County Sheriff's Office" to violate Counterclaim Defendant Huddleston's civil rights, as none are employed by the Mobile County Sheriff's Office.[5]

40.    Therefore, this claim is inapplicable to them. To the extent this claim is asserted against them, it fails as a matter of law.

**d.    All claims brought under § 1983**

41.    It is well established that a claim under 42 U.S.C. § 1983 must involve state action to be valid.

42.    Specifically, "Section 1983 provides a remedy for persons alleging deprivations of their constitutional rights by government officials through action taken 'under color of state law.'" *Point Properties, Inc. v. Anderson*, 584 So. 2d 1332, 1336 (Ala. 1991).

---

[5] While Sheriff Burch is a member of the Mobile County Sheriff's Office, he is only a Counterclaim Plaintiff in this matter as a Board Member of the BLBHA.

25

43.     Counterclaim Defendants' Complaint recognizes this requirement as they alleged: "Defendants were acting under color of law, exercising the authority given to them by the government of the Mobile County Sheriff's Office." (Doc. 2).

44.     As previously noted, none of Counterclaim Plaintiffs are employed by the Mobile County Sheriff's Office.

45.     Further, there is no "'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

46.     As it relates to Counterclaim Plaintiffs, all claims under § 1983 fail as a matter of law for the lack of state action.

#### e.     Conversion

47.     Plaintiffs' conversion claim is groundless in law as none of Moving Defendants converted Plaintiffs' property to their own use, destroyed Plaintiffs' property, or exercised dominion over Plaintiffs' property.

48.     Plaintiffs' property was seized pursuant to a search warrant that was executed by the Mobile County Sheriff's Department.

49.     The Mobile County Sheriff's Department then retained possession of those items while the criminal charges against Counterclaim Defendant Huddleston proceeded.

50.     Counterclaim Plaintiffs are a public housing authority and said Housing Authority's Board Members.

51.    None of Counterclaim Plaintiffs were responsible for seizing Counterclaim Defendants' property during the search nor possessing the property while the criminal charges were litigated.

52.    Counterclaim Defendants' claim for conversion against Counterclaim Plaintiffs is groundless under the law.

## II. Counterclaim Defendants brought suit for an improper and vexatious purpose.

53.    The day this matter was filed, Counterclaim Defendant Huddleston took to social media to proclaim "Mobile County Alabama Sheriff Paul Burch sued for armed home invasion with convicted felon – just 4 days before May 19 GOP primary." (Ex. H & I).

54.    She then tagged approximately 100 media accounts or social media individuals in seventeen (17) follow-up posts. *Id.*

55.    This list of tagged individuals includes Elon Musk, Donald Trump, Fox News, OANN, ABC, NBC News, Joe Rogan, Sean Hannity, and Tucker Carlson, among others.

56.    As is clear from the Complaint, the actions complained of occurred in 2022.

57.    Substantially the same allegations were previously alleged in the prior lawsuit in 2022, nearly four years ago, but were dismissed.

58.    Four days prior to Counterclaim Plaintiff Paul Burch's primary election, and four years since the acts complained of occurred, the lawsuit was filed, and Counterclaim Defendant Huddleston took to social media.

3661769.1

59. In her article, Counterclaim Defendant Huddleston even notes her disappointment that "only a single local news article" had covered her lawsuit. (Ex. J).

60. The only logical conclusion regarding the timing of these events and Counterclaim Defendant Huddleston's actions after the suit was filed is that Counterclaim Defendants sought to undermine Counterclaim Plaintiff Paul Burch's chances of winning re-election and annoy him, the BLBHA, and its Board Members with yet another lawsuit.

61. Counterclaim Defendants' lawsuit is "without substantial justification as it is "groundless, in fact or in law," "vexatious," and "interposed for any improper purpose." ALA. CODE § 12-19-270, et seq.

62. The ALAA provides for a penalty when a claim is brought "without substantial justification." ALA. CODE § 12-19-270, et seq.

63. Counterclaim Plaintiffs seek this Court to enforce this penalty.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiffs respectfully request that this Court enter judgment in its favor and against Counterclaim Defendants as follows:

a. An award of reasonable attorney's fees incurred by Counterclaim Plaintiffs in defending against Counterclaim Defendant's claims, pursuant to the Alabama Litigation Accountability Act;

b. An award of all costs incurred by Counterclaim Plaintiffs in defending against Counterclaim Defendant's claims, pursuant to the Alabama Litigation Accountability Act;

28

3661769.1

c.    An award of reasonable attorney's fees incurred by Counterclaim Plaintiffs in having to bring this claim against Counterclaim Defendants, pursuant to the Alabama Litigation Accountability Act;

d.    An award of all costs incurred by Counterclaim Plaintiffs in having to bring this claim against Counterclaim Defendants, pursuant to the Alabama Litigation Accountability Act;

e.    Such other relief as the Court deems just and proper.

Respectfully Submitted,

*/s/ John D. Hemmings, III*
John D. Hemmings, III (HEM012)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
T (205) 868-6000 | F (205) 868-6099
Email: jhemmings@starneslaw.com


D. Kirby Howard, Jr. (HOW071)
STARNES DAVIS FLORIE LLP
11 N. Water Street; Suite 20290
Mobile, Alabama 36602
Phone: (251) 433-6049
dkhoward@starneslaw.com

29

3661769.1

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record:

*/s/ John D. Hemmings, III*

30

3661769.1

# Exhibit A



AlaFile E-Notice

02-CV-2020-902475.00

To: ZOGHBY ALEXANDER GARRETT
garrett.zoghby@arlaw.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

BAYOU LA BATRE HOUSING AUTHORITY V. VIRGINIA HUDDLESTON ET AL
02-CV-2020-902475.00

The following answer was FILED on 5/1/2021 9:58:03 AM

Notice Date:        5/1/2021 9:58:03 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

ELECTRONICALLY FILED
5/1/2021 9:58 AM
02-CV-2020-902475.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

BAYOU LA BATRE HOUSING )
AUTHORITY, et cet., )
)
   Plaintiff, )
)
v. )  Case No.: CV-2020-902475
)
VIRGINIA HUDDLESTON, )  **Jury Trial Demanded**
et al., )
)
   Defendants. )

## ANSWER & COUNTERCLAIM BY DEFENDANT VIRGINIA HUDDLESTON

**COMES NOW** Defendant Virginia Huddleston, by and through her undersigned counsel, and in Answer to Plaintiff's Complaint say's as follows:

### Affirmative Defenses

1. Defendant pleads not guilty and/or not liable.

2. Failure to state a claim upon which relief can be granted.

3. Defendant pleads all affirmative defenses under Rule 12(b)(1), (2), (3), (4), (5), and (7), *Ala.R.Civ.P.*, to include lack of personal and/or subject matter jurisdiction, insufficiency of process and/or insufficiency of service of process, and moves for dismissal.

4. Defendant pleads all affirmative defenses contained in Rule 8(c), *Ala.R.Civ.P.*, to the extent not

1

otherwise affirmatively set forth herein.

5.    Defendant pleads the applicable statute of limitations and/or statute of repose.

6.    Defendant pleads contributory negligence.

7.    Defendant pleads Plaintiff assumed the risk of its own conduct, barring any recovery.

8.    Defendant pleads lack of proximate cause.

9.    There is a lack of causal relation between any act or omission of this Defendant and the injury sustained by the Plaintiff.

10.    Defendant pleads waiver and/or estoppel, including but not limited to equitable, collateral, judicial, legal or statutory.

11.    Defendant pleads claim preclusion and/or issue preclusion.

12.    The Plaintiff's claims are barred by the doctrine of laches.

13.    Defendant pleads res judicata.

14.    Defendant pleads preemption.

15.    Defendant pleads abatement.

16.    Plaintiff's Complaint fails to name indispensable parties and must be dismissed, or, in the alternative,

stayed pending appropriate relief by the Court.

17. Defendant pleads that the action is not prosecuted in the name of the real party in interest.

18. Plaintiff lacks standing and/or lacks capacity.

19. Defendant pleads prior pending action.

20. Defendant pleads arbitration and specifically reserves the right to compel arbitration thus any participation by this Defendant in this litigation, specifically without limitation in discovery, should not be construed as a waiver; Defendant having specifically reserved her right.

21. Defendant pleads failure to mitigate damages.

22. Any recovery had by the Plaintiff must be reduced or set off by collateral sources paid to the Plaintiff.

23. To the extent that the Plaintiff has concluded or may conclude a settlement or recover a verdict against any person, entity or party against whom the Plaintiff have, or could have, made or will make a claim, then this Defendant is entitled to a set-off for any amount paid and is otherwise entitled to introduce the fact of said settlement or verdict at its option.

3

24.   Defendant pleads lack of privity.

25.   Defendant pleads payment and/or release.

26.   Defendant pleads bankruptcy and/or discharge in bankruptcy of any party.

27.   Defendant pleads justification.

28.   Defendant pleads economic loss doctrine.

29.   Defendant pleads State of Frauds.

30.   Defendant pleads the general issue.

31.   All claims for punitive damages are unconstitutional under the constitutions of Alabama and the United States.

32.   Defendant denies each and every material allegation of the Complaint not specifically admitted to and demands strict proof thereof.

33.   Defendant reserves the right to amend and/or supplement her answers should discovery reveal new or other available defenses.

## Defenses

34.   Defendant denies the material allegations of Plaintiff's Complaint and demands strict proof thereof.

4

## COUNTERCLAIM

Now, having answered the Plaintiff's Complaint, Defendant Virginia Huddleston ("Mrs. Huddleston") files her Counter-claim in this matter against the Plaintiff, and respectfully represents unto Your Honor as follows:

### Parties

1.  Mrs. Huddleston is over the age of nineteen (19) years and a permanent resident of Mobile County, State of Alabama.

2.  The Bayou La Batre Housing Authority ("BLBHA") is a public non-profit corporation organized pursuant to Ala.Code §§ 24-1-20 et seq., and authorized to incorporate by a resolution adopted by the Bayou La Bater City Council in 2008.

### Factual Allegations

3.  Mrs. Huddleston incorporates by reference the content of ¶¶ 1-2 above as if set forth fully herein

4.  In or around May 2013, BLBHA hired Mrs. Huddleston as its Executive Director.

5.  On or about October 1, 2019, BLBHA entered into an Employment Contract ("the Employment Contract") with Mrs. Huddleston, a true and correct copy of which is attached

5

hereto the content of which is incorporated by reference as if set forth fully herein.

6.    The Employment Contract was prepared by BLBHA's attorney, Brent Day.

7.    The Employment Contract was approved by BLBHA's Board on or about October 15, 2019.

8.    In relevant part, the Employment Contract reads:

"Upon the completion of the EMPLOYMENT CONTRACT and Huddleston's election not to extend the contract or Huddleston's termination, Huddleston shall receive an annual retirement salary of $100,000 paid in equal bi-monthly payments of $4,166.67 at the time of cessation for the period of her life or ninety-nine years, whichever comes first. Huddleston shall also receive an annual 2% cost of living increase beginning one year after the cessation of her employment and be calculated based upon the prior year's salary. Additionally, BLBHA will continue to provide health insurance coverage comparable to the outgoing health insurance policy provided to Huddleston for the same term as indicated for Huddleston's retirement salary. In the alternative to the annual retirement salary as outlined above, Huddleston may elect to receive the net present value of her retirement based on a 10-year treasury rate at the time of separation from employment and social security life expectancy tables. BLBHA shall place funds in a separate dedicated account for the sole purpose of funding Huddleston's retirement options and shall invest said funds in a diversified portfolio managed

6

by a professional money manager of Huddleston's selection…" (See ¶ 3d. of Employment Contract).

"In the event Huddleston deems it necessary to defend the terms and conditions of this EMPLOYMENT CONTRACT, the BLBHA shall be responsible for any and all legal fees incurred by Huddleston in association with the defense of same. This shall include, but is not limited to, attorney's fees, filing fees, research fees, investigation fees, etc. Upon demand, BLBHA shall deposit with legal counsel as selected by Huddleston, a deposit of ten thousand dollars ($10,000.00) to be applied to her legal fees…" (See ¶ 3f. of Employment Contract).

"BLBHA hereby indemnifies and agrees to hold Huddleston harmless against and from any and all claims arising from the performance of employment related duties authorized by BLBHA in the conduct of its business or from any activity, work or other things done." (See ¶ 8 of Employment Contract).

9. On or about July 9, 2020, an Addendum to Employment Contract ("the Addendum") was executed by BLBHA and Mrs. Huddleston which modified ¶ 3 of the Employment Contract, a true and correct copy of which is attached hereto the content of which is incorporated by reference as if set forth fully herein.

10. The Addendum was approved by the Board of BLBHA on or about July 21, 2020.

7

11. In relevant part, the Addendum reads:

"BLBHA recognizes the outstanding achievements and contributions Huddleston has made in her role as Executive Director that has increased the value of Safe Harbor properties and improved the lives of its residents and neighbors. BLBHA recognizes Huddleston has gone above and beyond all requirements and expectations in the performance of her duties as Executive Director. BLBHA recognizes that while acting as Executive Director, Huddleston has been subjected to and endured malicious, extraordinary, extreme obstacles and long-term mistreatment and maltreatment beyond the traditional norms of someone in her position. BLBHA recognizes traditional retirement benefits have been unavailable to Huddleston during the course of her employment with BLBHA and therefore, upon the completion of the EMPLOYMENT CONTRACT and Huddleston's election not to extend the contract or Huddleston's termination, Huddleston shall receive a one-time lump sum retirement payout minus any prior retirement contributions paid to Huddleston by the BLBHA specifically designated for Huddleston's retirement fund… [a]t the end of this contract period the total lump-sum payment owed to Huddleston shall be $2,521,359.00…" (See ¶ 3d. of the Addendum).

"In the event Huddleston deems it necessary to defend the terms and conditions of this EMPLOYMENT CONTRACT, the BLBHA shall be responsible for any and all legal fees incurred by Huddleston in association with the defense of same. This shall include, but is not limited to, attorney's fees, filing fees, research fees, investigation fees, etc.

8

> Upon demand, BLBHA shall deposit with legal counsel as selected by Huddleston, a deposit of ten thousand dollars ($10,000.00) to be applied to her legal fees…" (See ¶ 3f. of the Addendum).

12. BLBHA has failed/refused to pay Mrs. Huddleston the sums owed her for retirement benefits pursuant to ¶ 3d. of the Employment Contract & Addendum, and sums owed her for attorney fees pursuant to ¶ 3f. of the Employment Contract & Addendum.

## Count I – Breach of Contract

13. Mrs. Huddleston incorporates by reference the content of ¶¶ 1-12 above as if set forth fully herein.

14. The Employment Contract and Addendum are contractual agreements.

15. Mrs. Huddleston fully performed her obligations under the Employment Contract and Addendum.

16. BLBHA has breached the Employment Contract and Addendum in:

    A)  Failing/refusing to make the monthly retirement payment to Mrs. Huddleston as directed by ¶ 3d. of the Employment Contract;

    B)  Failing/refusing to make the $10,000 attorney

9

fee payment as directed by ¶ 3f. of the Employment Contract & Addendum;

C)   Failing/refusing to make the lump sum retirement payment as directed by ¶ 3d. of the Addendum.

### Count II – Contractual Indemnity

17. Mrs. Huddleston incorporates by reference the content of ¶¶ 1-16 above as if set forth fully herein.

18. In the Employment Contract, BLBHA agreed to indemnify and hold Mrs. Huddleston harmless against and from any and all claims arising from the performance of employment related duties authorized by BLBHA in the conduct of its business or from any activity, work or other things done ("the Indemnity Agreement").

19. Mrs. Huddleston asserts she is entitled to indemnification from Plaintiff pursuant to the Indemnity Agreement for any judgment in this action arising from the performance of employment related duties authorized by BLBHA in the conduct of its business or from any activity, work or other things done.

**WHEREFORE** Virginia Huddleston requests a judgment against Plaintiff for compensatory damages in an amount in

10

excess of $50,000.00, in addition to court costs and

whatever else relief she may be entitled to.

**JURY TRIAL DEMANDED.**


/s/ Jerry M. Blevins
JERRY M. BLEVINS (BLE003)
Attorney for Defendant Virginia
Huddleston

OF COUNSEL:
Law Office of Jerry M. Blevins
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106
(334) 262-7600 (Voice)
(334) 262-7644 (Fax)
E-Mail: ATTYJMBlev@LawOfficeOfJerryMBlevins.com

11

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

Jay M. Ross, Esq.
A. Patrick Dungan, Esq.
Garrett Zoghby, Esq.
Adams and Reese, LLP
P.O. Box 1348
Mobile, Alabama 36633
Email:    jay.ross@arlaw.com
          patrick.dungan@arlaw.com
          garrett.zoghby@arlaw.com

Joe Stott, Esq.
Stott & Harrington, P.C.
2367 Valleydale Road, Suite 100
Birmingham, Alabama 35244
Email: joe@stottharrington.com

Tony Collier
7451 Highway 188
Coden, Alabama 36523

Michael Goodin
10675 Oak Avenue
Grand Bay, Alabama 36541

S. Joshua Briskman, Esq.
Briskman & Binion, P.C.
P.O. Box 43
Mobile, Alabama 36601
Email: jbriskman@briskman-binion.com

Buzz Jordan, Esq.
Buzz Jordan, P.C.
P.O. Box 210
Mobile, Alabama
Email: buzz@rossandjordan.com

via electronic transmission and/or by depositing a copy of the same in the U.S. Mail, postage prepaid this the 1st day of May 2021.

/s/ Jerry M. Blevins
Jerry M. Blevins

12

ELECTRONICALLY FILED
5/1/2021 9:58 AM
02-CV-2020-902475.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## EMPLOYMENT CONTRACT

THIS CONTRACT made this 1st day of October 2019, by and between The City of Bayou La Batre Housing Authority (hereinafter BLBHA), and Virginia C. Huddleston (hereinafter Huddleston) and supersedes any previous contract, addendum or codicil between the parties.

This contract is subject to the terms, covenants and conditions herein set forth and the parties each covenant, as a material part of the consideration for this contract, to keep and preform each and all of said terms and conditions.

WHEREAS, BLBHA desires to continue to employ Huddleston as Executive Director in the conduct of its business and;

WHEREAS, BLBHA has offered to tender valuable consideration to Huddleston as an inducement to enter into this employment agreement and;

WHEREAS, Huddleston has agreed to accept the offer of employment tendered by BLBHA.

NOW THEREFORE, the parties agree as follows:

1. This contract shall commence on the 1st day of October, 2019 and end on the 30th day of September, 2020.

2. Huddleston has the option to extend this contract for an additional successive one (1) year terms ("Option Term") subject to the following:

   a. The contract is not in default

   b. Huddleston provides written notice of her intent to renew the contract not less than thirty (30) days prior to the scheduled expiration of the date of agreement. Huddleston shall not be allowed to renew the contract in excess of ninety-eight (98) years.

3. Consideration for this contract is as follows:

   a. BLBHA shall tender to Huddleston an annual gross salary of $120,000.00 per year paid in bi-monthly equal payments of $5,000.00 for the initial term of this contract.

   b. Commencing in any option term of this agreement, the parties shall mutually agree to salary adjustments, if any, within ninety (90) days prior to the commencement of any option term.

   c. In no event shall BLBHA decrease the annual consideration to less than the gross annual sales in the initial term of this agreement.

d.  Upon the completion of the EMPLOYMENT CONTRACT and Huddleston's election not to extend the contract or Huddleston's termination, Huddleston shall receive an annual retirement salary of $100,000.00 paid in equal bi-monthly payments of $4,166.67 at the time of cessation for the period of her life or ninety-nine years, whichever occurs first. Huddleston shall also receive an annual 2% cost of living increase beginning one year after the cessation of her employment and be calculated based upon the prior year's salary. Additionally, BLBHA will continue to provide health insurance coverage comparable to the outgoing health insurance policy provided to Huddleston for the same term as indicated for Huddleston's retirement salary. In the alternative to the annual retirement salary as outlined above, Huddleston may elect to receive the net present value of her retirement based on a 10-year treasury rate at the time of separation from employment and social security life expectancy tables. BLBHA shall place funds in a separate dedicated account for the sole purpose of funding Huddleston's retirement options and shall invest said funds in a diversified portfolio managed by a professional money manager of Huddleston's selection. In the event the real property of the BLBHA is sold or any other event occurs to cause the cessation of the BLBHA, or the BLBHA receives a windfall, the monies therefrom shall first be used to fund the above referenced retirement account.

e.  That in the event the ownership of the BLBHA is sold or transferred in any way, the terms and conditions of the EMPLOYMENT CONTRACT shall remain in full force and effect. Any subsequent owner of the BLBHA shall assume the obligation created in the EMPLOYMENT CONTRACT. The terms and conditions of the EMPLOYMENT CONTRACT shall only be affected by the death of Huddleston or on the event Huddleston voluntarily or willfully terminates the EMPLOYMENT CONTRACT.

f.  In the event Huddleston deems it necessary to defend the terms and conditions of this EMPLOYMENT CONTRACT, the BLBHA or subsequent owner shall be responsible for any and all legal fees incurred by Huddleston in association with the defense of same. This shall include, but is not limited to, attorney's fees, filing fees, research fees, investigation fees, etc. Upon demand, BLBHA shall deposit with legal counsel as selected by Huddleston, a deposit of ten thousand dollars ($10,000.00) to be applied to her legal fees. Upon expenditure of said deposit, BLBHA shall deposit with Huddleston's legal counsel additional amounts of five thousand

dollars ($5,000.00) until such time the defense of this contract has been completed. This shall include any appeals or other action as may be deemed necessary by Huddleston.

4. Huddleston agrees to refrain, within the confines of Mobile County, Alabama, from engaging in any business which inherently conflicts with the interest of BLBHA.

5. BLBHA agrees to pay Huddleston contract or retirement payments on or before the 1st and 15th day of each month and on these respective dates thereafter.

6. All equipment and materials furnished by BLBHA to Huddleston, including but not limited to computers, software, communication devices, policy and procedure manuals, financial data including budgetary calculations and analysis, income statements and operational expenditures, leases, rent rolls, tenant indexes and files, shall be used by Huddleston in the performance of job duties and these shall remain the property of BLBHA. All property of BLBHA, as set forth herein, shall be returned by Huddleston on the termination date of this agreement. All records of BLBHA to which Huddleston has access, shall be considered proprietary and said information shall not be disseminated by Huddleston, to any third party without first obtaining written authorization authorizing any such disclosure.

7. BLBHA shall at all times during this contract and its renewals, maintain workman's compensation insurance and liability insurance for the benefit of Huddleston.

8. BLBHA hereby indemnifies and agrees to hold Huddleston harmless against and from any and all claims arising from the performance of employment related duties authorized by BLBHA in the conduct of its business or from any activity, work or other things done.

9. BLBHA agrees to procure policies of health and dental insurance pursuant to which Huddleston, as an employee will be an insured of said policies. BLBHA, shall pay the policy premiums as they come due and shall pay 100% of the cost of policy premiums.

10. Huddleston shall be entitled to be off for all federal, state and local holidays.

11. Huddleston shall be entitled to compensation for one sick day during each month during the term of this contract or any renewal. Said sick leave is cumulative within any contract or option term.

12. Huddleston shall be entitled to compensation for two personal days per month during the term of this contract or any renewal.

13. Huddleston shall be entitled to three weeks paid vacation during the term of this contract and any renewal.

14. BLBHA shall provide Huddleston compensation for all holidays recognized by the federal, state and local government for its employees.

15. BLBHA shall reimburse Huddleston for authorized travel expenses pursuant to the reimbursement schedules of the State of Alabama in effect at the time said authorized travel expenses are incurred.

16. Notwithstanding any other termination provision in this agreement, the BLBHA may terminate this agreement without cause upon ninety (90) days written notice to Huddleston, provided however, BLBHA shall tender full compensation to Huddleston for the remaining term of this contract together with sick days, personal days and vacation days with payment due in full no later than the 90th day.

17. The parties agree that the oversight of the BLBHA of its officers, directors and employees shall be professional at all times conductive to maintaining the highest workplace environment and standards.

18. All rights, options and remedies contained in this contract shall be construed and held to be cumulative.

19. Any and all notices, elections or demands permitted or required to be made under this contract shall be in writing, and shall be delivered personally, or sent by overnight currier service by a company regularly engaged in the business of delivering business packages, or sent by registered or certified mail, return receipt requested, to the other party at the respective address set forth as follows: To BLBHA: 12131 Safe Harbor Circle E, Irvington, AL 36544; to Huddleston: 3480 Semmes Woods Dr., Semmes, AL 36544. The date of personal delivery or, if sent by mail or overnight currier, then the date of delivery or first refusal thereof as evidenced by the carrier's or courier's receipt, shall be the effective date of such notice, election or demand.

20. No wavier by the parties of any such provision of this contract shall be deemed to be wavier of any other provision hereof or any subsequent breach by the other party of the same or any other provision.

21. The parties agree that time is of the essence in this contract.

22. All rights and liabilities herein given to or imposed upon the respective parties hereto shall extend to and bind the several respective heirs, executers, administrators' successors and assigns of the said parties.

23. If any provision of this contract is declared invalid, unenforceable or unconstitutional it shall in no way effect, impair or invalidate any other provision hereof.

24. If any provision of this contract is determined to be vague or ambiguous, said provision shall be read in a light more favorable to Huddleston.

25. No provision of this contract may be amended except by an agreement in writing.

26. This contract is made by the parties in the State of Alabama, and shall be construed, interpreted and governed by and in accordance with the laws of such state. The parties agree that all legal proceedings with respect to this contract shall be brought in the district or circuit court of Mobile County, Alabama.

27. The parties each hereby represent that the person signing on behalf of such party has the full right and authority to enter into this contract and by doing so does not violate any existing agreement to which it is a party or by which it sis bound or affected.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this contract as the day and year first above written.

The City of Bayou La Batre Housing Authority

By _____    Oct 1, 2019
                                    Date

Its: _Chairperson_____

By: _____    Oct. 1, 2019
                                    Date

Its: _Vice Chairman_____

_____    10-1-2019
Virginia C. Huddleston            Date

ELECTRONICALLY FILED
5/1/2021 9:58 AM
02-CV-2020-902475.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## ADDENDUM TO EMPLOYMENT CONTRACT

The parties, The City of Bayou La Batre Housing Authority (hereinafter BLBHA) and Virginia C. Huddleston (Hereinafter Huddleston) executive an EMPLOYMENT CONTRACT on or about October 1, 2019, and;

WHEREAS Paragraph twenty-five (25) of the EMPLOYMENT CONTRACT provides that the parties may amend the contract by an agreement in writing, and'

WHEREAS, BLBHA and Huddleston agree that the EMPLOYMENT CONTRACT shall be amended by agreement to modify the Paragraph Three (3) "Consideration for this contract is as follows" in its entirety and any addendums there to read as follows;

NOW, THEREFORE, the parties, BLBHA and HUDDLESTON, agree the the EMPLOYMENT CONTRACT be amended in its entirety and any addendums thereto read as follows:

3. Consideration for this contract is as follows:

    a.    BLBHA shall tender to Huddleston an annual gross salary of $120,000 per year paid in bi-weekly equal payments of $5,000.00 for the initial term of this contract.

    b.    Commencing in any option term of this agreement, the parties shall mutually agree to salary adjustments, if any, within ninety (90) days prior to the commencement of any option term.

    c.    In no event shall BLBHA decrease the annual consideration to less than the gross annual salary in the initial term of this agreement.

    d.    BLBHA recognizes the outstanding achievements and contributions Huddleston has made in her role as Executive Director that has increased the value of the Safe Harbor properties and improved the lives of its residents and neighbors. BLBHA recognizes Huddleston has gone above and beyond all requirements and expectations in the performance of her duties as Executive Director. BLBHA recognizes that while acting in her role as Executive Director, Huddleston has been subjected to and endured malicious, extraordinary, extreme obstacles and long-term mistreatment

and maltreatment beyond the traditional norms of someone in her position. BLBHA recognizes traditional retirement benefits have been unavailable to Huddleston during the course of her employment with BLBHA and therefore, upon the completion of the EMPLOYMENT CONTRACT and Huddleston's election not to extend the contract or Huddleston's termination, Huddleston shall receive a one-time lump-sum retirement payout minus any prior retirement contributions paid to Huddleston by the BLBHA specifically designated for Huddleston's retirement fund. Huddleston will receive the net present value of her retirement based on a 10-year treasury rate at the time of separation from employment and social security life expectancy tables. BLBHA shall place funds in a separate dedicated account for the sole purpose of funding Huddleston's retirement options and shall invest said funds in a diversified portfolio managed by a professional money manager of Huddleston's selection. At the end of this contract period the total lump-sum payment owed to Huddleston shall be $2,521,359.00 In the event the real property or any asset of the BLBHA is sold or any other event occurs to cause the cessation of the BLBHA, or the BLBHA receives a windfall, the monies therefrom shall first be used to fund the above referenced retirement account.

e.  The terms and conditions of the EMPLOYMENT CONTRACT shall only be affected by the death of Huddleston.

f.  In the event Huddleston deems it necessary to defend the terms and conditions of this EMPLOYMENT CONTRACT, the BLBHA shall be responsible for any and all legal fees incurred by Huddleston in association with the defense of same. This shall include, but is not limited to, attorney's fees, filing fees, research fees, investigation fees, etc. Upon demand, BLBHA shall deposit with legal counsel as selected by Huddleston, a deposit of ten thousand dollars ($10,000.00) to be applied to her legal fees. Upon expenditure of said deposit, BLBHA shall deposit with Huddleston's legal counsel additional amounts of five thousand dollars ($5,000.00) until such time the defense of this contract has

been completed. This shall include any appeals or other action as may be deemed necessary by Huddleston.

That this Addendum to Employment Contract shall be made part thereof and shall continue to remain part thereof in any extensions unless specifically invalidated by agreement of both parties in writing as per Paragraph twenty-five (25) of the EMPLOYMENT CONTRACT.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this addendum to contract as the day and year first above written.

The City of Bayou La Batre Housing Authority

By: _____    7-9-2020
Marcia Stork, Chairwoman                 Date

By: _____    7-9-2020
John Joyner, Vice Chairman               Date

_____    7-9-2020
Virginia C. Huddleston                   Date



AlaFile E-Notice

02-CV-2020-902475.00

To:  ZOGHBY ALEXANDER GARRETT
garrett.zoghby@arlaw.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

BAYOU LA BATRE HOUSING AUTHORITY V. VIRGINIA HUDDLESTON ET AL
02-CV-2020-902475.00

The following answer was FILED on 5/1/2021 10:05:11 AM

Notice Date:      5/1/2021 10:05:11 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

ELECTRONICALLY FILED
5/1/2021 10:05 AM
02-CV-2020-902475.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

BAYOU LA BATRE HOUSING )
AUTHORITY, et cet., )
                 )
         Plaintiff, )
                 )
v. )       Case No.: CV-2020-902475
                 )
VIRGINIA HUDDLESTON, )       **Jury Trial Demanded**
et al., )
                 )
         Defendants. )

## ANSWER & COUNTERCLAIM BY DEFENDANT DARRYL WILSON

**COMES NOW** Defendant Darryl Wilson, by and through his undersigned counsel, and in Answer to Plaintiff's Complaint say's as follows:

### Affirmative Defenses

1.    Defendant pleads not guilty and/or not liable.

2.    Failure to state a claim upon which relief can be granted.

3.    Defendant pleads all affirmative defenses under Rule 12(b)(1), (2), (3), (4), (5), and (7), *Ala.R.Civ.P.*, to include lack of personal and/or subject matter jurisdiction, insufficiency of process and/or insufficiency of service of process, and moves for dismissal.

4.    Defendant pleads all affirmative defenses contained in Rule 8(c), *Ala.R.Civ.P.*, to the extent not

1

otherwise affirmatively set forth herein.

5.   Defendant pleads the applicable statute of limitations and/or statute of repose.

6.   Defendant pleads contributory negligence.

7.   Defendant pleads Plaintiff assumed the risk of its own conduct, barring any recovery.

8.   Defendant pleads lack of proximate cause.

9.   There is a lack of causal relation between any act or omission of this Defendant and the injury sustained by the Plaintiff.

10.  Defendant pleads waiver and/or estoppel, including but not limited to equitable, collateral, judicial, legal or statutory.

11.  Defendant pleads claim preclusion and/or issue preclusion.

12.  The Plaintiff's claims are barred by the doctrine of laches.

13.  Defendant pleads res judicata.

14.  Defendant pleads preemption.

15.  Defendant pleads abatement.

16.  Plaintiff's Complaint fails to name indispensable parties and must be dismissed, or, in the alternative,

2

stayed pending appropriate relief by the Court.

17.  Defendant pleads that the action is not prosecuted in the name of the real party in interest.

18.  Plaintiff lacks standing and/or lacks capacity.

19.  Defendant pleads prior pending action.

20.  Defendant pleads arbitration and specifically reserves the right to compel arbitration thus any participation by this Defendant in this litigation, specifically without limitation in discovery, should not be construed as a waiver; Defendant having specifically reserved his right.

21.  Defendant pleads failure to mitigate damages.

22.  Any recovery had by the Plaintiff must be reduced or set off by collateral sources paid to the Plaintiff.

23.  To the extent that the Plaintiff has concluded or may conclude a settlement or recover a verdict against any person, entity or party against whom the Plaintiff have, or could have, made or will make a claim, then this Defendant is entitled to a set-off for any amount paid and is otherwise entitled to introduce the fact of said settlement or verdict at its option.

3

24.  Defendant pleads lack of privity.

25.  Defendant pleads payment and/or release.

26.  Defendant pleads bankruptcy and/or discharge in bankruptcy of any party.

27.  Defendant pleads justification.

28.  Defendant pleads economic loss doctrine.

29.  Defendant pleads State of Frauds.

30.  Defendant pleads the general issue.

31.  All claims for punitive damages are unconstitutional under the constitutions of Alabama and the United States.

32.  Defendant denies each and every material allegation of the Complaint not specifically admitted to, and demands strict proof thereof.

33.  Defendant reserves the right to amend and/or supplement his answers should discovery reveal new or other available defenses.

### Defenses

34.  Defendant denies the material allegations of Plaintiff's Complaint and demands strict proof thereof.

4

## COUNTERCLAIM

Now, having answered the Plaintiff's Complaint, Defendant Darryl Wilson ("Mr. Wilson") files his Counter-claim in this matter against the Plaintiff, and respectfully represents unto Your Honor as follows:

### Parties

1.  Mr. Wilson is over the age of nineteen (19) years and a permanent resident of Mobile County, State of Alabama.

2.  The Bayou La Batre Housing Authority ("BLBHA") is a public non-profit corporation organized pursuant to Ala.Code §§ 24-1-20 et seq., and authorized to incorporate by a resolution adopted by the Bayou La Bater City Council in 2008.

### Factual Allegations

3.  Mr. Wilson incorporates by reference the content of ¶¶ 1-2 above as if set forth fully herein.

4.  In or around August 2013, BLBHA hired Mr. Wilson as its Facilities Manager.

5.  On or about October 1, 2019, BLBHA entered into an Employment Contract ("the Employment Contract") with Mr. Wilson, a true and correct copy of which is attached hereto

5

the content of which is incorporated by reference as if set forth fully herein.

6.   The Employment Contract was prepared by BLBHA's attorney, Brent Day.

7.   The Employment Contract was approved by BLBHA's Board on or about October 15, 2019.

8.   In relevant part, the Employment Contract reads:

"Upon the completion of the EMPLOYMENT CONTRACT and Wilson's election not to extend the contract or Wilson's termination, Wilson shall receive an annual retirement salary of $70,000 paid in equal bi-monthly payments of $2,916.67 at the time of cessation for the period of her life or ninety-nine years, whichever comes first. Wilson shall also receive an annual 2% cost of living increase beginning one year after the cessation of her employment and be calculated based upon the prior year's salary. Additionally, BLBHA will continue to provide health insurance coverage comparable to the outgoing health insurance policy provided to Wilson for the same term as indicated for Wilson's retirement salary. In the alternative to the annual retirement salary as outlined above, Wilson may elect to receive the net present value of her retirement based on a 10-year treasury rate at the time of separation from employment and social security life expectancy tables. BLBHA shall place funds in a separate dedicated account for the sole purpose of funding Wilson's retirement options and shall invest said funds in a diversified portfolio managed by a professional money

6

manager of Wilson's selection…" (See ¶ 3d. of Employment Contract).

"In the event Wilson deems it necessary to defend the terms and conditions of this EMPLOYMENT CONTRACT, the BLBHA shall be responsible for any and all legal fees incurred by Wilson in association with the defense of same. This shall include, but is not limited to, attorney's fees, filing fees, research fees, investigation fees, etc. Upon demand, BLBHA shall deposit with legal counsel as selected by Wilson, a deposit of ten thousand dollars ($10,000.00) to be applied to her legal fees…" (See ¶ 3f. of Employment Contract).

"BLBHA hereby indemnifies and agrees to hold Wilson harmless against and from any and all claims arising from the performance of employment related duties authorized by BLBHA in the conduct of its business or from any activity, work or other things done." (See ¶ 8 of Employment Contract).

9.   On or about July 9, 2020, an Addendum to Employment Contract ("the Addendum") was executed by BLBHA and Mr. Wilson which modified ¶ 3 of the Employment Contract, a true and correct copy of which is attached hereto the content of which is incorporated by reference as if set forth fully herein.

10.  The Addendum was approved by the Board of BLBHA on or about July 21, 2020.

11.  In relevant part, the Addendum reads:

7

"BLBHA recognizes the outstanding achievements and contributions Wilson has made in his role as Facilities Manager that has increased the value of Safe Harbor properties and improved the lives of its residents and neighbors. BLBHA recognizes Wilson has gone above and beyond all requirements and expectations in the performance of her duties as Facilities Manager. BLBHA recognizes that while acting in her role as Facilities Manager, Wilson has been subjected to and endured malicious, extraordinary, extreme obstacles and long-term mistreatment and maltreatment beyond the traditional norms of someone in her position. BLBHA recognizes traditional retirement benefits have been unavailable to Wilson during the course of his employment with BLBHA and therefore, upon the completion of the EMPLOYMENT CONTRACT and Wilson's election not to extend the contract or Wilson's termination, Wilson shall receive a one-time lump sum retirement payout minus any prior retirement contributions paid to Wilson by the BLBHA specifically designated for Wilson's retirement fund… [a]t the end of this contract period the total lump-sum payment owed to Wilson shall be $1,661,412.00…" (See ¶ 3d. of the Addendum).

"In the event Wilson deems it necessary to defend the terms and conditions of this EMPLOYMENT CONTRACT, the BLBHA shall be responsible for any and all legal fees incurred by WIlson in association with the defense of same. This shall include, but is not limited to, attorney's fees, filing fees, research fees, investigation fees, etc. Upon demand, BLBHA shall deposit with legal counsel as selected by Wilson a deposit of ten thousand dollars

8

($10,000.00) to be applied to her legal fees…" (See ¶ 3f. of the Addendum).

12. BLBHA has failed/refused to pay Mr. Wilson the sums owed him for retirement benefits pursuant to ¶ 3d. of the Employment Contract & Addendum, and sums owed him for attorney fees pursuant to ¶ 3f. of the Employment Contract & Addendum.

## Count I – Breach of Contract

13. Mr. Wilson incorporates by reference the content of ¶¶ 1-12 above as if set forth fully herein.

14.  The Employment Contract and Addendum are contractual agreements.

15. Mr. Wilson fully performed his obligations under the Employment Contract and Addendum.

16. BLBHA has breached the Employment Contract and Addendum in:

> A)  Failing/refusing to make the monthly retirement payment to Mr. Wilson as directed by ¶ 3d. of the Employment Contract;

> B)  Failing/refusing to make the $10,000 attorney fee payment as directed by  ¶ 3f. of the Employment Contract & Addendum; &

9

C)    Failing/refusing to make the lump sum retirement payment as directed by ¶ 3d. of the Addendum.

## Count II – Contractual Indemnity

17. Mr. Wilson incorporates by reference the content of ¶¶ 1-16 above as if set forth fully herein.

18. In the Employment Contract, BLBHA agreed to indemnify and hold Mr. Wilson harmless against and from any and all claims arising from the performance of employment related duties authorized by BLBHA in the conduct of its business or from any activity, work or other things done ("the Indemnity Agreement").

19. Mr. Wilson asserts he is entitled to indemnification from Plaintiff pursuant to the Indemnity Agreement for any judgment in this action arising from the performance of employment related duties authorized by BLBHA in the conduct of its business or from any activity, work or other things done.

**WHEREFORE** Darryl Wilson requests a judgment against Plaintiff for compensatory damages in an amount in excess of $50,000.00, in addition to court costs and whatever else relief he may be entitled to.

10

**JURY TRIAL DEMANDED.**


/s/ Jerry M. Blevins
JERRY M. BLEVINS (BLE003)
Attorney for Defendant Darryl
Wilson

OF COUNSEL:
Law Office of Jerry M. Blevins
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106
(334) 262-7600 (Voice)
(334) 262-7644 (Fax)
E-Mail: ATTYJMBlev@LawOfficeOfJerryMBlevins.com

11

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing upon:

Jay M. Ross, Esq.
A. Patrick Dungan, Esq.
Garrett Zoghby, Esq.
Adams and Reese, LLP
P.O. Box 1348
Mobile, Alabama 36633
Email:    jay.ross@arlaw.com
          patrick.dungan@arlaw.com
          garrett.zoghby@arlaw.com

Joe Stott, Esq.
Stott & Harrington, P.C.
2367 Valleydale Road, Suite 100
Birmingham, Alabama 35244
Email: joe@stottharrington.com

Tony Collier
7451 Highway 188
Coden, Alabama 36523

Michael Goodin
10675 Oak Avenue
Grand Bay, Alabama 36541

S. Joshua Briskman, Esq.
Briskman & Binion, P.C.
P.O. Box 43
Mobile, Alabama 36601
Email: jbriskman@briskman-binion.com

Buzz Jordan, Esq.
Buzz Jordan, P.C.
P.O. Box 210
Mobile, Alabama
Email: buzz@rossandjordan.com

via electronic transmission and/or by depositing a copy of the same in the U.S. Mail, postage prepaid this the 1st day of May 2021.

/s/ Jerry M. Blevins
Jerry M. Blevins

12



ELECTRONICALLY FILED
5/1/2021 10:05 AM
02-CV-2020-902475.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

# EMPLOYMENT CONTRACT

THIS CONTRACT made this 1st day of October 2019, by and between The City of Bayou La Batre Housing Authority (hereinafter BLBHA), and Darryl C. Wilson (hereinafter Wilson) and supersedes any previous contract, addendum or codicil between the parties.

This contract is subject to the terms, covenants and conditions herein set forth and the parties each covenant, as a material part of the consideration for this contract, to keep and preform each and all of said terms and conditions.

WHEREAS, BLBHA desires to continue to employ Wilson as Executive Director in the conduct of its bustiness and;

WHEREAS, BLBHA has offered to tender valuable consideration to Wilson as an inducement to enter into this employment agreement and;

WHEREAS, Wilson has agreed to accept the offer of employment tendered by BLBHA.

NOW THEREFORE, the parties agree as follows:

1.  This contract shall commence on the 1st day of October, 2019 and end on the 30th day of September, 2020.

2.  Wilson has the option to extend this contract for an additional successive one (1) year terms ("Option Term") subject to the following:

    a.  The contract is not in default

    b.  Wilson provides written notice of her intent to renew the contract not less than thirty (30) days prior to the scheduled expiration of the date of agreement. Wilson shall not be allowed to renew the contract in excess of ninety-eight (98) years.

3.  Consideration for this contract is as follows:

    a.  BLBHA shall tender to Wilson an annual gross salary of $84,000.00 per year paid in bi-monthly equal payments of $3,500.00 for the initial term of this contract.

    b.  Commencing in any option term of this agreement, the parties shall mutually agree to salary adjustments, if any, within ninety (90) days prior to the commencement of any option term.

    c.  In no event shall BLBHA decrease the annual consideration to less than the gross annual sales in the initial term of this agreement.

d.  Upon the completion of the EMPLOYMENT CONTRACT and Wilson's election not to extend the contract or Wilson's termination, Wilson shall receive an annual retirement salary of $70,000.00 paid in bi-monthly equal payments of $2,916.67 at the time of cessation for the period of her life or ninety-nine years, whichever occurs first. Wilson shall also receive an annual 2% cost of living increase beginning one year after the cessation of her employment and be calculated based upon the prior year's salary. Additionally, BLBHA will continue to provide health insurance coverage comparable to the outgoing health insurance policy provided to Wilson for the same term as indicated for Wilson's retirement salary. In the alternative to the annual retirement salary as outlined above, Wilson may elect to receive the net present value of her retirement based on a 10-year treasury rate at the time of separation from employment and social security life expectancy tables. BLBHA shall place funds in a separate dedicated account for the sole purpose of funding Wilson's retirement options and shall invest said funds in a diversified portfolio managed by a professional money manager of Wilson's selection. In the event the real property of the BLBHA is sold or any other event occurs to cause the cessation of the BLBHA, or the BLBHA receives a windfall, the monies therefrom shall first be used to fund the above referenced retirement account.

e.  That in the event the ownership of the BLBHA is sold or transferred in any way, the terms and conditions of the EMPLOYMENT CONTRACT shall remain in full force and effect. Any subsequent owner of the BLBHA shall assume the obligation created in the EMPLOYMENT CONTRACT. The terms and conditions of the EMPLOYMENT CONTRACT shall only be affected by the death of Wilson or on the event Wilson voluntarily or willfully terminates the EMPLOYMENT CONTRACT.

f.  In the event Wilson deems it necessary to defend the terms and conditions of this EMPLOYMENT CONTRACT, the BLBHA or subsequent owner shall be responsible for any and all legal fees incurred by Wilson in association with the defense of same. This shall include, but is not limited to, attorney's fees, filing fees, research fees, investigation fees, etc. Upon demand, BLBHA shall deposit with legal counsel as selected by Wilson, a deposit of ten thousand dollars ($10,000.00) to be applied to her legal fees. Upon expenditure of said deposit, BLBHA shall deposit with Wilson's legal counsel additional amounts of five thousand dollars ($5,000.00) until such time the defense of this contract has been

completed. This shall include any appeals or other action as may be deemed necessary by Wilson.

4. Wilson agrees to refrain, within the confines of Mobile County, Alabama, from engaging in any business which inherently conflicts with the interest of BLBHA.

5. BLBHA agrees to pay Wilson contract or retirement payments on or before the 1st and 15th day of each month and on these respective dates thereafter.

6. All equipment and materials furnished by BLBHA to Wilson, including but not limited to computers, software, communication devices, policy and procedure manuals, financial data including budgetary calculations and analysis, income statements and operational expenditures, leases, rent rolls, tenant indexes and files, shall be used by Wilson in the performance of job duties and these shall remain the property of BLBHA. All property of BLBHA, as set forth herein, shall be returned by Wilson on the termination date of this agreement. All records of BLBHA to which Wilson has access, shall be considered proprietary and said information shall not be disseminated by Wilson, to any third party without first obtaining written authorization authorizing any such disclosure.

7. BLBHA shall at all times during this contract and its renewals, maintain workman's compensation insurance and liability insurance for the benefit of Wilson.

8. BLBHA hereby indemnifies and agrees to hold Wilson harmless against and from any and all claims arising from the performance of employment related duties authorized by BLBHA in the conduct of its business or from any activity, work or other things done.

9. BLBHA agrees to procure policies of health and dental insurance pursuant to which Wilson, as an employee will be an insured of said policies. BLBHA, shall pay the policy premiums as they come due and shall pay 100% of the cost of policy premiums.

10. Wilson shall be entitled to be off for all federal, state and local holidays.

11. Wilson shall be entitled to compensation for one sick day during each month during the term of this contract or any renewal. Said sick leave is cumulative within any contract or option term.

12. Wilson shall be entitled to compensation for two personal day per month during the term of this contract or any renewal.

13. Wilson shall be entitled to three weeks paid vacation during the term of this contract and any renewal.

14. BLBHA shall provide Wilson compensation for all holidays recognized by the federal, state and local government for its employees.

15. BLBHA shall reimburse Wilson for authorized travel expenses pursuant to the reimbursement schedules of the State of Alabama in effect at the time said authorized travel expenses are incurred.

16. Notwithstanding any other termination provision in this agreement, the BLBHA may terminate this agreement without cause upon ninety (90) days written notice to Wilson, provided however, BLBHA shall tender full compensation to Wilson for the remaining term of this contract together with sick days, personal days and vacation days with payment due in full no later than the 90th day.

17. The parties agree that the oversight of the BLBHA of its officers, directors and employees shall be professional at all times conductive to maintaining the highest workplace environment and standards.

18. All rights, options and remedies contained in this contract shall be construed and held to be cumulative.

19. Any and all notices, elections or demands permitted or required to be made under this contract shall be in writing, and shall be delivered personally, or sent by overnight currier service by a company regularly engaged in the business of delivering business packages, or sent by registered or certified mail, return receipt requested, to the other party at the respective address set forth as follows: To BLBHA: 12131 Safe Harbor Circle E, Irvington, AL 36544; to Wilson: 3480 Semmes Woods Dr., Semmes, AL 36544. The date of personal delivery or, if sent by mail or overnight currier, then the date of delivery or first refusal thereof as evidenced by the carrier's or courier's receipt, shall be the effective date of such notice, election or demand.

20. No wavier by the parties of any such provision of this contract shall be deemed to be wavier of any other provision hereof or any subsequent breach by the other party of the same or any other provision.

21. The parties agree that time is of the essence in this contract.

22. All rights and liabilities herein given to or imposed upon the respective parties hereto shall extend to and bind the several respective heirs, executers, administrators' successors and assigns of the said parties.

23. If any provision of this contract is declared invalid, unenforceable or unconstitutional it shall in no way effect, impair or invalidate any other provision hereof.

24. If any provision of this contract is determined to be vague or ambiguous, said provision shall be read in a light more favorable to Wilson.

25. No provision of this contract may be amended except by an agreement in writing.

26. This contract is made by the parties in the State of Alabama, and shall be construed, interpreted and governed by and in accordance with the laws of such state. The parties agree that all legal proceedings with respect to this contract shall be brought in the district or circuit court of Mobile County, Alabama.

27. The parties each hereby represent that the person signing on behalf of such party has the full right and authority to enter into this contract and by doing so does not violate any existing agreement to which it is a party or by which it sis bound or affected.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this contract as the day and year first above written.

The City of Bayou La Batre Housing Authority

By: _Marcia Stork_    _Oct 1, 2019_
                        Date

Its: _Chairperson_

By: _(signature)_    _Oct. 1, 2019_
                     Date

Its: _Vice Chairman_

_(signature)_
Darryl C. Wilson    _10-1-19_
                    Date

ELECTRONICALLY FILED
5/1/2021 10:05 AM
02-CV-2020-902475.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## ADDENDUM TO EMPLOYMENT CONTRACT

The parties, The City of Bayou La Batre Housing Authority (hereinafter BLBHA) and Darryl C. Wilson (Hereinafter Wilson) executive an EMPLOYMENT CONTRACT on or about October 1, 2019, and;

WHEREAS Paragraph twenty-five (25) of the EMPLOYMENT CONTRACT provides that the parties may amend the contract by an agreement in writing, and'

WHEREAS, BLBHA and Wilson agree that the EMPLOYMENT CONTRACT shall be amended by agreement to modify the Paragraph Three (3) "Consideration for this contract is as follows" in its entirety and any addendums there to read as follows;

NOW, THEREFORE, the parties, BLBHA and Wilson, agree the the EMPLOYMENT CONTRACT be amended in its entirety and any addendums thereto read as follows:

3. Consideration for this contract is as follows:

    a. BLBHA shall tender to Wilson an annual gross salary of $84,000.00 per year paid in bi-weekly equal payments of $3,500.00 for the initial term of this contract.

    b. Commencing in any option term of this agreement, the parties shall mutually agree to salary adjustments, if any, within ninety (90) days prior to the commencement of any option term.

    c. In no event shall BLBHA decrease the annual consideration to less than the gross annual salary in the initial term of this agreement.

    d. BLBHA recognizes the outstanding achievements and contributions Wilson has made in his role as Facilities Manager that has increased the value of the Safe Harbor properties and improved the lives of its residents and neighbors. BLBHA recognizes Wilson has gone above and beyond all requirements and expectations in the performance of her duties as Facilities Manager. BLBHA recognizes that while acting in her role as Facilities Manager, Wilson has been subjected to and endured malicious, extraordinary, extreme obstacles and long-term mistreatment and

maltreatment beyond the traditional norms of someone in her position. BLBHA recognizes traditional retirement benefits have been unavailable to Wilson during the course of his employment with BLBHA and therefore, upon the completion of the EMPLOYMENT CONTRACT and Wilson's election not to extend the contract or Wilson's termination, Wilson shall receive a one-time lump-sum retirement payout minus any prior retirement contributions paid to Wilson by the BLBHA specifically designated for Wilson's retirement fund. Wilson will receive the net present value of his retirement based on a 10-year treasury rate at the time of separation from employment and social security life expectancy tables. BLBHA shall place funds in a separate dedicated account for the sole purpose of funding Wilson's retirement options and shall invest said funds in a diversified portfolio managed by a professional money manager of Wilson's selection. At the end of this contract period the total lump-sum payment owed to Wilson shall be $1,661,412.00 In the event the real property or any asset of the BLBHA is sold or any other event occurs to cause the cessation of the BLBHA, or the BLBHA receives a windfall, the monies therefrom shall first be used to fund the above referenced retirement account.

e.    The terms and conditions of the EMPLOYMENT CONTRACT shall only be affected by the death of Wilson.

f.    In the event Wilson deems it necessary to defend the terms and conditions of this EMPLOYMENT CONTRACT, the BLBHA shall be responsible for any and all legal fees incurred by Wilson in association with the defense of same. This shall include, but is not limited to, attorney's fees, filing fees, research fees, investigation fees, etc. Upon demand, BLBHA shall deposit with legal counsel as selected by Wilson, a deposit of ten thousand dollars ($10,000.00) to be applied to her legal fees. Upon expenditure of said deposit, BLBHA shall deposit with Wilson's legal counsel additional amounts of five thousand dollars ($5,000.00) until such time the defense of this contract has been completed. This shall include any appeals or other action as may be deemed necessary by Wilson.

That this Addendum to Employment Contract shall be made part thereof and shall continue to remain part thereof in any extensions unless specifically invalidated by agreement of both parties in writing as per Paragraph twenty-five (25) of the EMPLOYMENT CONTRACT.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this addendum to contract as the day and year first above written.

The City of Bayou La Batre Housing Authority

By _____   7-9-2020
Marcia Stork, Chairwoman                 Date

By _____   7-9-2020
John Joyner, Vice Chairman               Date

_____   7-9-2020
Darryl C. Wilson           Date

# Exhibit B

| May 2022 Grand Jury Session | INDICTMENT | GJ No: 337 |
| | | *Secret* |

State of Alabama
 v.

Virginia Christine Huddleston

STATE OF ALABAMA
CIRCUIT COURT OF
THIRTEENTH JUDICIAL
CIRCUIT

CC2022-1787

Circuit Court of Mobile County, May 2022

Count 1

THEFT 3/500-1499 (eff. 1-30-16)
Bond Amount: $1000.00

The Grand Jury of said county charge that, before the finding of this indictment, Virginia Christine Huddleston, alias, VIRGINIA H. SHANAHAN, whose name is to the Grand Jury otherwise unknown, did, from approximately **March 2, 2020 through June 26, 2020,** knowingly obtain or exert unauthorized control over **the fund(s), account (s), credit card, and/or flooring material,** the property of **Bayou La Batre Housing Authority,** of the approximate **aggregate** value of **which exceeds $500.00 but which does not exceed $1,499.00,** with the intent to deprive the owner of said property, in violation of §13A-8-4.1 of the Code of Alabama, against the peace and dignity of the State of Alabama.

A **TRUE BILL,** presented to the court by the foreperson of the Grand Jury, in the presence of ___14___ Grand Jurors and filed in open Court by order of the Court on this the **13ᵗʰ day of May, 2022.**

No Prosecutor.
Total Bail fixed in open court at $1,000.00.

_____
Foreperson of the Grand Jury

_____
Circuit Court Judge
**Thirteenth Judicial Circuit of Alabama**

**ASHLEY RICH**
**District Attorney**
**Thirteenth Judicial Circuit of Alabama**

_____
**Clerk of Circuit Court**
**Thirteenth Judicial Circuit of Alabama**

**CHARGES:**
( 1 ) THEFT 3/500-1499 (EFF. 1-30-16)

Race:   Sex: Female   DOB: 5/4/1967   SSN: ███████   Eyes:   Hair:   Ht:   Wt:   Address: 3480 Semmes Woods Drive, Semmes, AL 36575

# IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

STATE OF ALABAMA,                    *

VS.                                  *

DEFENDANT.                           *

# ORDER

It is hereby ORDERED,

1. The District Attorney shall produce or make available to the Defendant's attorney at arraignment the following:
   (a) A copy of the indictment against the Defendant;
   (b) All statements of the Defendant which are reduced to writing;
   (c) All statements of the Defendant which are electronically recorded or taped, and any transcripts hereof;
   (d) The substance of any oral statements made by the Defendant which are not included within (b) and (c) hereof or if the District Attorney knows of any statements or spontaneous remarks made while the Defendant is in the custody of the police or during the investigation;
   (e) Any and all evidence tending to exculpate the guilt of the Defendant;
   (f) The results of any scientific or expert tests, experiments, or examinations to be used by the Prosecution at trial;
   (g) All physical evidence or documentary evidence which the Prosecution will offer into evidence in its case in chief, including any search warrant and search affidavits upon which the Prosecution will rely on in its case in chief;
   (h) All physical evidence or documentary evidence seized from the Defendant by law enforcement officers, whether or not the same will be offered into evidence at trial;
   (i) In prosecutions under the Alabama Uniform Controlled Substances Act, the Defendant may procure the examination and testing of controlled substances or other prosecution evidence by his own expert, upon request to the District Attorney or his assistants. Such

1

examination and testing shall only take place in the presence of the District Attorney or his authorized representative, and the same shall be done at the Defendant's expense;

(j) The name and last known address of all confidential government informants who are eyewitnesses to the commission of the crime charged in the indictment, if the Defendant does not already have such information.

(k) Any video or audio recordings received from the District Attorney's Office may be reviewed with the Defendant, but may not be duplicated or published to any third party by the District Attorney's Office, the Defendant or Defense Counsel, absent specific authorization from the Court.

2. In all instances where physical or documentary evidence, tape recordings, and the like are to be inspected, examined or copied by the Defense Counsel, the parties shall ensure that such procedures are used as will safeguard and maintain the integrity of said evidence.

3. The District Attorney is under an obligation to disclose to Defense Counsel any evidence subject to this Order which he subsequently discovers to exist, and to do so within a reasonable time after its existence is discovered.

4. The District Attorney shall disclose to the Defendant and his attorney any prior convictions of the Defendant of which the District Attorney is aware.

5. Any disagreements with the parties concerning the scope, identify or existence of discoverable matter are to be submitted to the Court for resolution upon written motion of either party a reasonable time before trial. Any party who does not so submit any unresolved discovery issue to the Court will be precluded from raising the same at trial. If the Court finds that either party has failed to use good faith in complying with this Order, the Court may, in the case of the State, bar the State from using at trial any non-disclosed matter, and the Court may, in the case of the Defendant, hold any objections to the State's use of said matter at trial, based upon prior non-disclosure, to be waived.

6. If the prosecutor elects to make an offer of recommendation, the offer is to be made as soon as possible after arraignment unless special circumstances exist

2

(e.g., mental evaluation necessary, youthful offender report necessary, etc.) which inhibit a meaningful offer.

7. A conference shall be held with the District Attorney, the Defendant's attorney and the Defendant before the Status Hearing to be scheduled by the Court at arraignment.

8. At said conference:

    a. The District Attorney shall generally outline the evidence which she expects to produce at the trial; provided, however, that this requirement shall <u>not</u> apply to evidence used for impeachment purposes;

    b. The District Attorney shall advise the Defendant of all pending charges against the Defendant known to the State;

    c. Unless otherwise ordered, the Defendant shall have until the Status Hearing within which to accept or reject any recommendation of the State. No sentencing recommendation shall be entertained by the Court after the Status Hearing.

9. A strike list shall be compiled for any trial by jury and a copy of the strike list shall be given to each party. Upon selection of the jury, the strike list shall be made part of the Court record. Neither the Defendant or Victim shall retain a copy of the strike list and each counsel shall collect the extra copies of the list and submit them to the Court. No counsel or their client shall duplicate or publish to any third party the strike list absent specific authorization from the Court.

**DONE at Mobile, Alabama this the** 13TH **day of** MAY **20** 22 **.**

_____
MICHAEL A. YOUNGPETER
PRESIDING CIRCUIT COURT JUDGE

3

# Exhibit C

807    S+

# WRIT OF ARREST - GRAND JURY INDICTMENT

STATE OF ALABAMA                    MOBILE COUNTY                    CIRCUIT    COURT

AGENCY NUMBER:                              WARRANT NUMBER: GJ 2022 050337.00
                                            OTHER CASE NBR:                .

AN INDICTMENT HAVING BEEN FOUND BY THE GRAND JURY OF MOBILE COUNTY,
ALABAMA, ON THE _13th_ DAY OF _MAY_, _2022_

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST    HUDDLESTON VIRGINIA CHRISTIN    AND BRI
HIM/HER BEFORE THE CIRCUIT    COURT OF MOBILE COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
            THEFT OF PROPERTY 3R    CLASS: D    TYPE: F    COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN    THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ _____, OR UNTIL LEGALLY DISCHARGED.

BOND SET AT: (1)        $1,000.00    BOND TYPE:

_JoJo Schwarnauer_
JUDGE/CLERK/MAGISTRATE OF CIRCUIT    COURT

CHARGES: THEFT OF PROPERTY 3R    13A-008-004.1            F   FELONY

NAME: HUDDLESTON VIRGINIA CHRISTIN        ALIAS:
ADDRESS: 3480 SEMMES WOODS DRIVE          ALIAS:
ADDRESS:
CITY: SEMMES              STATE: AL        ZIP: 36575 0000
                                          PHONE: 000 000 0000 EXT: 000

EMPLOYMENT:
DOB: 05/04/1967    RACE: W    SEX: F    HAIR: BRN
EYE: GRN    HEIGHT: 0'00" 5'7" WEIGHT: 000 175
SID: 000000000    SSN: ████████    DL NUM: 7820910

# E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND
( ✓ )  PLACING DEFENDANT IN THE MOBILE COUNTY JAIL
(   )  RELEASING DEFENDANT ON APPEARANCE BOND

THIS __27th__ DAY OF __MAY__        __2022__

_Sam Cochran_
SHERIFF

_MCSO Deputy Phillips, Lena_
BY

OPERATOR: BRE        DATE: 05/26/2022



2022 MAY 31 AM 10:__

WARRANTS DIVISION
2022-MAY-27 - AM 10:13
MOBILE COUNTY
SHERIFF'S OFFICE

Exhibit D

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| BAYOU LA BATRE HOUSING AUTHORITY, A PUBLIC NON-PROFIT CORPORATION | Case No.: CV-2020-902475 |
| Plaintiff, | |
| vs. | JURY TRIAL DEMANDED |
| DEFENDANT'S NAME, | |
| VIRGINIA HUDDLESTON; DARRYL WILSON | |

## COUNTERCLAIM BY DEFENDANTS VIRGINIA HUDDLESTON AND DARRYL WILSON

COMES NOW Defendants Virginia Huddleston ("Huddleston") and Darryl Wilson ("Wilson"), and files this counterclaim against the Plaintiffs, whose wrongful conduct caused irreparable damages to Defendants Huddleston and Wilson, and alleges as follows:

## THE PARTIES

1. Defendant Virginia Huddleston is over the age of nineteen (19) years and a permanent resident of Mobile County, State of Alabama.

2. Defendant Darryl Wilson is over the age of nineteen (19) years and a permanent resident of Mobile County, State of Alabama.

3. The Bayou La Batre Housing Authority ("BLBHA") is a public non-profit corporation organized pursuant to Ala.Code §§ 24-1-20 et seq., and authorized to incorporate by a resolution adopted by the Bayou La Batre City Council on December 1, 2009.

## JURISDICTION AND VENUE

4. This court has jurisdiction over this matter, in which the amount in controversy exceeds $20,000, pursuant to Ala. Code § 12-11-30 (1975).

5. This court is the appropriate venue for this action pursuant to Ala. Code § 6-3-2 (1975) because Plaintiffs were conducting business at the time of the accrual of this cause in Mobile County and the events giving rise to the counterclaim occurred in Mobile County.

## STATEMENT OF FACTS

6. May 30, 2020, Plaintiffs held a meeting of the members of the Board of Directors. This meeting was when Defendants Huddleston and Wilson first became aware the Plaintiffs were engaged in a coordinated plot against Defendants Huddleston and Wilson. The meeting was held at the Bayou La Batre City Hall instead of its standard meeting place located at the office of the Bayou La Batre Housing Authority.

7. Prior to the meeting Plaintiffs contacted all local media outlets to insure their presence at the meeting.

8. Local news station WKRG, Mobile, Alabama, broadcast the meeting live on its Facebook platform.

9. During the meeting Plaintiffs made coordinated false and defamatory (both civil and criminal) allegations they knew to be false against Defendants Huddleston and Wilson.

10. During the meeting it was co-conspirator and Attorney Jay Ross, who personally, knowingly and willfully introduced multiple false, misleading and defamatory (both civil and criminal) allegations against Huddleston and Wilson and provided validation to other Plaintiffs claims Ross knew to be false. Jay Ross is a material witness in all of the cases currently in front of this Honorable Court involving Defendants Huddleston and Wilson.

11. During the meeting, Bayou La Batre Housing Authority Attorney Brent Day, was present. Day who was the representing attorney for the Bayou La Batre Housing Authority during the events in this case afforded three opportunities for Ross and other Plaintiffs to correct themselves and retract some of the criminal and false allegations maliciously levied against Defendants Huddleston and Wilson. Ross and the other Plaintiffs refused and continued to further defame (both civil and criminal) Defendants Huddleston and Wilson.

12. During the meeting co-conspirator Paul Burch, acting in his capacity as a member of the board of directors but speaking on authority in his role as Commander of the Criminal Investigations Unit for the Mobile County Sheriff's Department admitted the false and criminally defamatory allegations

made by Plaintiffs during the meeting was the basis for Burch to order his Criminal Investigation Unit to open a criminal investigation into Defendants Huddleston and Wilson a week prior to the meeting.

13. In his role as Commander of Criminal Investigations co-conspirator Paul Burch gave multiple media interviews in which he purposely restated the false allegations against Defendants Huddleston and Wilson and created even more.

14. During the meeting, co-conspirator and Mayor Terry Downey, who appointed the Plaintiffs to the board of directors, made criminally defamatory allegations against Defendants Huddleston and Wilson.

15. Five (5) days later, on October 5, 2020, the Mobile County Sheriffs Office, led by co-conspirators Paul Burch and civilian John Hatcher, executed a Search Warrant on the home of Defendants Huddleston and Wilson. Every local media outlet was notified prior to the execution of the Search Warrant on Defendants homes and were present during the execution of the Search Warrant.

16. Plaintiffs intentionally generated a media frenzy lasting months in which these false civil and criminally defamatory allegations were repeated.

17. Plaintiffs have continued to engage in outrageous and malicious acts of both civil and criminal defamation, retaliation, harassment, and intimidation of Defendants Huddleston and Wilson as recently as June 3, 2022, when co-conspirator John Hatcher appeared in his capacity as member of the Board of Directors for the Bayou La Batre Housing Authority, on the FM Talk Radio Show "Midday Mobile" in an episode titled "Johnny Hatcher Talks About the Bayou La Batre Housing Scandal". During the interview Hatcher not only reasserted as true the false and defamatory (both civil and criminal) allegations against Defendants Huddleston and Wilson but Hatcher made even more false and misleading statements and allegations against Defendants Huddleston and Wilson.

18. On December 14, 2020, Plaintiffs filed its vexatious and frivolous lawsuit against Defendants Huddleston and Wilson which Plaintiffs knowingly riddled with false, defamatory statements (both civil and criminal), and misleading information while also withholding exculpatory evidence with the intent to cause further harm to Defendants Huddleston and Wilson, and in effort to purposely mislead Your Honor as well as the public.

19. Months prior to co-conspirator Mayor Terry Downey appointing Plaintiffs to the Board of Directors of the Bayou La Batre Housing Authority, Plaintiffs conspired to destroy Defendants Huddleston and Wilson both personally and professionally. Plaintiffs nefarious plot included defamation (both civil and criminal), retaliation, harassment, intimidation, and weaponization of the judicial system with an intended ultimate end goal of Defendants Huddleston and Wilson being left destitute and Defendants Huddleston and Wilsons personal freedoms and liberties stripped by the intended imprisonment of Defendants Huddleston and Wilson.

20. As a direct result of Plaintiffs unethical, immoral, wrongful, malicious and indefensible, civil and criminal acts Defendants Huddleston and Wilson have been irreparably harmed both personally and professionally and have suffered damages in an amount to be proven at trial.

WHEREFORE, PREMISES CONSIDERED, Defendants Huddleston and Wilson seeks compensatory and punitive money damages from the Plaintiffs in an amount to be determined by the trier of fact to compensate Huddleston and Wilson for the irreparable harm done to their personal and professional reputations, mental and emotional stress, and other unspecified damages allowable by law, plus all costs, and all other relief at law and equity to which Huddleston and Wilson may be entitled.

## **PRAYER FOR RELIEF**

WHEREAS, PREMISES CONSIDERED, as the direct result of the foregoing wrongful acts, Defendants Huddleston and Wilson seeks an award of the following relief:

I. Defendants request leeway from Your Honor as this counterclaim is being filed Pro Se in order to meet the statute of limitations in this case.

II. Due to the criminal allegations levied, ongoing criminal investigations of Defendants Huddleston and Wilson, and current criminal charges pending against Huddleston, Defendants Huddleston and Wilson request a Stay in this case until the Statute of Limitations have expired, any criminal charges against Defendants Huddleston and Wilson have been resolved, and/or Defendants waive their Constitutional Fifth Amendment Rights already asserted and granted by this court in Plaintiffs case against Defendants.

III. Compensatory and punitive damages in excess of the jurisdictional limits of this Court in such sum as the trier of fact shall award based on the wrongdoing alleged in this complaint;

IV. Court Costs, Future Attorneys' fees and cost of courts, and other unspecified costs and expenses.

## DEFENDANTS RESPECTFULLY REQUESTS TRIAL STRUCK BY JURY

Respectfully submitted,

Defendants:

/s/ Virginia Huddleston

/s/ Darryl Wilson

**Plaintiffs to be served via Process Server from Mobile County Sheriff's Office as follows:**

Bayou La Batre Housing Authority
12131 Safe Harbor Circle E
Irvington, Alabama 36575

# Exhibit E



AlaFile E-Notice

02-CV-2020-902475.00

Judge: S. WESLEY PIPES

To:  WOOD ALEXANDRA TERRY
atw@starneslaw.com

# COURTESY NOTICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

BAYOU LA BATRE HOUSING AUTHORITY V. VIRGINIA HUDDLESTON ET AL
02-CV-2020-902475.00

The following matter was FILED on 11/10/2022 3:07:04 PM

MOTION TO ALLOW FILING OF AMENDED CCOMPLAINT
[Filer: PRO SE]

Notice Date:        11/10/2022 3:07:04 PM

This copy is being provided as a courtesy copy only. Providing this copy is not required by law and is not intended to constitute service.

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| BAYOU LA BATRE HOUSING AUTHORITY, A PUBLIC NON-PROFIT CORPORATION | Case No.: CV-2020-902475 |
| Plaintiff, | |
| vs. | JURY TRIAL DEMANDED |
| DEFENDANT'S NAME, | |
| VIRGINIA HUDDLESTON; DARRYL WILSON | |

## MOTION TO ALLOW FILING OF AMENDED COMPLAINT

Come Now Defendants/Counterclaim Plaintiffs, Virginia Huddleston and Darryl Wilson, Pro Se, and respectfully request that this court allow Defendants/Counterclaim Plaintiffs first Amended Complaint to be filed on the record. Said complaint was originally filed on September 29, 2022, and reflected the incorrect date Plaintiff's held a board meeting at Bayou La Batre City Hall which was broadcast live by WKRG as May 30, 2020. The amended complaint reflects the correct meeting date of September 30, 2020.

Amended Complaints are attached for filing with this court in the event the court grants this motion.

VIRGINIA HUDDLESTON & DARRYL WILSON
Defendants/Counterclaim Plaintiffs filing Pro Se
3480 Semmes Woods Dr
Semmes, Alabama 36575

Virginia Huddleston _____ Nov 10, 2022
Virginia Huddleston                Date

Darryl Wilson _____ 11·10·22
Darryl Wilson                Date

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| VIRGINIA HUDDLESTON: DARRYL WILSON | Case No.: |
| Plaintiff, | |
| vs. | JURY TRIAL DEMANDED |
| DEFENDANT'S NAME, | |
| JAY ROSS, PAUL BURCH, JOHN WAYNE HATCHER, MICHAEL BURDINE, DEBRA JONES, STEPHANIE GODSEY, TERRY DOWNEY, ADAMS AND REESE, LLP, CITY OF BAYOU LA BATRE, MOBILE COUNTY SHERIFF'S OFFICE | |

## CLAIM VIRGINIA HUDDLESTON AND DARRYL WILSON

COMES NOW Plaintiffs Virginia Huddleston ("Huddleston") and Darryl Wilson ("Wilson"). and files this complaint against the Defendants, whose wrongful conduct caused irreparable damages to Plaintiffs Huddleston and Wilson, and alleges as follows:

### THE PARTIES

1. Plaintiff Virginia Huddleston is over the age of nineteen (19) years and a permanent resident of Mobile County, State of Alabama.

2. Plaintiff Darryl Wilson is over the age of nineteen (19) years and a permanent resident of Mobile County, State of Alabama.

3. Defendant Jay Ross is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was the Attorney of Record for the Bayou La Batre Housing Authority and the City of Bayou La Batre at all times pertinent to the actions which are the basis of this cause.

4. Defendant Paul Burch is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a member of the Board of Directors for the Bayou La Batre Housing Authority and Commander of the Mobile County Sheriff's Department Criminal Investigations Unit at all times pertinent to the actions which are the basis of this cause.

COURTESY COPY

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

VIRGINIA HUDDLESTON; DARRYL WILSON          Case No.: 02-CV-2020-902475.00

        Plaintiff,

vs.                                          JURY TRIAL DEMANDED

DEFENDANT'S NAME,

        JAY ROSS, PAUL BURCH, JOHN
WAYNE HATCHER, MICHAEL BURDINE, DEBRA
JONES, STEPHANIE GODSEY, TERRY DOWNEY,
ADAMS AND REESE, LLP, CITY OF BAYOU LA
BATRE, MOBILE COUNTY SHERIFF'S OFFICE

## MOTION TO ALLOW FILING OF AMENDED COMPLAINT

Come Now Defendants/Counterclaim Plaintiffs, Virginia Huddleston and Darryl Wilson,

Pro Se, and respectfully request that this court allow Defendants/CounterclaimPlaintiffs first

Amended Complaint to be filed on the record. Said complaint was originally filed on September

29, 2022, and reflected the incorrect date Plaintiff's held a board meeting at Bayou La Batre

City Hall which was broadcast live by WKRG as May 30, 2020. The amended complaint

reflects the correct meeting date of September 30, 2020.

Amended Complaints are attached for filing with this court in the event the court grants

this motion.

VIRGINIA HUDDLESTON & DARRYL WILSON
Defendants/Counterclaim Plaintiffs filing Pro Se
3480 Semmes Woods Dr
Semmes, Alabama 36575

Virginia Huddleston                          11-10-2022
_____                      _____
Virginia Huddleston                          Date

Darryl Wilson                                11/10/2022
_____                      _____
Darryl Wilson                                Date

COURTESY COPY

5. Defendant John "Johnny" Hatcher is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a Board member of the Housing Authority at all times pertinent to the actions which are the basis of this cause.

6. Defendant Michael Burdine is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a Board member of the Housing Authority at all times pertinent to the actions which are the basis of this cause.

7. Defendant Debra Jones is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a Board member of the Housing Authority at all times pertinent to the actions which are the basis of this cause.

8. Defendant Stephanie Godsey is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a Board member of the Housing Authority at all times pertinent to the actions which are the basis of this cause.

9. Defendant City of Bayou La Batre is located in Mobile County, Alabama, and was represented by Mayor Terry Downey and other co-conspirators City officials and employees, names unknown, at all times pertinent to the actions which are the basis of this claim.

10. Defendant Adams and Reese, LLP, employer of Jay Ross, Managing Partner, who was the Attorney of Record for the Bayou La Batre Housing Authority and the City of Bayou La Batre at all times pertinent to the actions which are the basis for this claim.

11. Defendant Mobile County Sheriff's Department, employer of Captain Paul Burch, Commander of the Criminal Investigations Unit in Mobile County, Alabama at all times pertinent to the actions which are the basis of this claim.

**JURISDICTION AND VENUE**

12. This court has jurisdiction over this matter, in which the amount in controversy exceeds $20,000, pursuant to Ala. Code § 12-11-30 (1975).

13. This court is the appropriate venue for this action pursuant to Ala. Code § 6-3-2 (1975) because Defendant was conducting business at the time of the accrual of this cause in Mobile County and the events giving rise to the claim occurred in Mobile County.

## STATEMENT OF FACTS

6. On September 30, 2020, Defendants held a public meeting of the members of the Bayou La Batre Housing Authority Board of Directors. This meeting was when Plaintiffs Virginia Huddleston and Darryl Wilson became aware the Defendants were engaged in a coordinated conspiracy Against Plaintiffs Huddleston and Wilson. The meeting was held at the Bayou La Batre City Hall instead of its standard located at the office of the Bayou La Batre Housing Authority.

7. Prior to the meeting Defendants contacted all local media outlets to insure their presence at the meeting.

8. Local news station WKRG, Mobile, Alabama, broadcast the meeting live on its Facebook platform.

9. During the meeting Defendants made coordinated false and defamatory (both civil and criminal) allegations known to be false against Plaintiffs Huddleston and Wilson.

10. During the meeting it was the Bayou La Batre Housing Authority Attorney and co-conspirator, Jay Ross, who personally knowingly and willfully introduced multiple false, misleading and defamatory (both civil and criminal) allegations against Huddleston and Wilson and provided validation to other Defendants claims Ross knew to be false. Jay Ross is a material witness in all of the cases currently in front of this Honorable Court involving Plaintiffs Huddleston and Wilson.

11. During the meeting, Bayou La Batre Housing Authority Attorney Brent Day, was present. Day who was the representing attorney for the Bayou La Batre Housing Authority during the events in this case afforded three opportunities for Ross and other Defendants to correct themselves and retract some of the criminal and false allegations maliciously levied against Plaintiffs Huddleston and

Wilson. Ross and the other Defendants refused and continued to further defame (both civil and criminal) Plaintiffs Huddleston and Wilson.

12. During the meeting, Defendant and co-conspirator Paul Burch, acting in his capacity as a member of the board of directors but speaking on authority in his role as Commander of the Criminal Investigations Unit for the Mobile County Sheriff's Department admitted the false and criminally defamatory allegations made by Defendants during the meeting was the basis for Defendant Burch to order his Criminal Investigation Unit to open a criminal investigation into Plaintiffs Huddleston and Wilson a week prior to the meeting.

13. In his role as Commander of Criminal Investigations and co-conspirator Paul Burch gave multiple media interviews in which he purposely restated the false allegations against Plaintiffs Huddleston and Wilson and created even more.

14. During the meeting, Mayor and co-conspirator Terry Downey, who appointed the Defendants to the board of directors, made criminally defamatory allegations against Plaintiffs Huddleston and Wilson.

15. Five (5) days later, on October 5, 2020, the Mobile County Sheriffs Office, led by co-conspirators Paul Burch and civilian John Hatcher, executed a Search Warrant on the home of Plaintiffs Huddleston and Wilson. Every local media outlet was notified prior to the execution of the Search Warrant on Plaintiffs homes and were present during the execution of the Search Warrant.

16. Defendants intentionally generated a media frenzy lasting months in which these false civil and criminally defamatory allegations were repeated.

17. Defendants have continued to engage in outrageous and malicious acts of both civil and criminal defamation, retaliation, harassment, and intimidation of Plaintiffs Huddleston and Wilson as recently as June 3, 2022, when Defendant and co-conspirator John Hatcher appeared in his capacity as member of the Board of Directors for the Bayou La Batre Housing Authority, on the FM Talk Radio Show "Midday Mobile" in an episode titled "Johnny Hatcher Talks About the Bayou La Batre Housing Scandal". During the interview Defendant Hatcher not only reasserted as true the false and defamatory (both civil and criminal) allegations against Plaintiffs Huddleston and Wilson but Defendant Hatcher and

COURTESY COPY

made even more false, defamatory, and misleading statements and allegations against Plaintiffs Huddleston and Wilson.

18. On December 14, 2020, the Bayou La Batre Housing Authority filed its vexatious and frivolous lawsuit against Plaintiffs Huddleston and Wilson which was knowingly riddled with false, defamatory statements (both civil and criminal), and misleading information while also withholding exculpatory evidence with the intent to cause further harm to Plaintiffs Huddleston and Wilson, and in effort to purposely mislead Your Honor as well as the public. *SEE MOBILE COUNTY CIRCUIT COURT CASE # CV-2020-9902475.00*

19. Months prior to Mayor and co-conspirator Terry Downey appointing defendants to the Board of Directors of the Bayou La Batre Housing Authority, Defendants conspired to destroy Plaintiffs Huddleston and Wilson both personally and professionally. Defendants nefarious plot included defamation (both civil and criminal), retaliation, harassment, intimidation, and weaponization of the judicial system with an intended ultimate end goal of Plaintiffs Huddleston and Wilson being left destitute and Plaintiffs Huddleston and Wilsons personal freedoms and liberties stripped with the intended imprisonment of Defendants Huddleston and Wilson.

20. As a direct result of Defendants unethical, immoral, wrongful, malicious and indefensible civil and criminal acts Plaintiffs Huddleston and Wilson have been irreparably harmed both personally and professionally, and have suffered damages in an amount to be proven at trial.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Huddleston and Wilson seeks compensatory and punitive money damages from the Defendants in an amount to be determined by the trier of fact to compensate Plaintiffs Huddleston and Wilson for the irreparable harm done to their personal and professional reputations, mental and emotional stress, and other unspecified damages, plus all costs, and all other relief at law and equity to which Huddleston and Wilson may be entitled.

### PRAYER FOR RELIEF

WHEREAS, PREMISES CONSIDERED, as the direct result of the foregoing wrongful acts, Plaintiffs Huddleston and Wilson seeks an award of the following relief:

I. Defendants request leeway from Your Honor as this claim is being filed Pro Se in order to meet the statute of limitations in this case.

II. Plaintiffs request all Defendants in this case be joined to Plaintiff's Counterclaim in case # CV-2020-902475.00 BAYOU LA BATRE HOUSING AUTHORITY V. VIRGINIA HUDDLESTON ET AL. filed in MOBILE COUNTY CIRCUIT COURT.

III. Due to the criminal allegations levied, ongoing criminal investigations of Plaintiffs Huddleston and Wilson, and current criminal charges pending against Huddleston. Plaintiffs Huddleston and Wilson request a Stay in this case until the Statute of Limitations have expired, any criminal charges against Plaintiffs Huddleston and Wilson have been resolved, and/or Plaintiffs waive their Constitutional Fifth Amendment Rights already asserted and granted by this court in CASE # CV-2020-902475.00 BAYOU LA BATRE HOUSING AUTHORITY V. VIRGINIA HUDDLESTON ET AL. filed in MOBILE COUNTY CIRCUIT COURT.

IV. Compensatory and punitive damages in excess of the jurisdictional limits of this Court in such sum as the trier of fact shall award based on the wrongdoing alleged in this complaint;

V. Court Costs, Future Attorneys' fees and cost of courts, and other unspecified costs and expenses.

## DEFENDANTS RESPECTFULLY REQUESTS TRIAL STRUCK BY JURY

Respectfully submitted,

Defendants:

/s/ Virginia Huddleston

/s/ Darryl Wilson

# CERTIFICATE OF SERVICE

We hereby certify that on November 10, 2022, we caused to be served a true and correct copy of this document served via U.S. Mail and a copy on all other parties of record.

_____
Virginia Huddleston

_____
Darryl Wilson

Adams & Reese, LLP
Aaron G. McLeod or Matthew Jackson
Counsel for Jay Ross
1901 Ave. North, Suite 3000
Birmingham, Alabama 35203

Adams & Reese, LLP
11 N. Water St, Suite 23200
Mobile, Alabama 36602

John Wayne Hatcher
6560 Hayfield R
Mobile, Alabama 36582

Michael Burdine
8008 Oak Bend Dr
Theodore, Alabama 36582

Paul Burch
Mobile County Sheriff's Office
Criminal Investigation Unit
510 South Royal Street
Mobile, Alabama 36603

Debra Jones
8280 Meadow Lane S.
Irvington, Alabama 36544

Stephanie Godsey
13321 Center Ave.
Bayou La Batre, Alabama 36544

Terry Downey
PO Box 948
Bayou La Batre, Alabama 36544

Mobile County Sheriff's Office
510 Royal St.
Mobile, Alabama 36603

City of Bayou La Batre
13785 South Wintzell Ave.
Bayou La Batre, Alabama 36544

Bayou La Batre Housing Authority N/A
12131 Safe Harbor Circle E.
Irvington, Alabama 36544

# Exhibit F



AlaFile E-Notice

02-CV-2020-902475.00

Judge: S. WESLEY PIPES

To:  WOOD ALEXANDRA TERRY
alexterrywood@gmail.com

# COURTESY NOTICE

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

BAYOU LA BATRE HOUSING AUTHORITY V. VIRGINIA HUDDLESTON ET AL
02-CV-2020-902475.00

The following matter was FILED on 12/7/2022 1:51:31 PM

MOTION TO AMEND
[Filer: PRO SE]

Notice Date:      12/7/2022 1:51:31 PM

This copy is being provided as a courtesy copy only. Providing this copy is not required by law and is not intended to constitute service.

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

| STATE OF ALABAMA | | Case No. |
|---|---|---|
| Unified Judicial System | Revised 3/5/08 | 02-CV-2020-902475 |

☐ District Court  ☑ Circuit Court

**CIVIL MOTION COVER SHEET**

| Style of case: | Name of Filing Party: |
|---|---|
| VIRGINIA HUDDLESTON, DARRYL WILSON | VIRGINIA HUDDLESTON, DARRYL WILSON |
| v. JAY ROSS, ET AL | |

| Name, Address, and Telephone No. of Attorney or Party (If Not Represented): | ☐ Oral Arguments Requested |
|---|---|
| VIRGINIA HUDDLESTON & DARRYL WILSON 3480 SEMMES WOODS DR SEMMES, AL 36575 251-402-0709 Attorney Bar No.: | |

**TYPE OF MOTION**

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☑ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| | ☐ Consolidation |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Continue |
| ☐ Motion to Dismiss, or in the Alternative Summary Judgment($50.00) | ☐ Deposition |
| | ☐ Designate a Mediator |
| ☐ Renewed Dispositive Motion(Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Judgment as a Matter of Law (during Trial) |
| | ☐ Disburse Funds |
| | ☐ Extension of Time |
| ☐ Summary Judgment pursuant to Rule 56($50.00) | ☐ In Limine |
| | ☐ Joinder |
| ☐ Motion to Intervene ($297.00) | ☐ More Definite Statement |
| | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| ☐ Other _____ pursuant to Rule _____ ($50.00) | ☐ New Trial |
| | ☐ Objection of Exemptions Claimed |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| ☐ Local Court Costs $ _____ | ☐ Quash |
| | ☐ Release from Stay of Execution |
| | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☐ Vacate or Modify |
| | ☐ Withdraw |
| Hearing Date: DECEMBER 9, 2022 | ☐ Other _____ pursuant to Rule _____ (Subject to Filing Fee) |

COURTESY COPY

| Check here if you have filed or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees) ☐ | Date: DECEMBER 7, 2022 | Signature of Attorney or Party: |
|---|---|---|

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

VIRGINIA HUDDLESTON; DARRYL WILSON     | Case No.: 02-CV-2020-902475.00

Plaintiff,

vs.     | JURY TRIAL DEMANDED

DEFENDANT'S NAME,

JAY ROSS, PAUL BURCH, JOHN WAYNE HATCHER, MICHAEL BURDINE, DEBRA JONES, STEPHANIE GODSEY, TERRY DOWNEY, ADAMS AND REESE, LLP, CITY OF BAYOU LA BATRE, MOBILE COUNTY SHERIFF'S OFFICE

## MOTION TO AMEND

Plaintiffs file this amended complaint to be in compliance with Rule 12(b)(6) and in accordance with Rule 15(a) "Unless a court has ordered otherwise, a party may amend a pleading without leave of the court, but subject to disallowance on the court's own motion or a motion to strike of an adverse party, at any time more than forth-two (42) days before the first setting of the case for trial, and such amendment shall be freely allowed when justice so requires.

Respectfully submitted,

_____

Virginia Huddleston

_____

Darryl Wilson

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| VIRGINIA HUDDLESTON; DARRYL WILSON | Case No.: 02-CV-2020-902475.00 |
| Plaintiff, | |
| vs. | JURY TRIAL DEMANDED |
| DEFENDANT'S NAME, | |
| JAY ROSS, PAUL BURCH, JOHN WAYNE HATCHER, MICHAEL BURDINE, DEBRA JONES, STEPHANIE GODSEY, TERRY DOWNEY, ADAMS AND REESE, LLP, CITY OF BAYOU LA BATRE, MOBILE COUNTY SHERIFF'S OFFICE | |

## COMPLAINT

COMES NOW, Plaintiffs Virginia Huddleston and Darryl Wilson, and files this complaint against the defendants, whose wrongful conduct has caused irreparable harm and damage to Huddleston and Wilson, and alleges as follows:

## THE PARTIES

1.   Plaintiff Virginia Huddleston is over the age of nineteen (19) years and a permanent resident of Mobile County, State of Alabama.

2.   Plaintiff Darryl Wilson is over the age of nineteen (19) years and a permanent resident of Mobile County, State of Alabama.

3.   Defendant Jay Ross is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was the Attorney of Record for the Bayou La Batre Housing Authority and the City of Bayou La Batre at all times pertinent to the actions which are the basis of this cause.

4.   Defendant Paul Burch is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a member of the Board of Directors for the Bayou La Batre Housing Authority

Page 1 of 66

and Commander of the Mobile County Sheriff's Department Criminal Investigations Unit at all times pertinent to the actions which are the basis of this cause.

5.    Defendant John "Johnny" Hatcher is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a Board member of the Housing Authority at all times pertinent to the actions which are the basis of this cause.

6.    Defendant Michael Burdine is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a Board member of the Housing Authority at all times pertinent to the actions which are the basis of this cause.

7.    Defendant Debra Jones is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a Board member of the Housing Authority at all times pertinent to the actions which are the basis of this cause.

8.    Defendant Stephanie Godsey is over the age of nineteen (19) years, a resident of Mobile County, Alabama, was a Board member of the Housing Authority at all times pertinent to the actions which are the basis of this cause.

9.    Defendant Terry Downey is over the age of nineteen(19) years, a resident of Mobile County, Alabama, was a Board member of the Housing Authority at all times pertinent to the actions which are the basis of this cause.

10.    Defendant City of Bayou La Batre is located in Mobile County, Alabama, and was represented by Mayor Terry Downey and other co-conspirators City officials and employees, names unknown, at all times pertinent to the actions which are the basis of this claim.

11.   Defendant Adams and Reese, LLP, employer of Jay Ross, Managing Partner, who was the Attorney of Record for the Bayou La Batre Housing Authority and the City of Bayou La Batre at all times pertinent to the actions which are the basis for this claim.

## JURISDICTION AND VENUE

12.   This court has jurisdiction over this matter, in which the amount in controversy exceeds $20,000, pursuant to Ala. Code § 12-11-30 (1975).

13.   This court is the appropriate venue for this action pursuant to Ala. Code § 6-3-2 (1975) because Defendant was conducting business at the time of the accrual of this cause in Mobile County and the events giving rise to the claim occurred in Mobile County.

## STATEMENT OF FACT

14.   On September 30, 2020, Defendants held a well orchestrated public meeting of the members of the Bayou La Batre Housing Authority Board of Directors. This meeting was when Plaintiffs Virginia Huddleston and Darryl Wilson first became aware the defendants were engaged in a coordinated conspiracy against Plaintiffs Huddleston and Wilson.

15.   The meeting was held at the Bayou La Batre City Hall instead of its standard location at the office of the Bayou La Batre Housing Authority.

16.   Prior to the meeting defendants contacted all local media outlets to insure their presence at the meeting. Local news station WKRG, Mobile, Alabama, broadcast the meeting live on its Facebook platform.

17. On many occasions during the meeting defendants acted with absolute disregard for the truth during their malicious, civil and criminal slanderous assault on plaintiffs Huddleston and Wilson.

18.  During the meeting it was defendant and co-conspirator Jay Ross,  attorney for the Bayou La Batre Housing Authority, who maliciously and  introduced multiple false, misleading, civilly and criminally slanderous, and fraudulent  allegations against plaintiffs Huddleston and Wilson.

19.  Jay Ross also served to maliciously provide validation to the other defendants' false, vicious , slanderous and malicious claims Ross knew, or should have known,  to be false.

20.  Defendant Jay Ross is a material witness in all of the cases currently in front of  this Honorable Court involving Plaintiffs Huddleston and Wilson.

21.  Jay Ross and defendants maliciously concealed and misrepresented material facts regarding changes made to plaintiffs employment contracts in July 2020; specifically as reflected in plaintiffs retirement contract amendments and payout terms prior to July 2020 with the intent of making it appear as if plaintiffs committed a criminal act knowing they did not.

22.  Jay Ross and the other defendants proceeded to maliciously and falsely accuse plaintiffs Huddleston and Wilson of multiple criminal counts of embezzlement with absolute disregard for the truth and knowing the criminally defamatory and salacious accusations of embezzlement never occurred.

23. During the meeting, Bayou La Batre Housing Authority attorney Brent Day was present. Day was the representing attorney for the Bayou La Batre Housing Authority during the events in this case.

24. Day afforded three opportunities for Ross and the other Defendants to retract and correct their multiple malicious, fraudulent, and criminally slanderous claims of embezzlement made against Huddleston and Wilson. Ross and the other defendants not only refused. defendants continued to maliciously slander plaintiffs with absolute disregard for the truth. .

25. During the meeting, defendants maliciously and with absolute disregard for the truth accused plaintiffs of engaging in a conspiracy to defraud the housing "board" out of all of its assets. Defendants intentionally misrepresented, withheld, and concealed the actual reasons the former board of directors made the difficult decision to sale the property known as "Safe Harbor. "

26. Defendants falsely and maliciously accused Huddleston of entering into legally binding contracts without the proper authority of the board of directors.

27. Defendants falsely and maliciously accused plaintiffs of neglecting their job duties including the upkeep and maintenance of the homes located in the Safe Harbor neighborhood during their employment with the Bayou La Batre Housing Authority. Defendants intentionally lied to and mislead the public for the purpose further painting plaintiffs as criminals.

28. In effort to cause even further harm to plaintiffs, defendants had attorney Brent Day read aloud to the public a letter the board instructed Day to write and send to plaintiffs

Huddleston and Wilson. The letter is dated September 23, 2020. Defendants had Day issue a no trespass order, thereby making it further appear as if plaintiffs engaged in criminal conduct. In the letter defendants fraudulently demanded plaintiffs return their own personal property to the Bayou La Batre Housing Authority which defendant knew or should have known the Authority had no rightful ownership. Furthermore, defendants demanded the return of a hard-drive they knew, or should have known, never existed.

29.    Defendants intentionally mischaracterized a letter attorney Brent Day sent to the prior board regarding the sale of the Safe Harbor property in order to give the appearance of criminal wrongdoing by plaintiffs.

30.    During this meeting defendant Paul Burch, while acting in his capacity as a member of the board of directors intentionally chose to speak with the authority of his role as the Captain over the Criminal Investigation Unit and knowingly used the malicious, false, and fraudulent criminal allegations made in this meeting to justify ordering his "special investigations unit" to open a criminal investigation into plaintiffs Huddleston and Wilson the week prior. This "special investigation unit" was under Paul Burch's sole command.

31.    Defendant Paul Burch went on to maliciously and falsely accuse plaintiffs of misappropriation of funds and converting housing authority property to plaintiffs personal use.

32.    During the audience comment portion of the meeting, defendant Terry Downey, mayor (former) of the City of Bayou La Batre accused plaintiffs Huddleston and Wilson of embezzlement and engaging in a long-term "scam" to defraud the housing authority. Defendant Terry Downey acknowledged his role in the conspiracy against plaintiffs

Huddleston and Wilson when he acknowledged he placed the defendants on the board of directors for a "special reason."

33.    *The following relevant statements were made by defendants during the recorded WKRG News broadcast of the orchestrated live-streamed meeting of the board of directors for the Bayou La Batre Housing Authority  held on September 30, 2020,  and transcribed by rev.com.*

Jay Ross (00:19):

Well, let me say this. What you have in front of you is contract ending July 2020, effective October 2020. I'll give you the addendum which was a year ago. **They are not markedly different** from my two second read of them. That's the addendum.

John Hatcher (02:25):

So that just alone, other than the fact on face value, **I think it's criminal, I think we should rescind it.**

Jay Ross (02:31):

**And may I just add…**

Audience Member Linda Blake (02:34):

Could you say that again?

John Hatcher (02:34):

Ma'am?

Audience Member Linda Blake (02:34):

Could you say that again?

John Hatcher (02:35):

**I think on face value alone, it's criminal** but I also make a motion to rescind it or do away with it.

Jay Ross (02:40):

**If I may make a comment Mr. Hatcher. The bonuses that were paid in February do not.**

John Hatcher (02:46):

**That's not including**

Jay Ross (02:47):

**do not include the $60 and $70,000 bonuses are not part of any contract.**

Debra Jones (02:47):

**So that's the $69,000.**

John Hatcher (02:52):

**So it didn't apply to any of that.**

Jay Ross (02:55):

**I can't...based on what I've seen, it's not part of her employment or Mr. Wilson's employment contract.**

John Hatcher (03:01):

**So the $69,000 that she received and the $69,000 he received simultaneously was just drawn out of...straight out of the air.**

Jay Ross (03:12):

**I don't know.**

John Hatcher (03:14):

**Nothing they did, we just had it left over, said "Hey, y'all did a great job, we want to give y'all this."**

Debra Jones (03:17):

What was the date that that was done?

Jay Ross (03:20):

**February of 2020. A seasonal, seasonal bonus.**

Stephanie Godsey (03:24):
Seasonal?

Jay Ross (03:25):
**$70,000 dollars annual.**

John Hatcher (03:26):
**That's a nice way of saying annual.**

Brent Day (03:28):
After taxes each of them was 50,000 each.

Jay Ross (03:28):
**Something like that.**

John Hatcher (03:31):
**Well let me say this, we found another one for, I think it was $70,000 or $75,000 that they had gotten.**

Brent Day (03:38):
Right.

John Hatcher (03:38):
**two months before that.**

Brent Day (03:39):
Are you sure it's not the same one?

John Hatcher (03:40):
**It's not the same one.**

Brent Day (03:41):
Because we had to have $75 in order to be able to pay them $50 in taxes.

John Hatcher (03:47):

**No, no. 69 each. And then they had another one that was 75 and we found out that it was around the same time they got a lump sum payment for a house that had caught fire**

Brent Day (03:56):
Yes.

John Hatcher (03:56):
**and oddly enough, it was around the same figure.**

Brent Day (03:59):
Okay.

John Hatcher (04:00):
**So they turned around and squandered that money in my opinion.**

Brent Day (04:06):
What year was that.

John Hatcher (04:06):
**Uh, this year.**

Jay Ross (04:06):
**2020.**

Debra Jones (04:06):
**That was this year when the house the house caught on...**

Michael Burdine (04:08):
**Yeah they got the money in December and they got the $75,000 bonus first of January.**

John Hatcher (04:13):
**First of January, I'm sorry.**

Paul Burch (04:16):

**Mm-hmm.**

Debra Jones (04:16):

I thought you said the insurance money…

John Hatcher (04:17):

**So it's been nothing but just uh...oh they've enriched themselves.**

Debra Jones (04:20):

**Yes.**

John Hatcher (04:20):

**Very much.**

Michael Burdine (04:41):

**That seems to be way out of the range of anything that's normal. And uh...but we're fixing to end that because we have a motion and a second to terminate these contracts, all of those in favor, signify by saying Aye.**

Unanimous (04:51):

**Aye.**

Jay Ross (05:23):

Contract with Ten X, which is a national real estate company that sells commercial and...commercial properties all over the country. There is an alleged penalty of 5% of the purchase price or $40,000, whichever is less. So Mr. Hatcher's had some conversation with their senior representatives. So we don't know if they will try to sue us or not, but a termination of the contract, they called their marketing agreement, which was set for late October, not in November, but October on their website, suggests at least by the contract that we might be subject to a claim of $225,000 for a penalty provision for terminating it. And we won't go into all the legal arguments that I have to defend that and argue against it, but just such that the...all of the board members are aware that…

John Hatcher (06:29):

There are arguments.

Jay Ross (06:30):

There are quite a few arguments but it's out there. I don't know what they're going to do but Mr. Hatcher has talked to the representative. I've only had some email communication with their in-house counsel, so.

John Hatcher (06:41):

I feel confident we'll be able to work something out out with them.

Jay Ross (06:43):

We should.

John Hatcher (06:44):

I don't, there's no way we're paying that, in my opinion. We've got to vote on it. Everybody's got to vote. But my opinion, at this point, ' cause it's ridiculous. It's just.

Michael Burdine (06:58):

**I just can't see paying it because it's involved in a conspiracy to defraud the housing board out of all of their assets.**

Debra Jones (07:06):

**Exactly.**

Paul Burch (07:06):

**Well and they entered into an agreement with someone who was not authorized to make that agreement.**

John Hatcher (07:12):

**Yes. That's a fact.**

Jay Ross (07:14):

**I didn't state that but that, but that is one of many arguments.**

John Hatcher (07:17):

**That's what it was.** So we, we, I've talked back and forth with them. I think we're going to have more dialogue in the near future. You guys will definitely be kept up to speed on it. It's sad. It's sad, their contract's about as sad as this one. I mean it's unbelievable. **I mean, people's got their hands out, digging as deep as they can and we can't even, you know, I'm sorry. The former board, couldn't even**

Page 12 of 66

get them people a decent place. You know, we got people out there with floors that are in bad shape. Well, them houses ain't had a coat of paint since they were put there. There's roofs out there that's not been touched. I mean, and they have damage. I mean, there's an extensive amount of mold that they've gotten from people just neglecting them.

John Hatcher (08:27):

I mean, this is years of neglect. I mean they were there for seven years, and to be honest with you, I don't know that they...they...I don't really know what they did to be honest, I can't say. I can tell you this, I know a lot of stuff they didn't do.

John Hatcher (09:12):

We don't intend to charge anybody any different because they're our friends. Or because of a relationship of any sort.

Michael Burdine (13:01):

Okay. I'll speak to her tomorrow. So, I don't know, we haven't seen her letter so I don't guess we can accept her resignation, but I'll speak with her again tomorrow and see exactly what she has on her mind. The next thing on the agenda is, ah, for Mr Doug Anderson with Burr Foreman. He has sent us a bill for $20,367.61, which was all to do with the sale. Ah, telephone conversations with Virginia and review purchase agreement with Virginia. Different items. And, ah, I would recommend-

Jay Ross (13:43):

You don't have to take any action. You know, you can table it, whatever you think is best.

Michael Burdine (13:48):

That's what I was going to recommend is we table it until we see how far down the rabbit hole all this stuff goes.

John Hatcher (14:07):

Well, there is an active criminal investigation. Until all that's sorted out, I say, you know, we put him on hold until we have further information from the authorities.

John Hatcher (17:32):

Page 13 of 66

**And also, I, I'll tell you what, we were just talking about something else. You brought them letters today?**

Brent Day (17:36):
Yes.

John Hatcher (17:37):

**Would you mind going ahead and re- the recent one you had just sent out to, ah, Darryl and Virginia. Would you read that to the board members?**

Brent Day (17:46):
Sure.

John Hatcher  (17:46):
I don't think they've had a chance to-

Brent Day (17:48):

No problem. **Ah, we have sent letters to both Virginia Huddleston and Darryl Wilson, both dated September 23rd 2020. Ah, I'll start with Ms Huddleston. Dear Ms Virginia. Please be advised that the board of directors for the Bayou La Batre Housing Authority, herein after "board, "at its meeting on September 16, 2020, accepted your letter of resignation.**

(18:08):

**In addition, the board voted to exclude your presence from any real property owned by the Bayou La Batre Housing Authority. Therefore, the future appearance upon any property owned by the Bayou La Batre Housing Authority will be considered trespass and will result in immediate legal action.**

(18:23):

Finally, **the board notes that several items of personal property were removed from the safe harbor office by yourself. The board demands that all items of personal property be returned to the Bayou La Batre Housing Authority immediately. Specifically, the board notes that a hard drive was taken. The board demands that same be returned and that the information contained therein not be accessed, erased or otherwise defected. The same was sent to Mr Darryl Wilson.**

Michael Burdine (18:48):
**Thank you. Sounds very nice.**

John Hatcher (18:51):

We also have a, um, there was a, concerning the sale there was a letter that, ah, Brent Day had sent them sometime back. **A certified letter letting them know that what they were doing was, was mildly, um, ah, I think you were very mild when you put questionable, but I think it's more or less illegal. We gave them case law showing it was illegal. Um, so that's where all this stuff has, has spawned from. It's, it's... And you know, we have receipts right here we're going through. We've subpoena'd the bank records. Um, I'm sorry, we**

**haven't done anything. The Mobile County Sheriff's Department has done a, are doing a formal investigation and they have subpoena'd the records, the bank records and such. I'm sure there's going to be more to come of that. I, I have referred to all that-**

Michael Burdine (19:42):

**Paul, is there any information you can give us at this point on the investigation?**

Paul Burch (19:43):

**I will. Um, but, but I'd like to circle back just a minute to tie in what, um, Mr Day just read and then our discussion about Mr Horne. I know a lot of y'all are probably hearing we need to try hire this person for this, this person for that. We were left with a building with empty desks, empty files.** We don't know, don't have a clue what we have. And so we're trying to seek out experienced people, you know, and, and hopefully they'll be mercy, have mercy on us with the, the financial end of it. Just to see where to even start. And, and ah, that's, that's the real... I don't want y'all to think we're just trying to hire this person for this, this for that. **We, we wanna make it right. And, but we need expert opinions to do that.**

John Hatcher (20:27):

**I might add that we have three employees that still are under what, ah, Darryl Wilson was making. Far, far under.**

Paul Burch (20:34):

**Yeah, and, and he subbed everything out.**

John Hatcher (20:40):

**And he didn't do anything (laughing). As a lot of the residents out there will tell you, and you'll probably see that on the, I just had it. You remember the,**

we actually got the cover story on the Lagniappe because it's such a big deal. Um, it's um-

Paul Burch (20:55):

But, but to answer your question, um, you know, we have opened a criminal investigation with the Sheriff's Office. It's been assigned to the special investigations unit. Um, subpoenas have been, ah, requested through the District Attorney's office, um, for bank accounts, you know, what documents we could find. Um, we've, we've issued subpoenas to those companies so we can get explanations as to what was purchased. And, um, I, I will say just on the onset of some of the documents that I looked at, um, I think misappropriating money is putting it mildly. Ah, I think there were a lot of things purchased with housing authority money that were converted to personal use. And, ah, that's what we're looking to get to the bottom of.

Michael Burdine (21:40):

We're hoping at some point to, well, actually find some money that maybe we can recoup.

Jay Ross (21:45):

It may take a while.

Terry Downey, Mayor (22:36):

And people want transparency, um, what has taken place out there is, is, um, it's awful. And people read that contract, they can't catch their breath. No one has ever had a contract like that. Um, double the money they should be making.

Um, so there are a lot of things that went on. These men and women, uh, they were put on with special reason. Debbie was there from the get go. She got good background. Stephanie, uh, served on the planning board. She's a retired teacher. So, and these men here were out to find out what's, what's happened and put this thing back on, on steady ground. The transparency you can see, you have two attorneys here. There's going to be nothing swept under the rug. And, the farther I go with it, the more appalled I am at what really took place, the greed of people. When they cross that line and, and how board members also have a fiduciary responsibility to do what's right for the city and for the housing and for the people that live out there. And that's what I'm for.

(24:46):

...**This is to get this straightened out. If it can be legal action for those that have taken actions that are against the law and have taken monies that they shouldn't have, that's called embezzlement and if you look at the money the rent was coming in, and I'm sure these guys know much more than I. If you look at the money that was coming in, the place should have been able to function. And, and as far as special rent by anyone, that should not be. If you got a 2 bedroom house, needs to be a certain rent. And I think that if you look at what, what was being paid, and just me, if you look at what's being paid, it should be monies once they get their feet on the ground and sort out their mistakes, find out what, what's needing to be repaired and bring it up to speed.** I understand there's probably 9 houses that's not functional. I'm, I'm not sure. I heard that rumor.

Michael Burdine (25:46):

I don't think it's that many. I think it's like 5 or 6, isn't it.

Terry Downey, Mayor (25:49):

So that's 5 or 6 that the rent's not being paid.

Michael Burdine (25:50):

That's right.

Terry Downey, Mayor (25:52):

**When I was on the board before I ran for Mayor, I was always asked, I'd always ask, "What'd we spend on the housing repair?"** I think Linda can tell you that. **But, who knew what number I was getting? Now that I look at what was being promoted, um, there was a scam going and I think it was laid way back there. I think it was a devised plan and let's see how we can skin this onion.** Thank y'all.

Angie Jones-Goudreault (26:28):

Um, **you had mentioned something about the $69,000 that they received as a seasonal bonus,** uh, [inaudible 00:26:35] that it wasn't in their contract. Um, with the possibility of the criminal investigation, is there a possibility to freeze their access, access until this investigation is complete? Or how does that work?

Debra Jones (26:49):

You mean, freeze their bank account?

Angie Jones-Goudreault (26:51):

Yes, freeze their accounts before the money leaves the accounts?

Debra Jones (26:53):

**It's probably gone.**

Paul Burch (27:02):

**You can, and I don't want to say it's specific to then, but, but it's no different than a drug dealer. If you co-mingle illegal monies with legal monies, then that's a seizable account. So we're going to look at all aspects of it. And we're just looking through receipts today that make no sense.**

John Hatcher (27:24):

**The last thing we'd want to do is educate them. I assure you they're going to be watching and picking up every piece of paper and finding out every information they can get.**

Paul Burch (27:36):

**But I will say that the, the detectives that are assigned to the case, in my opinion, are the very best in the county and they will get to the bottom of it.**

Michael Burdine (30:59):

Let me address that right now. I was under the mistaken impression that if we cut all of the grass. **Because like I said, we had no paperwork or anything.**

Michael Burdine (36:24):

Well, I'm glad the, we have some happy residents. I really am. 'Cause I was afraid we were gonna have unhappy residents.

Michael Burdine (37:49):

Yes ma'am. I, I appreciate your input and, and I'm glad, like I said, I'm glad we have some happy neighbors here because that's what we want. We want, we want the best neighborhood that we can possibly have for the people that live in that neighborhood. Yes ma'am?

Terry Downey, Mayor (40:26):

As the mayor, I like the police out there. I don't know about the compensating the rent, but it's good to have the police close. When out on the road traveling, I always like to have the police there and their presence there. As far as, I'll leave

that up to the board how the rent is broken down. But it's good to have the police out there. Our policemen are on par with Satsuma, Chickasaw their wages, but it's still to have a place to stay, like you said, have a place that's not astronomical to try to rent. Around here, housing is a premium. **And that's why I wanted to see 'em build some houses, legitimate houses. And our building official, we've talked about it numerous times. Build some decent houses that, that will fit in with the neighborhood. And, and I got, ah, Mr Ramirez, one of our council members, said, "If I can just figure out how to get me a bonus before I leave here."**

George Ramirez (41:19):
Ain't gonna happen (laughing).

John Hatcher (41:19):
**A big one.**

34.     On the September 30, 2020, prior to the meeting of the board of directors meeting live-streamed by WKRG news on Facebook, the following quote is from an article posted by

*Gabriel Tynes, Lagniappe, Bayou La Batre residents "shocked" by housing board contracts,*

*September 30, 2020.*

> **Hatcher, meanwhile, wants to reassure residents the upheaval is over. He said after the board's financial position is clear, he'd be interested in helping to draw up a long-term maintenance and growth plan for Safe Harbor.**
>
> **"It's not been managed right in my opinion," he said. "But I think we'll always have a managing board here to keep it up, keep it the way it's supposed to be."**

35.     On September 30, 2020, after the defamatory meeting was complete, board of directors member, co-conspirator, defendant Michael Burdine who was also acting chairman of the board at the time,  posted the video of the of the live-streamed WKRG News broadcast on his personal Facebook page. Burdine added to the post, "Following the money." The image shows co-conspirator Burdine sitting at the head of the table.



36.    On October 5, 2020, five (5) days after the orchestrated live-broadcast of the board

meeting held on September 30, 2020, the Mobile County Sheriff's Office, led by co-

conspirators Paul Burch and civilian John Hatcher, executed a search warrant on the home of

Plaintiffs Huddleston and Wilson. Every local media outlet was notified prior to the execution

of the search warrant on Plaintiffs home and were present prior to the arrival of the Sheriff's

Department and remained for the execution of the search warrant.

37.    During the execution of the search warrant, defendant Paul Burch spent most of his

time outside giving media interviews while co-conspirator and civilian John Hatcher remained

inside directing the search of the plaintiffs home.

38.    During the interviews granted by Paul Burch, Burch's salacious, malicious, and false

accusation that Paul Burch knew, or should have known, to be false were designed to again

deceive and make it appear as if plaintiffs engaged in criminal activity. Furthermore, every

article plaintiffs found from that day are included. Multiple article cites defendant Paul Burch

stating that Paul Burch *"believes"* some of the tools taken from plaintiffs home during the

execution of the search warrant *"may"* belong to the Bayou La Batre Housing Authority.

*39.    Andrea Ramey, WPMI News Video Report, MCSO executives search warrant at former*

*housing authority executive director's home, October 5, 2020. Transcription performed by*

*Rev.com.*

Andrea Ramey (00:14):
Yeah, Kim. **The Sheriff's office says that the compensation approved by the previous board is highly questionable, and tonight, it's under investigation.**
(00:24):
**Investigators say Bayou La Batre Housing Authority's former executive director, Virginia Huddleston, and her husband, Darryl Wilson, the Housing Authority's former facilities manager, were raking in a lot of cash.**
(00:37):
Both recently resigned, as did Housing Authority board members. The former board paid Huddleston $120,000 annually, and Wilson earned nearly $90,000. **In addition to the high salaries, Captain Paul Burch says there was $70,000 bonuses doled out, and a retirement package that sound like lotto winnings.**

Paul Burch (00:59):
Hers was around two and a half million, and his was around one and a half million.

Andrea (01:03):
**Burch is still investigating the Housing Authority after being appointed to its board in the last month.**

Paul Burch (01:08):
**There's a, you know, steady income of money from the rent, and, um, none of that money has been put back into the community, a- and there's very little in the bank account.**

Andrea (01:50):
**Now investigators will begin to examine the hard drives and documents seized in today's search, looking at the actions of not only the former employees, but also the former board members.**

Andrea (02:20):

**The Sheriff's office also seized tools today in the search. Investigators believe some of those _may_ actually belong to the Housing Authority. Right now, no criminal charges have been filed.**

40.    Gabriel Tynes, Lagniappe, Deputies search home of former housing authority employees, October 5, 2020.

**Newly appointed authority members later revealed the couple were each awarded $69,000 in annual bonuses in February. MCSO Capt. Paul Burch, who was appointed to the authority by Mayor Terry Downey in August, said "very little maintenance had been done" during Huddleston and Wilson's employment.**

**"A number of subpoenas have been issued and we're awaiting their return," Burch said last week. "We're interested in bank accounts associated with the housing authority, various businesses where purchases we made using housing authority money and finding out what was purchased and whether it had a legitimate use. There is also personal property we're trying to account for."**

Anderson added he had no knowledge of the retirement payouts "until I read about it in Lagniappe." Meanwhile, **Burch said the new authority members are working to make emergency repairs to the property while accounting for authority money and property is ongoing.**
**"It's fair to say this is an open criminal investigation," he said. "I would encourage former employees or board members that want to get in front of it to contact us."**

41.    WKRG Staff, MCSO executes search warrant at home of former Bayou La Batre Housing Authority members, October 5, 2020.

SEMMES, Ala. (WKRG) — **The Mobile County Sheriff's Office executed a search warrant at the home of two former Bayou La Batre Housing Authority members days after the town met to discuss an investigation into the housing authority.**

Deputies went to the Semmes home of the former executive director Virginia Huddleston and her husband, former facilities manager Darryl Wilson.

**During the town meeting last Wednesday, September 30, Captain Paul Burch with the Mobile County Sheriff's Office said spending has been a great**

Page 22 of 66

concern and "not consistent with diligent spending." Burch said lots of money has been spent, but there is no evidence that money has been used on the homes. There is enough evidence to launch an investigation and issue subpoenas.

Those who are being accused of misappropriation of funds and negligence have resigned from the Housing Authority and board.

22.   Brendan Kirby, Fox 10 News video,  News Search Outside Home of Huddleston & Wilson

Brendan Kirby (00:51):
Sheriff's deputies out here today uh, with a search warrant. **They seized a number of documents and also tools _purported to belong_ to the housing authority.** Uh, this all coming uh, over the last couple of weeks, amid complaints from residents in the Safe Harbor Affordable Housing Development out there, that's- their homes are in terrible disrepair, falling apart. **Captain Paul Burch, of the Sheriff's Office told me moments ago that they _believe_ the tools that they seized were property of the housing authority, that uh, that this couple took after leaving the employment of the board.**

(01:27):
**And he also said that they are looking into allegations that a lot of revenue has been collected over the past several years, but very little of it has gone into maintenance of those properties.**

**Captain Burch informing us that the sheriff's office has hired an accounting firm to do a forensic audit.**

43.   Brendan Kirby, Fox 10 News, Sheriff's deputies raid home of former Bayou La Batre

housing officials, October 5, 2020.

Today, Sheriff's deputies executed a search warrant at the home of Virginia Huddleston, who recently resigned as executive director of the Bayou La Batre Housing Authority, and her husband, Darryl Wilson, who resigned as facilities manager. **Captain Paul Burch, commander of the Criminal Investigation Division at the Sheriff's Office, tells me investigators carried away documents and a number of tools _believed to be_ the property of the housing authority. He says the department has hired an accounting firm to go through hundreds of thousands of dollars worth of expenditures over several years.**

Paul Burch (01:21):
**I would say a broad investigation. Um, there, there are a lot of irregularities in, in the, uh, expenditures that we're gonna be looking at. A lot of those we're awaiting records for.**

Brendan Kirby (03:03):
**Captain Burch is playing two roles here. He's not only leading the criminal investigation, he also recently joined the Authorities Board of Directors at the request of the Mayor of Bayou La Batre.** Reporting live in Irvington, Brendan Kirby, Fox 10 News.

44.    On October 5, 2020, after the completion of the search warrant on plaintiffs home Micheal Burdine, chairman of the  board of directors for the Bayou La Batre Housing Authority and co-conspirator posted to his personal Facebook page a Lagniappe article tiled, "Deputies search home of former housing authority employees", dated October 5, 2020.  Co-conspirator Michael Burdine added his personal comment that read, "The plot thickens as some move to cover themselves and others move to blame someone else."



45. Defendants intentionally generated a media frenzy lasting months in which these false, malicious, civil and criminally defamatory allegations were repeated.

46. On December 17, 2020, a few days after defendant Jay Ross filed the vexatious and frivolous lawsuit against Plaintiffs Huddleston and Wilson, Micheal Burdine, chairman of the board of directors for the Bayou La Batre Housing Authority and co-conspirator posted to his personal Facebook page a Lagniappe article tiled, *"Lawsuit filed against former Bayou La Batre Housing Authority officials."* Michael Burdine added his personal comment that read, *"Follow the MONEY."*



Michael Burdine

Follow the MONEY.

Lawsuit filed against former Bayou La Batre Housing Authority officials - Lagniappe Mobile

47. O n                                                              May 20, 2022, defendant John Hatcher was interviewed on Midday Mobile, a local talk radio show, by host Sean Sullivan.

48. Defendant John Hatcher began the fifteen (15) minute interview by clearly stating that Terry Downey, mayor (former) of the City of Bayou La Batre put John Hatcher on the board of directors for the Bayou La Batre Housing Authority so John Hatcher could "straighten it out," and it was John Hatcher who handpicked the new members of the board of directors.

49. Defendant John Hatcher admits defendant Michael Burdine was appointed to the board of directors by Terry Downey after Hatcher's recommendation. John Hatcher stated Michael Burdine was qualified to sit on the board of directors because he, "has done a tremendous amount of investigation work and so he's qualified to sit on the board for that reason."

50. Defendant John Hatcher stated that in response to Terry Downey's request to know who else John Hatcher wanted appointed to the board of directors, JohnHatcher responded, "Captain Paul Burch with the Mobile County Sheriff's Department. I need him."

51. Defendant John Hatcher maliciously and intentionally deceived the public and criminally slandered plaintiff Darryl Wilson when he accused Darryl Wilson of stealing "a bunch of files, and stuff like that…" "Tons of files."

52. Defendant John Hatcher maliciously and intentionally deceived the public and criminally slandered plaintiffs Huddleston and Wilson when he falsely accused plaintiffs of stealing their own property from the Housing Authority and "liquidating the place, stealing a hard-drive for the security system" that defendant knew, or should have known, never existed, in order "to cover up the crime they just committed."

53. Defendant John Hatcher admitted he contacted co-conspirator Paul Burch after police informed John Hatcher he must have receipts showing ownership of the tools and there must be an investigation, and that police, "can't do it just because."

54. Defendant John Hatcher maliciously, fraudulently, and intentionally criminally slandered plaintiffs when he claimed to have found a receipt for smoke detectors containing a camera.

55.    Defendant John Hatcher maliciously, fraudulently, and intentionally criminally slandered plaintiffs when he claimed "we also found a tremendous amount of receipts of stuff that wasn't there. Still can't find it."

56.    Defendant John Hatcher maliciously, fraudulently, and intentionally criminally slandered plaintiffs when he claims plaintiffs engaged in a scheme to sale the property known as "Safe Harbor," and it was all geared to "enrich themselves."

57.    Defendant John Hatcher proceeded to engage in a coverup of the civil and criminal conspiracy and crimes members of the board of directors, mayor Terry Downey, and co-conspirator Captain Paul Burch engaged in during their civil and criminal conspiracy against plaintiffs which included the weaponization of the judicial system. John Hatcher attempted to rewrite history in order to alter the events and facts as they transpired and claimed, "Paul [Burch] could not be a part of the investigation when he was on the board." John Hatcher then claimed it was only after Paul Burch left the board so Paul Burch could run for Sheriff for Mobile County, Alabama, did Paul Burch, "start leading the march, taking a heavier hand in it, things started happening." "Paul got a hold to it, put that thing on the front burner, started watching it. Let me tell you something. It's cooking, brother."

58.    Defendant John Hatcher maliciously and fraudulently slandered plaintiffs when he claimed plaintiffs left "seventeen (17) houses that was deplorable, unlived in, that they had done no maintenance on. The other houses were lack of maintenance. People were upset, there was rats running in on them."

59.    Defendant John Hatcher maliciously and fraudulently slandered plaintiffs when he intentionally mischaracterized terms of plaintiffs retirement.

60. Defendant John Hatcher maliciously and fraudulently criminally slandered plaintiffs when he falsely accused plaintiffs of using "money that they squandered from down there [the Housing Authority] to purchase, "a nice new Mercedes that they're driving, SUV, and the nice new Fiat that she has, and all these wonderful things that they bought."

61. Defendant John Hatcher maliciously and fraudulently criminally slandered plaintiffs when he said, "Sean, what board do you know that would agree to something like that without receiving something in return?

62. Sean Sullivan, Midday Mobile, FM 106.5 Talk Radio, **Johnny Hatcher** Talks About His Bid for the School Board, May 20, 2022.

> Host Sean Sullivan (03:02):
> All right. Uh, make this man suffer through too much more of this. Johnny Hatcher running for Mobile County School Board joining us. But w- we got an update. The first time you and I started talking, we started talking about Bayou La Batre, and the housing board in Bayou La Batre.
>
> Johnny Hatcher (03:15):
> Yes, sir, we sure did.
>
> Sean Sullivan (03:17):
> And what it ... So you and I talked back then. And this was, I mean, we talked, and talked, and talked about this, and the story had so much to it. And then it seems like to a lot of us who don't live it everyday, that this thing kind of fell off the map.
>
> Johnny Hatcher (03:29):
> Just went away.
>
> Sean Sullivan (03:30):
> It went away. So can you remind folks what the accusations were in this?

Johnny Hatcher (03:34):
Well, I'll tell you what happened.

Sean Sullivan (03:35):
Okay.

Johnny Hatcher (03:36):
**There was a, uh, husband and wife duo that worked down at the, uh, Safe Harbor, which was at Bayou La Batre Housing Authority.**

Sean Sullivan (03:43):
Okay.

Johnny Hatcher (03:44):
**She was a facility manager, and he was the, uh, maintenance manager. Their combined salary was $210,000 a year. Astronomical. Nobody makes that kind of money. Just, just crazy money.**

Sean Sullivan (03:57):
Right.

Johnny Hatcher (03:57):
So when all these numbers started getting out-

Sean Sullivan (04:00):
And they didn't, they, they, they ... The the board sets the salary, right?

Johnny Hatcher (04:03):
Oh, yes.

Sean Sullivan (04:04):
Okay. All right. Just for the record.

Johnny Hatcher (04:05):
**The board, the, the board definitely complicit in all this.** So the, uh, the mayor, Terry Downey at the time, he reached out to me and he says, "Johnny, I want to put you on this board. Would you be willing to sit on this board? We've got problems and we want your help. We feel like you're the guy who can straighten it out." Uh, I said, "Terry," I said, "I appreciate that." And I said, "**And I'd love to come down there, straighten it out, because I agree with you, there's problems.**" I says, "But I'm not gonna do it without your backing, and, and the full

backing of the, uh, uh, City Council in Bayou La Batre. It's just not gonna happen." He says, "Let me make a phone call." He called me back, he says, "You got it." I said, "Okay, I'll take it."
(04:42):
So when he appointed me to the board, shortly after that, another board member passed away, Scotty Scott. **Scotty Scott was replaced by Michael Burdine at my request.** Michael Burdine is a career law enforcement. He was with the city police department for, I think, 26, 27 years. He went to the sheriff's department and was there for 10 years. **Uh, has done a, a tremendous amount of investigation work. So he, he's, he's qualified to sit on that board for that reason, and that's why I wanted him.**

Sean Sullivan (05:14):
Okay.

Johnny Hatcher (05:15):
And once we got him on there, immediately, uh, one of the board members, Johnny Joyner, he decided he didn't want to be a part of that board anymore, so he left. When he left, the mayor once again says, **"Johnny, I'm relying on you. You need help. You tell me who will help you." I said, "Captain Paul Birch with Mobile County Sheriff's Department, I need him."** He says, "Okay." He says, "Will he do it?" And I said, "Well there's the problem. Let me call him." (laughs).

Sean Sullivan (05:41):
Mm-hmm.

Johnny Hatcher (05:42):
**So I called Paul up, explained to him what was going on. He didn't want to do it at first, but after I explained everything that was going on, he jumped in with both feet. We then turned around and called f- the, called for an emergency meeting, which three board members can do.**
**Everything we did was legal and just. We called for the meeting. We, we posted the meeting. We had the meeting. After the meeting everybody resigned. All the other board members-**

Sean Sullivan (06:07):
Except y'all three?

Johnny Hatcher (06:08):
Except us three. All, all the, the, the, the former board members.

Sean Sullivan (06:12):
Okay.

Johnny Hatcher (06:12):
The, the three newest did not. Everybody else resigned. Uh, the, uh, facility manager and them said they wanted to come in and get their personal belongings. Well, I, uh ... That was on a Thursday, I believe it was. **Well, on a Friday I got a phone call telling me that there was some strange activity. A guy had pulled up behind the office, not in the front, snuck around, went in through the side door, and was in the building. Well, when I drove up out there, I see Darryl Wilson leaving the property with a bunch of, you know, files and, and stuff in a, like a-**

Sean Sullivan (06:48):
Coming out of the office with everything?

Johnny Hatcher (06:50):
**Yeah. Coming out of the office with ... Yeah. It's just sneaking out. I have no idea what all he took before then, but I know he took that. Tons of files. So he leaves out. Well we, we reported it, like we should, with the local authorities. Nothing you can do, he has a right to be there. He, he works there.**

Sean Sullivan (07:06):
Mm-hmm.

Johnny Hatcher (07:07):
I said, "Okay." Well they were supposed to come and get their stuff on Sunday. Told us to be there Sunday, they would come get their stuff. It's what they told the attorney. **Well, I get another phone call Saturday morning telling me they're out there. And I said, "Well, crap. I'm on my way." When we go out there, we watch 'em loading up all the tools and everything. They're liquidating the place. Not only did they do that, they went so far as to take the hard drive for the camera system out there.**

Sean Sullivan (07:31):
Hmm.

Johnny Hatcher (07:32):
**To cover up the crime they just committed. So-**

Sean Sullivan (07:35):
So this is-

Johnny Hatcher (07:36):
**... that's where it all started.**

Sean Sullivan (07:36):
Okay.

Johnny Hatcher (07:37):
**So we, we, we called, and we, and, and they says, "Well listen, if you don't have the receipts and stuff, uh, you got to get all that together. Get it to us. Show us what was taken. Then we can do it. But we can't do it just because. We have to have an investigation." Well, I called Paul, told Paul what was going on. Paul says, "Meet me down there. You and Burdine meet me down there. We need to start looking over all this now." At Paul's direction, we started looking in, and Paul found a tremendous amount of stuff. He found ... I tell you what they bought. Uh, we had receipts for, uh, what is that, smoke detectors. But it wasn't a smoke detector, it was actually a, a security camera in a smoke detector. That's a heck of a thing to find a receipt for-**

Sean Sullivan (08:18):
Hmm.

Johnny Hatcher (08:19):
**... in a housing department, uh, isn't it? A development.**

Sean Sullivan (08:22):
*Wow. Yeah.*

Johnny Hatcher (08:23):
**Oh, yeah.**

Sean Sullivan (08:23):
*Like these could've been put into ... And, and I guess we also need a side note that-*

Johnny Hatcher (08:26):
**We, we didn't know, only speculating.**

Sean Sullivan (08:27):
Right.

Johnny Hatcher (08:28):
**But it, it's, it was (laughs) there. Um, we also found, uh, a tremendous amount of receipts f- uh, of stuff that wasn't there. Still we can't find it. But the most interesting thing that Paul had come across, I thought was amazing. He'd come across their addendums to their contracts. The addendums were, were voted on and approved before their contract was approved. And it was to give them a retirement that was worth, combined, $4.2 million. Wouldn't matter if they quit, got fired, no matter what, they got that money.**

Sean Sullivan (09:03):
Now this is for, uh ... And, and people don't, uh, know, you know, the, the house there in, in the housing, under the housing board in Bayou La Batre are how, how many houses there?

Johnny Hatcher (09:12):
Uh, at t- it's, it's 98 homes.

Sean Sullivan (09:15):
98 homes. Uh- w-

Johnny Hatcher (09:17):
90- 99, I'm sorry. We, we use one of them for a office.

Sean Sullivan (09:19):
Yeah.

Johnny Hatcher (09:19):
So there's 90- 98 that we rent out.

Sean Sullivan (09:22):
So the value, this is something that stuck with me way back, the value of the home or the property combined ...

Johnny Hatcher (09:29):
The, the value of the homes-

Sean Sullivan (09:32):
Yes. And the-

Johnny Hatcher (09:32):
**I've been offered $8 million to sell it-**

Sean Sullivan (09:33):
Okay.

Johnny Hatcher (09:33):
**... from other housing developments around here.**

Sean Sullivan (09:35):
But so the retirement that was in there was, at that point, worth half of the value of the entire housing board of, uh, homes in Bayou La Batre?

Johnny Hatcher (09:43):
It-

Sean Sullivan (09:43):
Just in retirement.

Johnny Hatcher (09:45):
**Sean, Sean, it gets better than that. They had a deal worked up, and was selling that property for four and half million dollars, and they were leaving with the lion's share. Four, 4.2 million. It was all geared up to enrich themselves.**

Sean Sullivan (09:59):
A-

Johnny Hatcher (10:00):
**That's all this was about.**

Sean Sullivan (10:01):
So, so the ... Now that we kind have, did the back story here, and before you ... Don't want to run out of time. But, so that, that was the story. Now, uh, you know, it seemed like that fire was raging to me, back then.

Johnny Hatcher (10:11):

**Oh, yes.**

Sean Sullivan (10:12):
Like, like I thought somethings at any point would happen. And like I said at the beginning, this just seemed to just go away. And I think people will ask, people who remember this story, they're probably, um, looking at the text line, and we have reminded some people. Now they're like, "Oh, yeah. That was a thing."

Johnny Hatcher (10:24):
[inaudible 00:10:25].

Sean Sullivan (10:25):
'Cause I mean, it's been ... You know, I mean, we're butchers, bakers, candlestick makers, something like that gets outs of the news cycle, we can forget about it. Now these people are ru- ... So, what's happening? Has anything happened with this case? What's an update?

Johnny Hatcher (10:35):
**You know, uh, it, it kinda stalled. We turned it over. Paul could not be a part of the investigation when he was on the board.**

Sean Sullivan (10:42):
A member of the board, yeah.

Johnny Hatcher (10:42):
**Because of the sheriff's department. Uh, Paul is very ethical. He's, he's, he's gonna do everything by the book. That's just Paul. If you know Paul, Paul is, is 100% by the book. He's a great guy. So when this, his election come up, Paul says to me, he says, "I'm gonna have to go ahead and at some point, you know, run my campaign." I said, "Well, Paul, how about this? No time like the present." I says, "If you leave now though, can you immediately start taking a, a, a heavier hand in this?" And he says, "Absolutely." He said, "That's exactly what I intend to do." So when Paul started leading the march, taking a heavier hand in it, things started happening. I'm not saying anything, it was just some disconnects, and you had some people who had lek the sheriff's department. And it just, for one reason or another, it, it, we got put on the back burner.**

Sean Sullivan (11:30):
Okay.

Johnny Hatcher (11:31):
**Paul got a hold to it, put that thing on, on, on the front burner, started watching it. And let me tell you something, it's cooking, brother.**

Sean Sullivan (11:39):
So it it ... So this has not gone ... And we're gonna come back from the break, and more of our conversation with Johnny Hatcher. So it is not lost.

Johnny Hatcher (11:46):
**(laughs) No, it's not lost.**

Sean Sullivan (11:47):
It's not lost and gone. All, all right. This is-

Johnny Hatcher (11:49):
**We're gonna ... I, I assure you one thing, there will be a resolution to this.**

Sean Sullivan (11:52):
All right. Coming right back, more Midday Mobile on FM Talk 1065.

Sean Sullivan (13:17):
**All right, continue our conversation with Johnny Hatcher, running for Mobile County School Board, but also the person who, way back, came to me with this story out of Bayou La Batre.** And I know, uh, you and I talked about, um, Lagniappe did a lot with you on this. And it's good to hear an update, 'cause it did seem like this fell off the end of the earth.

Johnny Hatcher (13:35):
It did. And I'm gonna tell you who brought it to the forefront, uh, was Gabe Tynes with Lagniappe.

Sean Sullivan (13:39):
Yeah.

Johnny Hatcher (13:40):
**With a question he had for Ashley Rich at one of her press conferences. Um, and Ashley and I have talked since then. We've had a meeting. Uh, went over some things. We found out where the**

disconnect was. Um, and again, I can't say enough good about Paul Burch. Paul Burch has a, a tremendous relationship with them at the DA's office. Everybody down there. And they put their top investigators on this. They, they, they're really doing a good job from, from what I've been able to see. Um, you know, mines, access is very limited. I can't tell you what do, or what they don't do.

Sean Sullivan (14:12):
Right.

Johnny Hatcher (14:13):
Because, uh, I don't, I, I'm, I'm not privy to that. But I can tell you-

Sean Sullivan (14:16):
But this case is still alive?

Johnny Hatcher (14:17):
Oh, my God, is it alive.

Sean Sullivan (14:18):
Okay.

Johnny Hatcher (14:19):
It's alive and well. I promise you one thing, uh, people will get justice. I'm not gonna stop, for one.

Sean Sullivan (14:25):
Right.

Johnny Hatcher (14:25):
Uh, you know, I'm not short on tenacity.

Sean Sullivan (14:26):
(laughs) That's true.

Johnny Hatcher (14:27):
If there's a wrongdoing, I assure you I'm gonna be there. I'm gonna make sure it gets corrected.

Sean Sullivan (14:30):
Right.

Johnny Hatcher (14:31):

Because, hey, that's the right thing to do. And that's why they ... **Hey, they didn't put me down there because they liked me, they put me down there because they wanted to see some results.** Anybody who wants to go down there, the fence was, was tore down on the place, or falling down.

Sean Sullivan (14:42):
Yeah.

Johnny Hatcher (14:43):
**We've redone the fence. The houses had never had a coat of paint on 'em. The houses down there being painted as we speak. Um, there was 17 houses that was deplorable, unlived in, that they had done no maintenance on. Uh, the other houses were lack of maintenance. People were upset, there was rats running in on 'em. You had all these complaints.** I tell you this, I encourage anyone to go down there, ride around, and tell me what you think. The deck are, have been redone, the porches. **We have done a lot down there, and we keep the maintenance up.** We actually hired a couple of guys, sent them to school to get their HVAC.

Sean Sullivan (15:18):
Okay.

Johnny Hatcher (15:18):
**So we have qualified people that know what they're doing down there. And the work is getting done.**

Sean Sullivan (15:23):
*So, i- is there any way to ... I mean, uh, where is the $4 million dollars of the retirement?*

Johnny Hatcher (15:29):
S-

Sean Sullivan (15:29):
Where is their ...

Johnny Hatcher (15:31):
**They wanted a retirement that was so outlandish. They wanted to be paid, um-**

Sean Sullivan (15:37):
This is the previous [inaudible 00:15:37]. Yeah.

Johnny Hatcher (15:38):
**Before ... Absolutely. Uh, Darryl and Virginia, they wanted to be paid- in their contracts, they wanted to be paid, uh, before anybody else got paid. Their contract had to be met. And, uh, their retirement was that it ha- it was a 99 year retirement.**

Sean Sullivan (15:55):
Hmm.

Johnny Hatcher (15:56):
**Who in the heck in their 50s in gonna live another 100 years? Or 99 years?**

Sean Sullivan (16:00):
Um ...

Johnny Hatcher (16:01):
**It's ridiculous.**

Sean Sullivan (16:03):
Maybe-

Johnny Hatcher (16:03):
**Brother, when we get them in that courtroom on the civil end, that nice new Mercedes that they're driving, SUV, and that nice new Fiat that she has, and, and all these wonderful things that they bought and paid for with money that they squandered from down there, in my opinion, I assure you will be i- in all in play.**

Sean Sullivan (16:22):
But it takes more to tango in this, and that's the story of ... 'Cause, you know, if, if individuals ask something from a board, they have to have a board say yes.

Johnny Hatcher (16:32):
**Sean, what board do you know that would agree to something like that without receiving something in return?**

Sean Sullivan (16:37):
Well that, well that, that's what I'm asking. That have ... But it's a, it's, is

... It takes multiple dance partners in this for it to go off. It can't ... Right?

Johnny Hatcher (16:42):
**Well, there's, there's, there's things that I know, I can't discuss on here.**

Sean Sullivan (16:45):
Okay.

Johnny Hatcher (16:46):
**But I can tell you, there's some, there's some ... These people got some, uh, they got some explaining to do.**

Sean Sullivan (16:53):
Okay.

Johnny Hatcher (16:53):
(laughs).

Sean Sullivan (16:54):
So you ... Um, and so, um, we got, like, a minute left here. This is something, so you ... Number one, this case is not dead.

Johnny Hatcher (16:59):
Absolutely.

Sean Sullivan (17:00):
It is still alive. And, uh, in the near future we can expect a, to hear you come back in and talk a bit more about this?

Johnny Hatcher (17:06):
**Yes. Yes. I'm gonna stay in front of everybody until somebody's held accountable, until justice is served. I'm not giving up. I will not give up. And I can tell you this, I see more activity right now than I have seen in a lo- since the very beginning.**

Sean Sullivan (17:20):
Okay.

Johnny Hatcher (17:21):

**In the very beginning there was a lot of activity. But let me tell you something, there was a lot of stuff we had to go through.**

Sean Sullivan (17:26):
Mm-hmm.

Johnny Hatcher (17:26):
**We went through 16 boxes. A lot of that stuff was missing, we couldn't find. We had to archive stuff off computers and get information that we needed. We've had to subpoena, uh, uh, bank accounts, uh, some of which people still don't know have been subpoenaed. Uh, we've have to subpoena, uh, records from stores. We've, we've done everything that you've seen that they're doing right now at Pritchard Water.**

Sean Sullivan (17:52):
That's it.

Johnny Hatcher (17:53):
**So we're doing our job.**

Sean Sullivan (17:54):
And that's, and that's a part of it too, that this is a bigger story. While this is, uh, this, this has been going on, uh ... Well this, this story out of Bayou La Batre's been going on longer than this latest wave out of Pritchard. These are the stories. This is why it's important. You're doing what you're doing. The folks at Lagniappe are doing the investigative reporting they're doing, uh, that we can talk about it here at FM Talk 1065, 'cause this is how we ... I mean, this is the oversight.

Johnny Hatcher (18:14):
**Absolutely.**

Sean Sullivan (18:14):
This is what has to be done.

Johnny Hatcher (18:15):
**Mm-hmm.**

Sean Sullivan (18:16):
We have to keep an eye on things.

Johnny Hatcher (18:17):

**When, when-**

Sean Sullivan (18:17):
And we appreciate people doing that.

Johnny Hatcher (18:19):
**Uh, when you're, you're, you know, elected to a board, or you're appointed to a board, and especially if you're the chairman of the board such as I am, you have fiduciary duty to do these things.**

63.    On May 27, 2022, plaintiff Virginia Huddleston was arrested for Theft of Property, 3rd

Degree. The indictment reads as follows:

Circuit Court of Mobile County, May 2022
Count 1
THEFT 3/500-1499 (eff. 1-30-16) Bond Amount: $1000.00
    The Grand Jury of said county charge that, before the finding of this indictment, Virginia Christine Huddleston, alias, VIRGINIA H. SHANAHAN, whose name is to the Grand Jury otherwise unknown, did, from approximately **March 2, 2020 through June 26, 2020**, knowingly obtain or exert unauthorized control over **the fund(s), account (s), credit card, and/or flooring material,** the property of **Bayou La Batre Housing Authority,** of the approximate **aggregate** value of **which exceeds $500.00 but which does not exceed $1,499.00,** with the intent to deprive the owner of said property, in violation of §13A-8-4.1 of the Code of Alabama, against the peace and dignity of the State of Alabama.

64.    Gabriel Tynes, Lagniappe, Bayou housing director arrested on felony theft charge, May

27, 2022.

**The former director of the Bayou La Batre Housing Authority (BLBHA), who resigned in 2020 after a freshly appointed board uncovered exorbitant bonuses, high salaries and an attempted $4.1 million retirement scheme, was arrested today on a single felony charge of third degree theft.**

**Johnny Hatcher, who was appointed to the BLBHA shortly before Huddleston's resignation, believes the charge may be related to personal property the BLBHA could not account for after Huddleston's departure.**

**"The wheels of justice turn slowly sometimes, but they do indeed turn, and I'm hopeful this won't be the only arrest or the only charge in this case," Hatcher said today. "I feel confident this is just the beginning."**

**At the time of the search warrant, Mobile County Sheriff Office Capt. Paul Burch said investigators were examining the BLBHA's bank records and financial transactions to account for the legitimacy of purchases, while it was also trying to locate various items of missing personal property.**

Huddleston and Wilson resigned and the sale was canceled after former Bayou La Batre **Mayor Terry Downey appointed new members to the BLBHA, who began to push for a forensic audit and criminal investigation. In December 2020, the BLBHA filed a lawsuit against Huddleston, Wilson, and former members of the board, claiming the employment contracts were invalid because they were "never presented to or approved by the board, and the board's attorney was never involved in the drafting or review" of the contracts.**

65.    NBC News, Former Executive Director of Bayou La Batre Housing Authority Charged with Theft, May, 31, 2020.

Anchor:

**The former Bayou La Batre Housing Authority was arrested on the single felony charge of third degree theft. Investigators say Virginia Huddleston is facing felony charges of theft of property. Huddleston resigned in 2020 after a board uncovered exorbitant bonuses, high salaries and an attempted retirement scheme, totaling more than $4 million.**

66.    On June 3, 2022, a few days after plaintiff Virginia Huddleston's arrest, defendant John Hatcher again appeared on talk radio show Midday Mobile, with Sean Sullivan. Sullivan  stated that defendant John Hatcher was in studio with Sullivan "last week" and that defendant John Hatcher told Sullivan that, "something's coming, something's coming, something's coming."

67.    Defendant John Hatcher announced the arrest of plaintiff Virginia Huddleston. Defendant Hatcher then maliciously and fraudulently criminally slandered plaintiffs Huddleston and Wilson when he intentionally and falsely claimed, that Darryl Wilson was a member of the board and that Wilson voted to hire Huddleston; Wilson then resigned from the board, at which time Huddleston promptly hired Wilson. Defendant John Hatcher then said, "It's illegal." "Highly unethical." "They done it. They got away with it, but I think that's the last thing they'll ever get away with down there."

68.    When Defendant John Hatcher was challenged on the charge against plaintiff Virginia Huddleston and it not being related to any of the criminal allegations defendants publicly levied against plaintiffs, defendant John Hatcher replied, "But it's still a charge. It's still theft of property." Defendant John Hatcher then went on to criminally slander plaintiff Virginia Huddleston and alleged plaintiffs theft was closer to $1499 and not $500.

69.    Defendant John Hatcher again proceeded to engage in a cover up of the civil and criminal conspiracy and crimes members of the board of directors, mayor Terry Downey, and co-conspirator Captain Paul Burch engaged in during their civil and criminal conspiracy against plaintiffs which included the weaponization of the judicial system. John Hatcher attempted to rewrite history in order to alter the events and facts as they transpired and claimed, "...he's [co-conspirator Paul Burch] helped steer this some. But, you know, the main thing is that the detective work that, you know, in the very beginning it's me doing it. And, you know, being told how to do this 'cause Paul couldn't do it 'cause he was on the board at that time." "Yeah, so when he's [co-conspirator Paul Burch] on the board, he had to take a back seat to it because of a conflict. He really didn't have to but he done that."

Page 44 of 66

70.     When show host Sean Sullivan expressed his surprise at the charge of theft of property third degree against plaintiff Virginia Huddleston and how its traditional to lead off with a big charge, Hatcher again engaged in a coverup of the civil and criminal wrong doing by defendants, mayor Terry Downey, and co-conspirator Captain Paul Burch, when defendant John Hatcher stated, "If anybody else were investigating and doing it probably so, but the thing is this got stalled due to, some information was, was not necessarily mishandled but just wasn't turned over properly, and everything has been done now, everything to the letter of the law has been done on our end."

71.     Defendant John Hatcher maliciously and knowingly criminally slandered plaintiffs when in reference to the Bayou La Batre Housing Authority obtaining ownership of the property said, "Well, as soon as they put it in their name they immediately put it on the market with an auction company."

72.     Defendant John Hatcher again maliciously and criminal slandered plaintiffs by accusing them of being a part of a criminal conspiracy when he stated, "Yes. It's part of the conspiracy. Un, they conspired to sell that property and give themselves an outlandish retirement." "Yeah, they were going to sale if off for pennies."

74.     Sean Sullivan, Midday Mobile, FM 106.5 Talk Radio, Johnny Hatcher Discusses Bayou La Batre Housing Scandal, June 3, 2022.

> Sean Sullivan (04:01):
> ... story with the Bayou La Batre Housing Authority, uh, broke open. And, uh, I, I was wanting you to update on that as well because we had it make the news this week. *You were in with me last week. Said, "Something's coming, something's coming, something's coming."*

Johnny Hatcher (04:12):
**Yes, it was. Yes.**

Sean Sullivan (04:14):
**Uh, you had to keep your powder dry on some things. So talk about what happened. And, and, and, and, well, first of all, let's just set up what happened before we talk about the what's next.**

Johnny Hatcher (04:23):
**Well, what we had was an arrest, uh, with, uh, the facility manager-**

Sean Sullivan (04:28):
Okay.

Johnny Hatcher (04:28):
… **Virginia Huddleston. She is-**

Sean Sullivan (04:30):
Now this is the one we talked about that the couple.

Johnny Hatcher (04:31):
**Mm-hmm.**

Sean Sullivan (04:32):
That you had the manager and then you had the maintenance and [inaudible 00:04:34].

Johnny Hatcher (04:33):
**The maintenance manager was her husband.**

Sean Sullivan (04:35):
Yeah. Husband. Right.

Johnny Hatcher (04:36):
**Darryl Wilson.**

Sean Sullivan (04:37):
Who had been on the board.

Johnny Hatcher (04:38):
**Absolutely. He started off on the board and hired her then immediately resigned and she hired him which is (laughs) it's, it's [inaudible 00:04:47].**

Sean Sullivan (04:46):
It's a nice, nice gig if you can get where you-

Johnny Hatcher (04:48):
**It's, well, it's, it's illegal.**

Sean Sullivan (04:50):
Yeah. Very. Yeah.

Johnny Hatcher (04:52):
**It's just highly unethical. Um, but they done it. They got away with it, but, uh, I think that's the last thing they'll ever get away with down there.**

Sean Sullivan (04:58):
So what happened this week? But, 'cause when I read the f- story when it first came out, Johnny, i- it would, Virginia, uh, I don't say w- it was a, uh, i- it was like a- they would response from, from, from her and [inaudible 00:05:10] saying that what she was being charged with or whatever was not even related to the charges in the first place. Or saying, I'm, I'm having trouble understanding. Can you, can you help me?

Johnny Hatcher (05:20):
**Th- there's, there's so much out there it's unreal. Uh, is this one of the minor charges? Sure it's one of the minor.**

Sean Sullivan (05:26):
Okay.

Johnny Hatcher (05:27):
**But it's still a charge. It's, it's still theft of property. I mean-**

Sean Sullivan (05:29):
So it is happening. And it's, it is related to this.

Johnny Hatcher (05:31):
**... just because it doesn't meet his standard (laughs), doesn't mean it's not [inaudible 00:05:34].**

Sean Sullivan (05:34):
Okay. Well, I understand. That's their defense attorney-

Johnny Hatcher (05:35):
**Yeah.**

Sean Sullivan (05:35):
**... so that's why I wanted to make sure I got you on to talk about it from-**

Johnny Hatcher (05:37):
**Yeah.**

Sean Sullivan (05:38):
... the perspective that, that this is... I mean, 'cause it was almost, it seemed like in that commentary, e- and, and I know **Dennis, but he was, you know, saying that, "Well, this is something that doesn't even fit the definition of the, you know, the, the first charges.**

Johnny Hatcher (05:50):
**Oh, well, they can first file their own d- first charges to make him aware of that. I love Dennis to death. He's a great guy. But (laughs) there, there's allegations-**

Sean Sullivan (05:58):
Okay.

Johnny Hatcher (05:58):
**... of charges, uh, looming. And, and they, and they are. They're, look, the wheels of justice turn slow, but indeed they do turn.** [inaudible 00:06:07].

Sean Sullivan (06:06):
'Cause what we have is a theft of property third, right?

Johnny Hatcher (06:09):
**That's right.**

Sean Sullivan (06:10):
'Kay. And in that story remember we said, uh, that things between 500 bucks and almost 15 over [inaudible 00:06:16], 1500 bucks.

Johnny Hatcher (06:16):
**That's right. That's right.**

Sean Sullivan (06:18):
Okay. So that is…

Johnny Hatcher (06:19):
**And it's closer to the latter.**

Sean Sullivan (06:21):
Okay. So it's a, so this charge comes from a thing. I don't know if it's been published yet the, the, the…

Johnny Hatcher (06:26):
**It hasn't. Uh, they haven't put a- put anything out there yet. They don't… She'll have her, uh, preliminary hearing, um, she just got arrested from the indictment. The indictment was done, God knows when. I have no idea. Secret indictments they, you know, when they do them, they, they're secret.**

Sean Sullivan (06:40):
Right.

Johnny Hatcher (06:41):
**Uh, so I have no knowledge of any of that. I can just tell you that we have been diligently working, putting things together.**

Sean Sullivan (06:46):
And when you say we, for people who have not heard you talk before, we being?

Johnny Hatcher (06:49):
**Paul Burch, brother.**

Sean Sullivan (06:50):
Yeah. And?

Johnny Hatcher (06:51):
**And the DA's office, uh, Cr- Clay Rossi with the DA's office has been a big help. Uh, Keith Blackwood, believe it or not, has, has got his fingers in this and doing a really good job as well. Uh, he's helped steer this some. But, you know, the main thing is that the detective work that, uh, you know, in the very beginning it's me doing it. And, you know, being told how to do this 'cause Paul couldn't do it 'cause-**

Sean Sullivan (07:13):
Right. But you were on the board.

Johnny Hatcher (07:14):
**Yeah. Paul was on the board**

Sean Sullivan (07:15):
Paul was not at that point-

Johnny Hatcher (07:17):
**Well, Paul was on the board-**

Sean Sullivan (07:17):
… or he had to come off the board-

Johnny Hatcher (07:18):
**… at that time.**

Sean Sullivan (07:18):
… to *do this.*

Johnny Hatcher (07:18):
**Yeah. So wh- when he's on the board, he had to take a, a back seat to it-**

Sean Sullivan (07:22):
Mm-hmm.

Johnny Hatcher (07:22):
**… because of a conflict.**

Sean Sullivan (07:23):
Mm-hmm.

Johnny Hatcher (07:23):
**He really didn't have to but he done that. You know, he's, he's very professional. So when he was able to come off the board and run for sheriff then he became a great big help. Let me tell you something. There's no finer detective than Paul- Paul Burch. I mean, he's, he's phenomenal. We get to digging. We, when we're doing more, I mean, w- we found a lot but I can't sit here and tell you. Dennis would love for me to tell you all, what all we found.**

Sean Sullivan (07:49):
Yeah.

Johnny Hatcher (07:49):
**And what all kinda angles we're coming at but that's just not gonna happen.**

Sean Sullivan (07:52):
Well, okay. So but, some of questions here-

Johnny Hatcher (07:54):
**But, I can tell you that we are definitely not stopping. This, this, hey, this little snowball is gonna turn into an avalanche.**

Sean Sullivan (08:00):
I- e- is, is, is there an issue here with statute of limitations as well? I mean, now that this-

Johnny Hatcher (08:05):
**It's coming up.**

Sean Sullivan (08:05):
Yeah.

Johnny Hatcher (08:06):
**We need three years.**

Sean Sullivan (08:06):
Okay.

Johnny Hatcher (08:07):
**So things are gonna start hitting.**

Page 51 of 66

Sean Sullivan (08:09):
Okay.

Johnny Hatcher (08:10):
**Cause as the Feds-**

Sean Sullivan (08:10):
[inaudible 00:08:11].

Johnny Hatcher (08:10):
**...Now wait a minute now. The Feds got their own timeline. Whatever they do is their business. They, you know, they don't, I don't know what their statute of limitations are.**

Sean Sullivan (08:17):
Okay.

Johnny Hatcher (08:17):
**But I can just tell you this, uh, they are well aware of everything going on. Uh, and they stay in, in contact.**

Sean Sullivan (08:24):
I g, I guess, uh, maybe that reaction too and seeing that story when it broke about that theft of property third degree, Johnny, was, we're all kinda trained to expect the, if there's gonna be a big one it's, you'd lead off with the big one and then you hear all the others.

Johnny Hatcher (08:38):
**Yeah.**

Sean Sullivan (08:38):
Right? I mean, I mean that's-

Johnny Hatcher (08:39):
**Yeah. Typically that's what's happened. Well, this is, and, you know what - If anybody else were investigating and doing it probably so but the thing is is this got stalled due to, um, some information was, was not necessarily**

mishandled but just wasn't turned over properly. Um, and wh- and everything has been done now, everything to the, to the letter of the law has been done on our end. And we're working diligently and moving forward thr- with an investigation. Uh, and look- we've got things that have, have stacked up. We, we could drop it all if we want to, but we want to make sure it's 100% before we do it.

Sean Sullivan (09:15):
Okay.

Johnny Hatcher (09:15):
That's the most important thing. We see it, we know it's there. We got it dead on.

Sean Sullivan (09:20):
Okay.

Johnny Hatcher (09:21):
Now we've gotta take this and, and work with the sheriff's department. The sheriff's department in turn goes to the DA. The DA in turn takes it to the grand jury.

Sean Sullivan (09:28):
Jury, right.

Johnny Hatcher (09:29):
And that's ho- that's where we're at. We're in those stages.

Sean Sullivan (09:32):
A- and y- and also I, I kinda jump into things with you 'cause we've talked about this. But if people have not heard this conversation before of course this is surrounding, uh, Safe Harbor, the [inaudible 00:09:40].

Johnny Hatcher (09:39):
Oh, yeah. Yeah.

Sean Sullivan (09:40):
The 99 homes that-

Johnny Hatcher (09:40):
Oh, yes, yes.

Sean Sullivan (09:45):
... and there in Bayou La Batre. Um, a- and, and this, that this d- that is now, uh, it's always been in the hands of, of the board, but it was-

Johnny Hatcher (09:50):
That's right. Well, what is was is the property was owned by the city of Bayou La Batre.

Sean Sullivan (09:56):
And that came money from federal and state grants, right?

Johnny Hatcher (09:59):
That's right. They come from federal grant monies, Katrina, after Katrina.

Sean Sullivan (10:01):
[inaudible 00:10:02].

Johnny Hatcher (10:02):
That's right. And they spent-

Sean Sullivan (10:03):
Seven, what was it? 17 million of something?

Johnny Hatcher (10:03):
Oh, close to 18 million.

Sean Sullivan (10:05):
Okay.

Johnny Hatcher (10:07):
**Absolutely. 18 million dollars to build the place. And then there when Virginia started working diligently to get the property put in their name, um, stating that they were going to build more houses and do all these other things. Well, the city and, sat down and said, "Well, you know what? What you're saying sounds really good. We're gonna go ahead and do this. We're gonna help grow it out there."**

Sean Sullivan (10:29):
Okay.

Johnny Hatcher (10:30):
**Well, as soon as they put it in their name, they immediately put it on the market with a, an auction company. Um-**

Sean Sullivan (10:36):
Didn't that seem odd? I mean, uh, uh, I'm asking a question that the answer to.

Johnny Hatcher (10:38):
[inaudible 00:10:39].

Sean Sullivan (10:41):
But doesn't it, doesn't it seem odd that the people that are running, that the, they vying for the job to run a facility immediately put it on the market to sell?

Johnny Hatcher (10:47):
**Yes. It's, and that's part of the conspiracy. Um, they conspired to sell that property and they give themselves an outlandish retirement. Now listen, they're in their 50s, but they wanted a, their retirement after being there only six years. They wanted it whether they quit, got fired, didn't matter what happened, they got paid in advance for 99 years. That equaled 4.2 million dollars. And they had it sold for 4.5. And when I got on there [inaudible 00:11:15] deal.**

Sean Sullivan (11:15):
Well, tha- and you just told me, you just told me that this started with the 17, eight, almost 18 million dollar federal grants there.

Johnny Hatcher (11:21):
**Yeah. And they're gonna sell it off pennies.**

Sean Sullivan (11:22):
[inaudible 00:11:23].

Johnny Hatcher (11:22):

**Oh, no, no, no. We've had, look, we've had offers for double that. Um, I choose not to take them because I wanna make sure that Bayou La Ba- Batre is, is, is Bayou La Batre.**

Sean Sullivan (11:32):
Right.

Johnny Hatcher (11:33):
You know, we pick and choose who comes in out there. And it's mainly for the people who live in Bayou La Batre-

Sean Sullivan (11:38):
Right.

Johnny Hatcher (11:38):
... who've grown up in there.

Sean Sullivan (11:39):
Right.

Johnny Hatcher (11:39):
That's who we want first and foremost.

Sean Sullivan (11:40):
Right.

Johnny Hatcher (11:41):
We take first responders, put them at the first of the list. And then second is people who live in Bayou La Batre, who have lived there.

Sean Sullivan (11:47):
Right.

Johnny Hatcher (11:47):
Um, we're, we're really careful as to the, the, the class of people we bring in there. We don't, the, if you have any convictions or, or drugs or anything like that, we, hey, we vet you very good. And we won't let you in. So...

Sean Sullivan (12:01):

Th- that part of it is, um, w- we got Virginia Huddleston. Uh, how about, you know, I mean, this, you said Darryl Wilson, her husband.

Johnny Hatcher (12:09):
Not yet.

Sean Sullivan (12:09):
Okay.

Johnny Hatcher (12:11):
Okay. All right. [inaudible 00:12:12].

Sean Sullivan (12:12):
**You are, I mean, you're like a Cheshire cat over there, man. You're, like, getting-**

Johnny Hatcher (12:15):
**(laughs)**

Sean Sullivan (12:17):
... [inaudible 00:12:15]. 'Cause, I mean, I'm looking at the text line. People, this story and, and I, I think this story, you and I did talk about that it, *it got some fuel put in it as well. Not that the investigation but in the public eye.*

Johnny Hatcher (12:27):
Yeah.

Sean Sullivan (12:28):
Fuel put in it because of Pritchard.

Johnny Hatcher (12:29):
Thank God for Gabe Tynes.

Sean Sullivan (12:32):
Mm-hmm.

Johnny Hatcher (12:32):
Gabe Tynes questioned the, the DA about it. And that's when everything come to light that there may have been some documents that she hadn't received. Uh, we

turned everything over. But there was a breakdown along the way where they didn't get them. Uh, as soon as we had showed that they did have all these, they immediately started moving forward and, again, I guess, uh, pushing for indictments. And I have no idea how many more are out there. I have no idea. I can tell you this. I will say this to anybody who sat on that board that is listening today. If it were me, I would be running to get the deal first. That's what I'd be doing. But if they wanna all hold together and stay strong, they can all go together and stay strong. It don't matter to me. I just don't think they gonna put them in the same prison. That's my opinion. It's, it's kinda hard to get mean in Tutweiler and vice versa.

Sean Sullivan (13:22):
Well, it's 2020, Johnny.

Johnny Hatcher (13:27):
Yeah. [inaudible 00:13:27].

Sean Sullivan (13:27):
You can [inaudible 00:13:27].

Johnny Hatcher (13:27):
It may, it may come down... Well, Darryl does a good job crying, so he could, he could very well... (laughs) I shouldn't have said that.

Sean Sullivan (13:32):
Yeah, but Y\you, you did. Uh, so does, ad- ad- desh- *assure me this, the statute of*

*limitations is not gonna run on these without getting, without something happening if, if there's justice* [inaudible 00:13:44]?

Johnny Hatcher (13:44):
You have my word that I'm gonna push this to the fullest. I will not stop.

Sean Sullivan (13:48):
Okay.

Johnny Hatcher (13:48):
I'm not short on tenacity.

Sean Sullivan (13:50):

Yeah. [inaudible 00:13:51].

Johnny Hatcher (13:51):
I assure you that this is going to be pushed and there's gonna be some people, if they don't do what they need to do, they're gonna have to answer to the public way before that statute of limitations runs out. I'll be here and I'll, I'll really come out strong at that point. But, uh, I expect them to do their job. That's all I ask. I'm not asking them to do anything wrong. I just want them to do their jobs. That's it.

75. The constant harassment and intimidation of plaintiffs has continued over the course of two years. The acts of harassment and intimidation includes Defendant John Hatcher driving by Plaintiffs Huddleston and Wilson's home a multitude of times since September 30, 2020, including May 18, 2022, a few days prior to plaintiff Virginia Huddleston's arrest.

76. Defendants have knowingly, maliciously, and fraudulently criminally slandered plaintiffs and deceived the public with their repetitive and public allegations the former board chose to sale the property of Safe Harbor for anywhere from $4.1 million to $4.5 million for the purpose of making the public believe plaintiffs had engaged in criminal behavior.

77. Defendants have knowingly, maliciously, and fraudulently criminally slandered plaintiffs and deceived the public with their repetitive and public allegations plaintiffs engaged in a criminal scheme to sale the property in order to fund plaintiffs retirement.

## COUNT ONE

## CIVIL CONSPIRACY

78. Plaintiff adopts and incorporates all previous paragraphs as if specifically alleged herein.

Page 59 of 66

79. Defendants combined and joined a concerted effort to formulate a deceitful scheme to publicly libel and slander plaintiffs, both civilly and criminally, with the express intent to destroy plaintiffs reputations both personally and professionally with the intent of making plaintiffs social pariahs and unable to financially support themselves.

80. Defendants combined and joined a concerted effort to formulate a deceitful scheme to retaliate against, and to harass intimidate plaintiffs.

81. Defendants combined and joined a concerted effort to formulate a deceitful scheme to weaponize the judicial system against plaintiffs with the intended result of plaintiffs being left financially destitute.

82. Defendants combined and joined a concerted effort to formulate a deceitful scheme to weaponize the judicial system against plaintiffs with the intended result of plaintiffs wrongfully being stripped of their personal freedoms and liberties by imprisonment.

83. Defendants combined and joined a concerted effort to formulate a deceitful scheme to weaponize the judicial system when they worked together prior to being appointed to the board of directors to formulate their scheme against plaintiffs.

84. Defendants engaged in an attempted cover up of their civil and criminal wrong doing.

85. Defendants actions have directly caused injury and damages to the plaintiffs.

86. Defendants conduct was wrongful, intentional, malicious, and deserving of punitive damages.

Wherefore, Plaintiffs seek money damages from the Defendants in an amount to be determined by the trier of fact to compensate plaintiffs for the irreparable harm to their

reputations, plus attorney's fees, costs, and all such other relief at law and equity to which plaintiffs may be entitled.

## COUNT TWO

## CIVIL AND CRIMINAL LIBEL AND SLANDER

85.     Plaintiffs adopt and incorporate all previous paragraphs as if specifically alleged herein.

86.     Defendants engaged in criminal libel and slander when they falsely accused plaintiffs of embezzling hundreds of thousands of dollars.

87.     Defendants engaged in criminal libel and slander when they falsely accused plaintiffs of engaging in a scheme to defraud the housing authority of its assets.

88.     Defendants engaged in criminal libel and slander when they falsely accused plaintiffs of stealing security hard drives that never existed to "cover up crimes they [plaintiffs] committed."

89.     Defendants engaged in criminal libel and slander when they falsely accused plaintiffs of stealing documents, tools, all office hard drives, and a security hard drive that never existed.

90.     Defendants engaged in libel and slander when they falsely accused plaintiffs Huddleston and Wilson of "illegally" hiring each other as employees at the Bayou La Batre Housing Authority.

91.     Defendants engaged in criminal libel and slander when they falsely accused plaintiffs of self-enrichment.

92.     Defendants engaged in libel and slander when they falsely accused plaintiffs of negligence in the performance of their day-to-day job duties.

93.    Defendants engaged in criminal libel and slander when they falsely accused plaintiffs of misappropriation of funds.

94.    Defendants engaged in criminal slander when they falsely accused plaintiffs of giving "something" to the former board members in exchange for approval of plaintiffs employment contracts.

95.    Defendants engaged in criminal slander when they falsely accused plaintiffs of purchasing their personal vehicles with money stolen from the Bayou La Batre Housing Authority.

96.    Defendants engaged in criminal slander when they falsely accused plaintiffs of entering into contracts without proper authority.

97.    Defendants engaged in criminal slander when they falsely accused plaintiffs of converting Housing Authority assets for their own use.

98.    Defendants conduct was wrongful, intentional, malicious, and deserving of punitive damages.

Wherefore, Plaintiffs seek money damages from the Defendants in an amount to be determined by the trier of fact to compensate plaintiffs for the irreparable harm to their reputations, plus attorney's fees, costs, and all such other relief at law and equity to which plaintiffs may be entitled.

## COUNT THREE

## <u>WANTONNESS</u>

99.    Plaintiffs adopt and incorporates all previous paragraphs as if specifically alleged herein.

100.  Defendants consciously committed acts of wrongdoing that resulted in injury to plaintiffs.

101.  Defendants consciously and intentionally acted with reckless disregard to the consequences of their wrongful acts.

102.  As a direct cause of Defendants reckless and wanton conduct, plaintiffs have been damaged and injured.

103.  Defendants conduct was wrongful, intentional, malicious, and deserving of punitive damages.

Wherefore, Plaintiffs seek money damages from the Defendants in an amount to be determined by the trier of fact to compensate plaintiffs for the irreparable harm to their reputations, plus attorney's fees, costs, and all such other relief at law and equity to which plaintiffs may be entitled.

## COUNT FOUR

### OPPRESSION

104.  Plaintiffs adopt and incorporates all previous paragraphs as if specifically alleged herein.

105.  Defendants consciously and maliciously subjected plaintiffs to cruel and unjust hardship in conscious disregard of plaintiffs rights.

106.  Defendants conduct was wrongful, intentional, malicious, and deserving of punitive damages.

Wherefore, Plaintiffs seek money damages from the Defendants in an amount to be determined by the trier of fact to compensate plaintiffs for the irreparable harm to their

reputations, plus attorney's fees, costs, and all such other relief at law and equity to which plaintiffs may be entitled.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, as the direct result of the foregoing wrongful acts  civil conspiracy, both civil and criminal libel and slander, wantonness, and oppression Plaintiffs sees and award of the following relief:

I.   Defendants to publicly acknowledge that plaintiffs did not engage in any wrong doing as alleged, criminal or otherwise.

II.   Defendants to publicly acknowledge their wrongdoing. Compensatory and punitive damages in excess of the jurisdictional limits of they Court in such sum as the trier of fact shall award based upon the wrongdoing alleged in this Complaint;

III.   Appropriate equitable and injunctive relief to which Plaintiffs may be entitled; and

IV.   Plaintiffs fees and cost of courts.


Respectfully submitted,

Defendants:


_____
Virginia Huddleston

_____
Darryl Wilson

## CERTIFICATE OF SERVICE

We hereby certify on this the 7th day of December, 2022, that we have hand filed

the foregoing with the Clerk of Court and have notified all counsel and/or defendants

the following by placing a copy of this motion in the U.S. Mail, Certified.

Adams & Reese, LLP
11 N. Water St
Mobile, Alabama   36602

Adams & Reese, LLP
Counsel for Jay Ross
1901 6th Ave. N., Suite 3000
Birmingham, Alabama   35203

K. Paul Carbo, Jr
Counsel for Paul Burch
The Atchinson Firm, P.C
411 Azalea Road
Mobile, Alabama 36609

John Wayne Hatcher
6560 Hayfield Rd
Theodore, Alabama 36582

Stephanie. Godsey
13321 Center Ave
Bayou La Batre, Alabama   36509

Terry Downey
P.O. Box 948
Bayou La Batre, Alabama   36509

Michael Burdine
8008 Oak Bend Dr
Theodore, Alabama  36582

City of Bayou La Batre
13785 South Wintzell Ave
Bayou La Batre, Alabama  36509

Debra Jones
8280 S Meadow Lane
Irvington, Alabama 36544

**THIS PAGE INTENTIONALLY LEFT BLANK**

COURTESY COPY

# Exhibit G

Search X

Home

Explore

Notifications

Chat

Grok

Bookmarks

Creator Studio

Premium  50% off

Profile

More

Post

← Post

**Virginia Huddleston**
@RealVirginiaH

Mobile County Alabama Sheriff Paul Burch sued for armed home invasion with convicted felon — just 4 days before May 19 GOP primary.
Local media blackout.
Full complaint: vhuddleston.substack.com/p/civil-lawsui...
#Accountability

10:21 AM · May 15, 2026 · **243** Views

💬 17       🔁 3       ♡ 4       🔖 1       ⬆️

Relevant ⌄                              View quotes ›

Post your reply                              Reply

**Virginia Huddleston** @RealVirginiaH · May 15
@JesseBWatters @Timcast @greggutfeld @DC_Draino @Catturd2 @TheGatewayPundit @charliekirk11
💬          🔁          ♡          �", 61       🔖 ⬆️

**Virginia Huddleston** @RealVirginiaH · May 15
@Newsmax @OANN @BreitbartNews @JackPosobiec @libsoftiktok @EndWokeness @MattWalshBlog @TuckerCarlson
💬          🔁          ♡          ", 60       🔖 ⬆️

**Virginia Huddleston** @RealVirginiaH · May 15
): @DanBongino @benshapiro @megynkelly @RubinReport
💬          🔁          ♡          ", 24       🔖 ⬆️

**Virginia Huddleston** @RealVirginiaH · May 15
@FoxNews @Newsmax @OANN @JackPosobiec @EndWokeness @TurningPointUSA @DefiantLs
💬          🔁          ♡ 1        ", 31       🔖 ⬆️

**Virginia Huddleston** @RealVirginiaH · May 15
@JoeDanMedia  @amuse @FBIDirectorKash @mazemoore @LauraLoomer
💬          🔁          ♡          ", 30       🔖 ⬆️

**Virginia Huddleston** @RealVirginiaH · May 15
@elonmusk @joerogan @Shawn_Farash @seanhannity @marklevinshow @glennbeck @JudicialWatch @Heritage @bannonswarroom
💬          🔁          ♡          ", 25       🔖 ⬆️

**Virginia Huddleston** @RealVirginiaH · May 15
@KanekoaTheGreat @TheChiefNerd @jasoninthehouse
💬          🔁 1        ♡ 1        ", 23       🔖 ⬆️

**Virginia Huddleston** @RealVirginiaH · May 15
@MariaBartiromo @JudgeJeanine @TheFive @GutfeldFox
💬          🔁          ♡          ", 26       🔖 ⬆️

**Virginia Huddleston** @RealVirginiaH · May 15
SteveBannon @realDonaldTrump @TeamTrump @USDOJ
💬          🔁          ♡          ", 32       🔖 ⬆️

**Virginia Huddleston** @RealVirginiaH · May 15
@DataRepublican @foxnewsalert @EpochTimes @WashingtonExaminer

Relevant peo

**Virginia Hu**
@RealVirgin

M.B.A. Louis
Business For

What's happe

**Privacy on iPhone**
Safari helps block d
🅰 Promoted by Apple

Trending
**#NHLDraft**

Sports · Trending
**Sorsby**
Trending with The NC/

Trending in United Stat
**#ZIGxONDO**

Show more

Terms of Service  |  Privac
Accessibility  |  Ads info




X

Home

Explore

Notifications

Chat

Grok

Bookmarks

Creator Studio

Premium  50% off

Profile

More

Post

@DataRepublican @foxnewsalert @EpochTimes @WashingtonExaminer @Reason @ProjectVeritas @JamesOKeefeIII @Heritage @PragerU

17

**Virginia Huddleston** @RealVirginiaH · May 15
@PBDPodcast @ShawnRyanShow @LarryElder @EricWeinstein @JordanBPeterson

17

**Virginia Huddleston** @RealVirginiaH · May 15
@FreeBeacon @TheFederalist @SpectatorUSA @dcexaminer @WashingtonFreeBeacon @molliehemingway

19

**Virginia Huddleston** @RealVirginiaH · May 15
@ggreenwald @mtaibbi @ShellenbergerMD @ScottAdamsSays @mtracey

18

**Virginia Huddleston** @RealVirginiaH · May 15
@FoxBusiness @CNN @CBSNews @ABC @NBCNews

20

**Virginia Huddleston** @RealVirginiaH · May 15
@RandPaul @JDVance @larryelder @EricTrump @DonaldJTrumpJr @tedcruz @timburchett

31

**Virginia Huddleston** @RealVirginiaH · May 15
@MZHemingway @julie_kelly2

31

**Virginia Huddleston** @RealVirginiaH · May 15
@Daily_MailUS

28

**Relevant peo**

**Virginia Hu**
@RealVirgin
M.B.A. Louis
Business For

**What's happ**

**Privacy on iPhone**
Safari helps block d
Promoted by Apple

Trending
**#NHLDraft**

Sports · Trending
**Sorsby**
Trending with The NC

Trending in United Stat
**#ZIGxONDO**

Show more

Terms of Service  |  Privac
Accessibility  |  Ads info







# alacourt.com™
The Alabama Trial Court System at your desk



| LogOff

Name: John Hemmings, III    User ID: johhem    Last login Date: 6/8/2026 8:29:48 AM

**Monitor Case**    **Print Case**

| County: | 02-MOBILE | Case Number: CV-2020-902475.00 | Judge: | SWP-S. WESLEY PIPES | Trial Type: | J-JURY |
| Style: | BAYOU LA BATRE HOUSING AUTHORITY V. VIRGINIA HUDDLESTON ET AL | | Filed: | 12/14/2020 | Status: | A-ACTIVE |
| Type: | OTHER CV CASE | | Court Action: | | Track: | S-STANDARD |

REAL TIME

### Main Menu

**Search**
- Party Search
- Case Lookup
- UTC Lookup
- SSN Enforcement
- Attorney Search
- Warrant Search
- Witness Search
- Docket Search
- HotSheet™

**Tracking**
- Attorney Tracker
- Case Monitor
- Name Tracker

**Desktop**
- My Alacourt

**Administration**
- Update User Info

Case | DHR | Settings | Parties | Consolidated Case Action Summary | Images | Witness List | Financial | Motions | Entire Case

## Party List

▶ C001 - BAYOU LA BATRE HOUSING AUTHORITY
▶ D001 - HUDDLESTON VIRGINIA
▶ D002 - WILSON DARRYL
▶ D003 - STORK MARCIA
▶ D004 - JOYNER JOHN W JR.
▶ D005 - COLLIER TONY
▶ D006 - THORNTON ANNETTE
▶ D007 - GOODIN MICHAEL
▶ O001 - ADDITIONAL ATTORNEY FOR PLAINTIFF
▶ O002 - ADDITIONAL ATTORNEY FOR PLAINTIFF
▶ T001 - GODSEY STEPHANYIE
▶ T002 - JONES DEBRA
▶ T003 - BURCH PAUL
▶ T004 - BRUDINE MICHAEL
▶ T005 - HATCHER JOHN
▶ T006 - ROSS JAY
▶ T007 - ADAMS AND REESE
▶ T008 - MOBILE COUNTY SHERIFF'S OFFICE
▶ T009 - CITY OF BAYOU LA BATRE
▶ T010 - DOWNEY TERRY

## Party Detail

### Party Information

| Party: | C001-Plaintiff | Name: | BAYOU LA BATRE HOUSING AUTHORITY | | Type: | G-GOVERNMENT |
| Index: | D HUDDLESTON V | Alt Name: | | Hardship: | No | JID: | SWP |
| SSN: | XXX-XX-X999 | DOB: | | Sex: | | Race: | |
| Add1: | 12131 SAFE HARBOR CIRCLE | | Add2: | | | |
| Phone: | (251) 433-3234 | City: | IRVINGTON | State: AL | Zip: 36544-0000 | Country: | US |

### Attorneys

| Name | Attorney Code | Type Of Counsel | Email | Phone |
|---|---|---|---|---|
| DUNGAN AUBREY PATRICK | DUN054 | | PATRICK.DUNGAN@ARLAW.COM | (251) 433-3234 |
| ROSS JAY MICHAEL | ROS013 | | JAY.ROSS@ARLAW.COM | (251) 433-3234 |
| ZOGHBY ALEXANDER GARRETT | ZOG005 | | GARRETT.ZOGHBY@ARLAW.COM | (251) 433-3234 |
| DIAZ CALEB WILLIAM | DIA014 | | CALEB.DIAZ@ARLAW.COM | (251) 401-1500 |
| BUTLER MICHAEL WARREN | BUT021 | | WBUTLER@STARNESLAW.COM | (251) 433-6049 |
| HEMMINGS JOHN DELANE III | HEM012 | | JHEMMINGS@STARNESLAW.COM | (205) 866-6056 |

### Service Information

| Issued: | 09/29/2022 | Issued Type: | S-SHERIFF | Reissue: | | Reissue Type: | |
| Return: | | Return Type: | | Return: | | Return Type: | |
| Served: | 10/03/2022 | Service Type: | S-SERVED PERSONALLY | Service On: | | Served By: | |
| Answer: | 07/30/2021 | Answer Type: | L-COUNTERCLAIM | Notice of No Service: | | Notice of No Answer: | |

### Court Action

| Court Action: | | | | Court Action Date: | |
| Amount Of Judgment: | | $0.00 | Court Action For: | | Exemptions: | |

# Exhibit H

# Exhibit I

# Civil Lawsuit Filed Against Sheriff Paul Burch, Bayou La Batre Housing Authority, and Others Seeking Accountability After Years of Retaliation and Media Scrutiny



**VIRGINIA HUDDLESTON**
MAY 14, 2026



Sh

**Civil Lawsuit Filed: Seeking Accountability After Years of Retaliation and Media Scrutiny**

*Virginia Huddleston holds a Bachelor of Science in Business Forensics from Franklin University and a Master of Business Administration from Louisiana State University. She i former certified fraud examiner and served as Executive Director of the Bayou La Batre Housing Authority from May 2013 to September 2020.*

Virginia Huddleston
Semmes, Alabama
May 14, 2026



For more than two years, local and regional media outlets provided extensive coverage of allegations made against me and my husband, Darryl Wilson, in connection with our roles at the Bayou La Batre Housing Authority. Those reports were based on unproven and false claims advanced by certain board members and law enforcement officials and dominated public discourse, contributing to significant personal and professional harm.

On May 12, 2026, we filed a civil complaint in the Circuit Court of Mobile County, Alabama, formally seeking redress for the conduct described in detail across my previous Substack articles. The complaint, *Virginia Huddleston & Darryl Wilson v. Paul Burch et al.*, asserts multiple causes of action under Alabama law and federal civil rights statutes, including false arrest, false imprisonment, malicious prosecution, conversion of personal property, and violations of our constitutional rights under 42 U.S.C. §§ 1983 and 1985.

**Key elements of the complaint include:**

- Detailed factual allegations concerning the October 5, 2020, raid of our home, during which Mobile County Sheriff's Office personnel, under the supervision Paul Burch, permitted private citizen and Housing Authority board member Jo Wayne Hatcher ("Johnny Hatcher") — a three-time convicted felon — to enter home. Deputies loaded seized personal property belonging to Darryl Wilson — items he personally owned long before the Bayou La Batre Housing Authority even existed — into Hatcher's truck and allowed him to drive off with it. The Housing Authority had no legitimate claim or proof of ownership over these personal items. What the Sheriff's Department did that day, with Paul Burch as supervisor, constituted an armed home invasion; anyone else who engaged in su conduct would face serious prison time under Alabama criminal law.

- The subsequent May 27, 2022, arrest and indictment on a third-degree theft charge came only after Paul Burch knowingly opened a criminal investigation a made public allegations of criminal wrongdoing without any basis in fact on September 30, 2020 — outrageous and false claims that alone exposed each of u to up to 140 years in prison (with additional public allegations made later). Importantly, the formal charges ultimately brought against me were in no way related to those initial outrageous and false public accusations. These formal charges were pursued despite prior criminal investigations conducted by the Mobile County Sheriff's Department, the Mobile County District Attorney's Office , and the FBI, all of which failed to find any evidence of criminal wrongdoing. The indictment was based on perjured testimony provided to the grand jury by John Wayne Hatcher ("Johnny Hatcher"), who was the sole witne Former District Attorney Ashley Rich, who is now the attorney for the Mobile County Sheriff's Department, allowed these false charges to proceed to the gra jury despite the complete absence of any evidence or basis in fact beyond Hatcher's word alone. The charges should never have been taken before a gran jury. Throughout the criminal proceedings, I refused all plea deals offered by th

prosecution because I refused to plead guilty to something I did not do. It was only after Hatcher learned he would be forced to testify under oath at trial, in front of a judge and jury, where he could not perform his typical run-and-hide maneuvers. Hatcher was going to be subjected to cross-examination by my defense attorney, Dennis Knizley, and it was going to be proven beyond a shadow of a doubt that Hatcher lied to law enforcement, to the Mobile County DA, and knowingly provided false information to get me indicted. Hatcher, the State's only witness, refused to appear in court on the trial date. The case was ultimately *nol prossed* (dismissed) on September 9, 2024, by Circuit Judge Michael Youngpeter after it was determined the allegations could not be proved at trial.

- Claims that certain defendants acted with malice and without probable cause in furtherance of a scheme to avoid fulfilling obligations under my employment contract and retirement package.

- Allegations regarding the unlawful seizure of personal property during the home search. Among the items taken were two boxes of important documents that could have assisted in our defense against the Bayou La Batre Housing Authority's civil lawsuit and in responding to the criminal allegations. Those allegations ultimately collapsed following investigations by three separate agencies. Although the criminal charges were dismissed on September 9, 2024, many seized items — including the critical documents — have never been returned. The Mobile County Sheriff's Office has stated that some items are "missing," meaning they disappeared while stored in a highly secured evidence room. Every item that was eventually returned was either damaged beyond repair or rendered completely inoperable. This troubling handling of evidence was previously detailed in my article ["Marrying the Wrong Man: How Paul Burch Abused His Badge to Destroy a Decorated Cop's Family."](#)

The full complaint is now a matter of public record. You may read the complete 24-page document, including the cover sheet and e-filing receipt, here:



**Huddleston ( Complaint Filing)**
2.48MB · PDF file

Download

Download

Notably, the filing has generated only a single local news article to date. While previous allegations received sustained and prominent coverage, this formal legal response—supported by court records, timelines, and documented outcomes—has met with virtual silence from the same outlets. Readers are encouraged to review both the complaint and my prior articles to form their own conclusions.

**This lawsuit lays bare a disturbing sequence of events in which public officials and law enforcement weaponized the justice system against private citizens.** After the Mobile County Sheriff's Department, the Mobile County Commission, and the FBI investigated and found no criminal wrongdoing, baseless charges were nevertheless pursued on the strength of perjured testimony from a single witness—a three-time convicted felon—before a grand jury. This was followed by an armed home invasion involving that same felon, the seizure of personal property (including two boxes of critical defense documents), and the unexplained disappearance of evidence from a secured evidence room. Driven by personal hatred for the two of us, Hatcher devised his own scheme and enlisted his politically powerful friends, who knowingly and willfully helped guide and orchestrate the effort to destroy our lives.

One may disagree with the terms of our contracted payout—that is perfectly acceptable. What Hatcher and the others never acknowledged is that any such disagreement should have been resolved through mediation in court, and we were always willing to sit down and mediate the terms of the retirement package. The sale of the Safe Harbor property had nothing to do with our retirement benefits; it was a decision driven by the City of Bayou La Batre, and the property was going to be sold regardless of whether our retirement package existed. Hatcher simply used the retirement package as a convenient pretext and justification to advance his scheme

falsely claiming the property was being sold to fund our retirement when, in reality the sale was inevitable either way. But disagreement does not justify breaking the law violating constitutional rights, or hiding behind badges, guns, and official authority do so. These actions are egregious precisely because they reveal how those entruste with public power can ignore exonerating investigations, enlist convicted felons in raids, manufacture criminal cases, and destroy evidence to settle personal or politic scores. When such power is abused, reputations are ruined, livelihoods are devastat and constitutional rights are trampled—with the media often amplifying the initial false narrative while remaining silent on the truth.

The sobering reality is that what happened to us can happen to any citizen. When accountability is absent, and the system is turned into a weapon, no one is safe from those who wield authority without restraint.

# My Family's Ongoing Ordeal in Alabama's Justice System

VIRGINIA HUDDLESTON · MAR 18



By Virginia Huddleston

Read full story →

## The Real Story of the Safe Harbor Sale Decision and Our Resignations: The $6.25 Million Offer — Not the $4.1 Million Lie Told to the Court

VIRGINIA HUDDLESTON · MAR 29



By Virginia Huddleston

Read full story →

## Why Alabama Criminal Defense Attorneys Are So Expensive: Lessons from My Family's Six-Year Fight in the Justice System

VIRGINIA HUDDLESTON · MAR 18



Virginia Huddleston holds a Bachelor of Science in Business Forensics from Franklin University an Master of Business Administration from Louisiana State University. She is a former certified fraud examiner and served as Executive Director of the Bayou La Batre Housing Authority from May 201 September 2020.

**Read full story** →

---

## Subscribe to Virginia Huddleston

Holds a Bachelor of Science in Business Forensics from Franklin University and a Master of Business Administration from Louisiana State University. She is a former certified fraud examiner.

| Type your email... | Subscribe |
|---|---|

By subscribing, you agree Substack's Terms of Use, and acknowledge its Information Collection Notice and Privacy Policy.

## Discussion about this post

Comments    Restacks



Write a comment…

© 2026 Virginia Huddleston · Privacy · Terms · Collection notice

Substack is the home for great culture